STACY SCHEFF
LAW OFFICE OF STACY SCHEFF
P.O. BOX 40611, TUCSON AZ 85717-0611
Tel: (520) 471-8333
Fax: (520) 300-8033
stacy.scheff@gmail.com
State Bar No. 028364

Attorney for Matthew D. Muller

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mathew D. Muller,<br><br>          Plaintiff,<br><br>     vs.<br><br>United States of America;<br>Robbie L. Rhodes, Warden, Federal<br>Correctional Institution Tucson;<br>Juan Baltazar, Warden, Federal Correctional<br>Complex Tucson; W. Jusino, Associate<br>Warden, U.S. Penitentiary Tucson;<br>Lorri Mitchell, Legal Assistant,<br>U.S. Penitentiary Tucson; Jane/John Does<br>1-25 employees at USP Tucson,<br><br>          Defendants. | CASE NO.: 4:18-cv-00376-RCC-PSOT<br><br>**MEMORANDUM AND POINTS OF<br>AUTHORITIES IN SUPPORT OF<br>PLAINTIFF'S MOTION FOR<br>PRELIMINARY INJUNCTION** |

Plaintiff Matthew Muller, via counsel, hereby requests a preliminary injunction

seeking two things: 1. To order the Federal Bureau of Prisons to allow Mr. Muller to

receive an independent psychiatric examination, to determine his current mental state.  2.

To temporarily block a planned extradition to California to stand trial in the state for the

same crimes for which he is now incarcerated.   Plaintiff brings this motion pursuant to

the provisions of Rules 35 and 65, Fed.R.Civ.P.   The grounds in support of this Motion

are that Plaintiff will suffer immediate and irreparable injury, loss, and damage unless the

threatened action of defendant is enjoined and restrained by this Court.   This Motion is

supported by the attached Memorandum of Points and Authorities.

**Certification of Efforts to Resolve Disputes and Provide Notice That Plaintiff**

**Will Seek TRO**

(Pursuant to Fed. R. Civ. P. 65(b) and LRCiv 7.2(j))

- Exhibit A: Declaration of Matthew Muller in Support of Motion for Temporary Restraining Order and Preliminary Injunction

- Exhibit B: Emails with Defendant Mitchell

- Exhibit C: Record of Correspondence Attempting to Resolve Disputes and Advising of Intent to Seek TRO

Pursuant to Federal Rule of Civil Procedure 65(b), the undersigned certifies that she and Plaintiff have made extensive efforts to resolve this matter informally with Defendants and have duly advised Defendants of this request for preliminary relief. Plaintiff and the undersigned have made over ten contacts with Defendants regarding the requested psychological examination.

The initial requests for the assessment were made on June 25 and 28, 2018.  On June 29, Plaintiff sent Defendant Baltazar, current Warden of USP Tucson, a detailed letter requesting reasons for the refused legal visit and an informal resolution to the matter.  On July 2, 2018, Plaintiff discussed the matter in person with Associate Warden Jusino and also sent a detailed letter repeating requests made to Warden Baltazar.   On July 3, Plaintiff spoke with Ms. Jusino again to confirm that officials would not change their position or give more information about their refusal to allow a psychological examination.  On July 6, Plaintiff sent another letter to Ms. Jusino and the USP Tucson

legal department, emphasizing his desire to avoid litigation and asking what reasons Defendants had to refuse what should be a routine legal visit.   On July 9, Plaintiff sent a final letter requesting informal resolution and advising Defendants he would seek a temporary restraining order and legal fees should they force him to file this action.

On or about July 11, 2018, Plaintiff filed a formal request for administrative remedy direct to the USP Tucson Warden.   He requested expedited processing in view of the matters time sensitivity.   No response has been received, other than to advise the undersigned that her paralegal may not visit the prison unaccompanied in order to obtain Plaintiff's signature on documents needed for this filing.

Various other informal contacts have been made by the undersigned and her staff. Attached as Exhibit C are records of messages and letters sent to Defendants.

## MEMORANDUM OF POINTS AND AUTHORITIES

### <u>INTRODUCTION</u>

This is an action seeking narrow injunctive and declaratory relief under the Court's federal question jurisdiciton.   The Plaintiff, Matthew Muller, is a federal inmate at U.S. Penitentiary ("USP") Tucson, where the Defendants are employed.   Mr. Muller requests only that the Defendants be required to follow the Constitution and their own policies, and that a forensic expert and the undersigned's paralegal be allowed to access him for legal visits.   In the interim, Mr. Muller seeks preliminary relief to maintain the status quo and preserve transient evidence.   He asks that Defendants not be allowed to wrongfully "fast-track" his transfer away from USP Tucson--an action that would place Plaintiff's life

in danger and allow Defendants to benefit from their abuse of Mr. Muller.

### STATEMENT OF FACTS AND OF THE CASE

Mr. Muller is a Marine Corps veteran, a former attorney and a past faculty member at Harvard Law School. His legal career focused on public interest law and access to justice, before psychiatric illness forced him to retire his law license and ultimately led to his incarceration. First Am. Compl. ¶¶ 15, 18 (Verified Complaint). Upon arriving at USP Tucson, Mr. Muller was almost immediately threatened by prison officials. He was warned that they knew he had been a lawyer and told not to help inmates with any legal work. *Id.* at para. 16. Mr. Muller was initially dissuaded. But he eventually decided he had a moral responsibility to help inmates he believed were wrongly convicted. *Id.* at ¶¶ 17-20.

Plaintiff's work branched until he was helping dozens of inmates, though never with cases against the prison for fear of the threats he had received. *Id.* at ¶¶ 21-25. Nevertheless, prison officials retaliated against Mr. Muller for his pro bono activities, lodging false disciplinary charges against him. *Id.* at ¶¶ 26-28; Pl.'s Decl. para. 3 (Ex. A). They threw him in "the hole," instigated inmates to rape and beat him, and then nearly killed Mr. Muller by failing to treat his resulting mental health crisis. Pl.'s Decl. paras 5-10; First Am. Compl. ¶¶ 29-58, 63-69.

Now the Defendants are blocking a routine legal visit by a forensic psychologist retained to assess Mr. Muller and report on his mental health. Pl.'s Decl. ¶¶ 17, 19-20; First Am. Compl. 73-78. Defendants also deprived Mr. Muller of his rights under the Interstate Agreement on Detainers, essentially tricking him out of exercising his option to

contest the transfer to a requesting agency.  First Am. Compl. ¶¶ 82-83.  This fast-tracking of Plaintiff's transfer is likely in retaliation for his protected activities and to prevent him from effectively seeking relief for the abuses he suffered.  *Id.*

The expert report is needed for reasons predating the attacks on Plaintiff.  It is not intended for use in suing the Defendants.   However, it will necessarily touch on Mr. Muller's recent ordeal and its psychological aftermath.  That ordeal is also discussed in this action, but the only claims made here relate to Defendants' interference with Mr. Muller's access to counsel.  Compl. ¶¶ 86-96.  Plaintiff seeks nothing more than an order directing Defendants to allow legal visits by the undersigned's forensic expert and paralegal.

To avoid irreparable injury, Plaintiff requests a preliminary order allowing the forensic psychologist, Dr. George Goldman, to conduct an initial exam of Mr. Muller to preserve transient evidence.  It is crucial that Dr. Goldman assess Mr. Muller as soon as possible--while symptoms are present and objective neuropsychological tests can document his condition.  In addition, the expert report is urgently needed to meet a filing deadline in Plaintiff's motion for postconviction relief.  Pl.'s Decl. ¶¶ 15-17.  It is further required to prove the medical necessity of delaying an imminent transfer of Mr. Muller until after his psychiatric condition has stabilized.  *Id.* at ¶¶ 11, 14.  Plaintiff requests that this transfer be enjoined at least until the expert report can be completed.

Defendants' efforts to delay Dr. Goldman's visit are akin to stalling a medical exam until after a prisoner's wounds from unlawful beatings have healed.   They are trying to cover up evidence, pure and simple.  Prison officials should not be allowed to

stack that wrong on top of the others they have inflicted upon Mr. Muller.   The Court

should order Defendants to allow Dr. Goldman's exam without further delay.

## **ARGUMENT**
### I**. Plaintiff is Entitled to a Temporary Restraining Order Because His Claims Will Likely Succeed on the Merits and Irreparable Harm is Near-Certain Absent Preliminary Relief**

Within the Ninth Circuit, the standard for issuing a temporary restraining order is

substantially the same as that for granting preliminary injunctions.  *Stuhlburg Int'l Sales*

*Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).   Plaintiffs seeking a

preliminary injunction generally must show that (1) their claims are likely to succeed on

the merits; (2) they will likely suffer irreparable harm without an injunction; (3) the

balance of equities tips in their favor; and (4) the public interest favors an injunction.

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *American*

*Trucking Associations Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

The Ninth Circuit allows the above factors to be weighed using a sliding scale

approach, whereby a strong showing in one factor may counterbalance a weaker showing

in another.  *E.g. Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.

2010); *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) ("plaintiffs must show

either (1) a likelihood of success on the merits and the possibility of irreparable injury, or

(2) the existence of serious questions going to the merits and balance of hardships tipping

in their favor").

Even without the benefit of this flexible approach, all four Winter factors weigh in

favor of the requested temporary restraining order, and relief should be granted.

**A. Without a TRO, Plaintiff Will Suffer Irreparable Harm in Multiple Legal Proceedings and Could Be Placed at High Risk of Suicide**

As set forth in the complaint, it is key that Dr. Goldman assess the Plaintiff as soon as possible, and Defendants have already succeeded in delaying the exam for five weeks. Compl. ¶¶ 73-78.   The symptoms Dr. Goldman seeks to document are by their nature transient.   See generally *H.S. Akiskal, Mood disorders: Clinical features*, *in* Kaplan & Sadock's COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 1693 (B.J. Sadock et al. ed., 9th ed. 2009. "*Patients suffering from serious depression typically exhibit marked cognitive impairments that correlate with other depressive symptoms and are measurable through objective tests*."   Muriel D. Lezak et al., NEUROPSYCHOLOGICAL ASSESSMENT 329-30 (4th ed. 2004).   "*Several of these tests are designed to detect malingering by patients trying to simulate psychopathology*."  *Id.* at 760-61, 768 (noting the Weschler Intelligence Scales and Bender-Gestalt tests as examples).

These objective tests could provide strong validation of Plaintiff's history of depressive illness and will prove his symptoms are in no way faked or exaggerated. Plaintiff's depressive symptoms are currently improving and at some point will no longer be corroborable by these tests.  Pl.'s Decl. ¶¶ 12, 17.   Further passage of time will also make it more difficult for Plaintiff to prove a causal link between restrictive conditions of confinement and his severe depression.  See *Id.* at ¶. 18; cf. *Jones v. Ryan*, 583 F.3d 626, 635 (9th Cir. 2009) (noting expert's testimony that passage of time between conduct at issue and mental exam diminished the relevance of the exam findings).

7

Plaintiff also faces an imminent filing deadline of August 6, 2018, in his motion under 28 U.S.C. § 2255. See *United States v. Muller*, No. 2:15-cr-00205-TLN-EFB (E.D. Cal.), Doc. 65 at p. 9 (order setting deadline for objections to magistrate's partial dismissal of motion). Plaintiff's mental health is a key issue in that motion and his claims will be substantiated by Dr. Goldman's report. See Pl.'s Decl. ¶¶ 15-18. In particular, Mr. Muller is claiming his attorney provided ineffective assistance of counsel by failing to timely arrange a mental health exam, and Dr. Goldman's opinion is needed to establish this failure prejudiced the defense. See, e.g., *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017) (failure to obtain a mental health exam can be grounds for postconviction relief). Plaintiff is requesting a filing extension but must in any event submit an expert report as soon as possible to avoid further prejudice to his § 2255 motion.

Further, Plaintiff will ultimately need to show that Defendants' interference with his access to counsel "frustrated... or impeded" a non-frivolous claim. *Lewis v. Casey*, 518 U.S. 343 351-53 (1996); *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (applying *Lewis* "actual injury" requirement to interference cases). If Defendants are allowed to continue stalling the expert exam until Mr. Muller's condition improves further, then objective tests of present symptoms may not corroborate his depression. This, in turn, will make it difficult to demonstrate that any objective evidence of depression ever existed at all, and that he suffered actual injury from Defendants' blocking an exam while his symptoms were at their worst.

Plaintiff has recently suffered a near-suicide and is in poor psychiatric health. Ex. A at 12. His temporary transfer away from USP Tucson is currently pending, and he

needs the psychological report to demonstrate the medical necessity of a delay in the transfer to allow for recovery. *Id.* at 12-13.   Without such a delay, Plaintiff's mental health is likely to again decline and he will be at heightened risk of suicide.  *Id.*; see also *Darring v. Kincheloe*, 783 F.2d 874, 876-77 (9th Cir. 1986) (noting that a prisoner's request for injunctive relief will become moot if he is transferred).

Finally, as set forth in the next section, Plaintiff will succeed in showing ongoing violations of his constitutional right of access to counsel.   As a matter of law, the continuing deprivation of constitutional rights amounts to irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *American Trucking Associations*, 559 F.3d at 1058-59.

**B. Plaintiff Will Succeed in Showing Defendants Have Interfered With His Access to Counsel**

1. The Right of Access to the Courts and to Counsel Are Among the Most Well-Established of Prisoners' Rights

The Supreme Court has pronounced that "[i]t is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *accord Silva v. Di Vittorio*, 658 F.3d 1090, 1101-02 (9th Cir. 2011) ("[u]nder the FIrst Amendment, a prisoner has both a right to meaningful access to the courts and a broader right to petition the government for a redress of his grievances)".

It is just as axiomatic that a prisoner's right to access legal services is an indispensable corollary of the right of access to the courts.   See, e.g., *Hatfield v. Bailleaux*, 290 F.2d 632, 637 (9th Cir. 1961) (access to courts necessarily includes access

to lawyers).  For this reason, prison "[r]egulations and practices that unjustifiably obstruct the availability of professional legal representation or other aspects of the right of access to the courts are inval*Id.*"  *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled in part on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989).

### 2. Defendants' Interference with Dr. Goldman's Legal Visit is Interference With Plaintiff's Access to Counsel

Defendants have repeatedly interfered or attempted to interfere with Plaintiff's access to the undersigned.   Pl.'s Decl. ¶¶. 9; Compl. ¶¶. 59-60 (noting problems with attorney visits and legal mail).   Blocking the forensic mental health exam is only their most recent gambit.  Defendants' demand for a court order allowing Dr. Goldman's visit is an improvised impediment aimed specifically at Mr. Muller.  However, even if it were a standard BOP rule, it would be a void one.  *Procunier*, 416 U.S. at 419.  It is also a rather stale ploy that courts first saw through decades ago.  See *Straub v. Monge*, 815 F.2d 1467, 1470 (11th Cir.), *cert. denied* 484 U.S. 946 (1987) (striking down a prison rule requiring inmates to obtain a court order to use the law library for anything besides criminal appeals).  Defendants are no more likely than past officials to fool a judge with this obstructionist device.

Meaningful access to counsel necessarily includes access to forensic experts retained by counsel, who are frequently integral to a case.  See generally, *e.g., Richter v. Hickman*, 578 F.3d 944 (9th Cir. 2009).  Indeed, BOP regulations themselves recognize not only inmates' right of access to lawyers, 28 C.F.R. § 543.13, but also their right of

access to professionals working with lawyers—even law students.  28 C.F.R. §§ 543.15-543.16.  The BOP "accords such assistants the same status as attorneys with respect to visiting and correspondence."  28 C.F.R. § 543.16(a).  Defendants' restrictions on legal visits are therefore contrary not just to the Constitution, but to the BOP's own regulations--making them a multipronged violation of the Administrative Procedures Act. See 5 U.S.C. § 706.

Defendants also failed to follow prescribed procedures for restricting legal visits. See Federal Bureau of Prisons, Program Statement 1315.07: Legal Activities, Inmate (Nov. 5, 1999) (requiring consultation with Regional Counsel prior to any restriction on legal visits).  And they failed to state any rationale for their decision to bar legal visits by a forensic psychologist acting as an expert witness and not a care provider.   See *Arrington v. Daniels*, 516 F.3d 1106, 1114 (9th Cir. 2008) (failure to state rationale for decision rendered BOP action arbitrary and capricious in violation of the APA).  Given these myriad violations, Mr. Muller's claims that the BOP interfered with his access to counsel are likely to succeed on their merits.

**C. The Equities Tip Sharply Toward Plaintiff, Who Stands to Lose Everything, and Away from Defendants, Who Lose Nothing If A TRO Is Granted**

Absent immediate relief, the harm to Plaintiff will mount as it becomes less and less possible for a forensic expert to detect and document his present symptoms. Defendants will have succeeded in depriving him of the best evidence for overturning a 40-year prison sentence.  They will also have left him without strong medical evidence of the need to delay his imminent transfer.  This exposes Mr. Muller to a heightened risk of

being overwhelmed by psychiatric illness and committing suicide.

The Defendants, by contrast, lose nothing to which they are otherwise entitled. They have put forth no justification for their forensic expert blockade.   They have not acted pursuant to any standing policy.   Indeed, all BOP policies appear to point the other direction.   The balance of the equities therefore tips entirely toward the Plaintiff and a grant of preliminary relief.  See, *e.g., Benda v. Grand Lodge*, 584 F.2d 308, 315 (9th Cir. 1978) ("[i]f the balance of harm tips decidedly toward the plaintiff" and at least some showing is made on the remaining factors, relief may be granted)

Indeed, Defendants have stated that they will readily comply if a court orders Dr. Goldman's assessment to proceed.   See Exhibit B (including correspondence in which Defendant Mitchell states the prison will allow an exam with a court order).

**D. The Public Interest Always Favors Protection of Constitutional Rights**

Finally, the public interest will be served by a grant of preliminary relief.  It is by now axiomatic that it is in the public interest for government officials such as the Defendants to obey the Constitution and other laws.   E.g. *Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir. 2001) (observing that it is in the public interest to uphold prisoners' constitutional rights); *City of Los Angeles v. Lyons*, 461 U.S. 95, 136 (1983) (noting that in cases involving government actors, courts "have much greater latitude in granting injunctive relief in furtherance of the public interest... than when only private interests are involved") (internal quotations omitted); *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) ("it is always in the public interest to protect constitutional rights").   The

public interest is even more strongly implicated where—as here—the Constitutional rights at issue involve access to the courts, and hence the ability to vindicate all other protected rights.

## II. THE REQUESTED PRELIMINARY RELIEF IS CONSONANT WITH RULE 65 AND THE PRISON LITIGATION REFORM ACT

A TRO under the terms Plaintiff has requested is properly tailored under the Prison Litigation Reform Act and addresses only the harm caused to Mr. Muller.  See *Lewis v. Casey*, 518 U.S. 343 (1996); *Gomez v. Vernon*, 255 F.3d 1118, 1130-31 (9th Cir. 2001). District Courts elsewhere in the Ninth Circuit have granted similar preliminary relief safeguarding prisoners' access to counsel.  E.g. *Johnson v. Sullivan*, No. 1:06-cv-01089-ALA, 2008 U.S. Dist. LEXIS 105935, 2008 WL 5396614, *7 (E.D. Cal., Dec. 23, 2008) (ordering multiple measures to stem a prison's interference with access).

### A. Plaintiff Has Made Extensive Efforts to Reach Informal Resolution, and Has Notified Defendants of the Filing of This Motion

Mr. Muller and the undersigned have diligently attempted to reach an out-of-court resolution with USP Tucson officials.  As set forth in the Verified Complaint, these efforts have included in-person conferences, e-mail communications and six detailed letters citing constitutional and BOP authority.  Replying to an initial contact, Defendants stated that inmates were not allowed visits for treatment by outside physicians.   Plaintiff immediately clarified that Dr. Goldman's visit was legal in nature, that he was adjunct to Plaintiff's attorney, and that the visit was not for medical or mental health care.

Defendants declined to further explain their reasons for refusing the legal visit.   They stated only that they would require a court order.   These efforts have continued for over a month--beginning from June 25, 2018--and included notice two weeks ago that Plaintiff would seek a TRO.

Plaintiff filed a formal administrative remedy request three weeks ago, although for reasons described below this was not required.   There has been no reply and Defendants have not relented.   The Court may now act to prevent further irreparable injury to Plaintiff.

**B. No Administrative Remedy is "Available" Within the Meaning of the Prison Litigation Reform Act**

The Supreme Court has held that the text of the Prison Litigation Reform Act ("PRLA") requires an inmate to exhaust only those grievance procedures that are meaningfully "available" to a prisoner to address the grieved matter.  *Ross v. Blake*, 136 S.Ct. 1850, 1859 (2016) (citing 42 U.S.C. S 1997e(a)).   The Court noted that "the ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose.'"  *Id.* at 1858 (quoting and citing various dictionary definitions).

In this case, the BOP remedy program offers no relief that addresses the time-sensitivity of the forensic psychological examination.   It would take up to six months to completely exhaust purported remedies.   See 28 C.F.R. § 542.14 et seq. (providing timelines for initial remedy requests and appeals).   Given the transient nature of depressive episodes in individuals suffering from bipolar disorder, the symptoms prompting the need or justification for a forensic examination would likely be gone by

the time a final administrative appeal was decided.  The purported remedy would be akin to a nine-month appeal process for a female prisoner denied a prenatal medical intervention.   Such a remedy is not "available" within the meaning of 42 U.S.C. § 1997e(a), because it is not capable of use to redress the complained-of matter. Accordingly, the PLRA exhaustion requirement is no bar to the Court granting either temporary or ultimate relief in this matter.

**C. Even if an Administrative Remedy Were Available, the "Irreparable Harm" Exception Would Apply**

As set forth elsewhere in this motion, Plaintiff would suffer irreparable harm if the forensic examination is further delayed.   In enacting the PLRA, Congress intended to incorporate well-established administrative law exceptions to the exhaustion requirement. S e e *Ross*, 136 S.Ct. at 1863 (Breyer, J., concurring) ("Congress intended the term 'exhausted' to mean what the term means in administrative law, to include administrative law's well-established exceptions to exhaustion") (internal quotations and citations omitted).  These well-established exceptions encompass situations in which an individual would suffer irreparable harm if required to fully exhaust remedies.   Such is the case here.

**D. The PLRA Did Not Abrogate Court's Authority to Grant Temporary Relief Pursuant to Rule 65**

Courts retain their traditional equitable discretion to grant temporary relief pending exhaustion of administrative remedies. *Jackson v. District of Columbia*, 254 f.3d 262, 267-68 (D.C. Cir. 2001).   The Supreme Court has held that since the text of the PLRA contained no provision barring preliminary injunctions pending exhaustion,

Congress did not overturn the usual practices of litigation allowing such relief.  See *Jones v. Bock*, 549 U.S. 199, 214-17, 220-22 (2007) (referring specifically to practices allowed under the Federal Rules of Civil Procedure).  Accordingly, the Court may, pursuant to its authority under Rule 65, issue a TRO allowing the forensic examination to proceed.

### III. PLAINTIFF SHOULD NOT BE REQUIRED TO POST SECURITY BECAUSE DEFENDANTS WILL SUFFER NO DAMAGES

Typically, litigants obtaining a temporary restraining order are asked to post security against any damages their opponents may sustain.  Fed. R. Civ. P. 65(c).  However, the individual Defendants in this case—U.S. government employees sued in their official capacities--will suffer no damages if the requested interim relief is granted.  In addition, Plaintiff suffers from a life-threatening illness, the severity of which could be exacerbated if relief is not granted.   See, e.g., *Elliot v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996) (noting that district courts have discretion to waive the Rule 65(c) bond requirement where "the balance of the equities weights overwhelmingly in favor of the party seeking the injunction").

District courts have wide discretion in fashioning the amount of any bond to be posted, and "the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).  Such is the case in this action.  No posting of security should be required.

## **CONCLUSION**

For all the foregoing reasons, Plaintiff's motion should be granted and a temporary restraining order issued.

Dated:  August 7, 2018

By:

STACY SCHEFF
Attorney for Plaintiff
Matthew Muller

17

# EXHIBIT A

1   STACY SCHEFF
    LAW OFFICE OF STACY SCHEFF
    P.O. BOX 40611, TUCSON AZ 85717-0611
    Tel: (520) 471-8333
2   Fax: (520) 300-8033
    stacy.scheff@gmail.com
3   State Bar No. 028364

4   Attorney for Matthew Muller

5                **IN THE UNITED STATES DISTRICT COURT**

6                   **FOR THE DISTRICT OF ARIZONA**

7

8   Mathew D. Muller,

9            Plaintiff,                        CASE NO.: 4:18-cv-00376-RCC-PSOT

10           vs.

11  United States of America;
    Robbie L. Rhodes, Warden, Federal
12  Correctional Institution Tucson;
    Juan Baltazar, Warden, Federal Correctional    **DECLARATION**
13  Complex Tucson; W. Jusino, Associate
    Warden, U.S. Penitentiary Tucson;
14  Lorri Mitchell, Legal Assistant,
    U.S. Penitentiary Tucson; Jane/John Does
15  1-25 employees at USP Tucson,

16           Defendants.

17

18

19  **DECLARATION OF MATTHEW MULLER IN SUPPORT OF MOTION
       FOR PRELIMINARY INJUNCTION AND TEMPORARY
20                  RESTRAINING ORDER**

21

22  I, Matthew Muller, declare under penalty of perjury:

23

24  1. I am the plaintiff in this case.  I make this declaration in support of my

25  motion for a preliminary injunction and temporary restraining order ("TRO").

26

27

28

2. I have read the averments made in the complaint and verify under penalty of perjury that they are true.  I adopt those facts as part of this supporting declaration.

3. As stated in the Verified Complaint, I was subjected to segregated confinement because I was giving legal help to another inmate I believe was wrongfully convicted.  At least seven officials at U.S. Penitentiary Tucson--ranging from correctional officers to senior prison management--have told me explicitly that I should stop helping inmates with their legal matters.  Some officials were threatening, and some were just trying to help me avoid trouble from other officials.  But they all were clear that I would be retaliated against if I did not stop helping inmates.

4. Based on these contacts and on my observations of what has happened to other inmates who give legal help, there is an unwritten policy at USP Tucson of punishing inmates who offer legal assistance to others.  This custom applies whether or not an inmate accepts money for his services (I did not), and whether or not an inmate limits his assistance to legal matters not involving prison staff (I did so limit myself).

5. On about April 30, 2018, I was confronted by Lieutenant Schied in the Special Housing Unit ("SHU") where I was detained.  He told me that if I did not like the difficult conditions in the SHU, then I should stop helping inmates with their legal work.  When I stated that I would continue to help any inmate I believed to be innocent, Schied yelled at me, threatened me with false disciplinary and criminal charges, and forced me into a cell with a dangerous inmate he either knew would harm me or bribed to harm me.

6. On about May 2, 2018, I was raped by that inmate.  Even after that, I still could not get moved out of the cell--until on May 4 he assaulted me again and I was moved.

7. I was then put into a cell with a different, almost equally volatile inmate. He attacked me, leaving me with multiple bleeding lacerations to my face and various contusions and swelling.

8. The physical impacts of these attacks were not pleasant.  But they were nothing compared to the mental agony I endured from the combined effect of the attacks, the degrading conditions of confinement, and the refusal of proper treatment for my long-time psychiatric illness.  Things got so bad that my parents hired an attorney, Stacy Scheff, just to help me get treatment and

survive the SHU.  They are both retired public school teachers who have two

other adult children unable to work because of psychiatric illness.  So, it is a

big expense for my family.

9. Even with an attorney, I could not get the help I needed.  At first, prison

officials blocked me from even seeing Stacy.  Then they kept me from calling

her.  One of the three letters I sent to her via confidential legal mail--the

most important letter--never arrived.  It was hard for me to do much of

anything while I was that depressed, so the different obstacles the prison

threw up were successful in keeping her from helping me much.

10. After begging for psychiatric treatment again and again, I finally gave up

and could no longer endure the mental suffering.  I made plans to kill myself.

And I am quite sure I would have, if my cellmate Cody Jackson had not

become suspicious.  He opened up some sealed envelopes while I was away

from the cell, read suicide notes I had written and figured out my plans to kill

myself.  Cody contacted my lawyer Stacy, and together with her and some

other inmates managed to get another Bureau psychologist to have me

released from the SHU so that I could begin to recover.

11. In part because of my detention in the SHU, I am currently dealing with an extradition request from Solano County, California.  I had been in the middle of negotiating a resolution to those charges when I was sent to the SHU in April.  I asked SHU officials again and again to allow me to contact my attorney for that process, but it was weeks before that was allowed.  As a result, negotiations broke down and Solano County continued with their extradition request.

12. Right now, as a result of everything that happened in the SHU, I am in poor mental health.  I have recovered a good bit in the month since my release.  But I am far from being ready to deal with the stress of transferring to a new institution and facing a new case.

13. Based on my health history, I think there is a high likelihood that the stress of that process would cause me to relapse into a serious depressive episode with high suicidality.  The transfer will never be easy.  But a few more months to recover could well be the difference between a difficult process and a lethal one.

14. I have tried requesting a delay in my extradition for mental health reasons.  But I need to prove that it is really needed.  So Stacy arranged for a

psychological examination that would help me prove the need and also serve at least two other purposes.

15. First, I had a pending § 2255 motion that I wanted to support with a mental health examination.  I was in solitary confinement for nearly two years during my federal criminal proceedings.  Much like what happened in the SHU here, I became severely depressed.  I pleaded guilty not because I was guilty, but because I did not care what happened to me.  I did not contest any of the untrue things people were saying about me.  My depression made me think I was worthless and so deserved to have bad things happen to me and said about me.  I was planning to commit suicide anyhow, so it didn't matter to me whether I was free or imprisoned for life.  It seemed easiest and cheapest for my family for me to just plead guilty.  So that is what I did.

16. The one silver lining about how bad my depression got in the SHU was that it was very similar to the way things happened in jail during my trial. So I wanted an expert to examine me while I was in that state of depression, and then testify and report on whether he thought I would be competent to plead guilty under those circumstances.  The expert could use tests and analyses to prove how depressed I was.  From what I understand, there are

certain cognitive impairments consistent with depression that could be measured.  But only if the expert assessed me while I was depressed.

17. If the prison had not blocked my legal visit like they did, I would have had a chance to have my mental health  and cognition assessed under circumstances very relevant to my § 2255 claims.  I am still suffering from depression now, I believe, even if it is not as bad as a month ago.  It is horrible being depressed, so I am doing everything I can to recover.  At the same time, I still want to be assessed while I am measurably depressed.  So I need a psychological examination as soon as possible.

18. Even more important than my own case, I hope to prove how restrictive confinement often causes depression or makes it much worse.  And how severe depression, in turn, causes people to plead guilty when they are not.  I thought that what happened in my case was very rare.  But I have already interviewed two inmates at USP Tucson who experienced the same.  They both committed a lesser offense they were accused of--one very minor--but ended up pleading guilty to major crimes because depression left them without the will to fight or to care what happened to them.

19. Since I have such a well-documented history of suicidal depression, and because I was in very poor mental health following confinement in the SHU, I

7

figured I could make the best of a bad situation.  I wanted to get an

assessment right away to show how someone in my condition has no business

making decisions that affect their lives and the lives of their families.


20.  Of course, a mental health examination would also prove how much I

suffered as a result of things that happened in the SHU.  That is not why I

wanted the exam, but it is probably a reason why prison officials are trying to

block it.  But suing the Bureau of Prisons for damages is one of the last

things on my mind right now.  I am just trying to get healthy and survive the

next few months.  I only want to be left alone for a while, so I can get better.


21. Once that happens, I do plan to continue helping inmates with their

cases--especially their § 2255 motions.  I think any jurist would be as shocked

as I was to learn how many cases there are of probable innocence among

inmates here.  Just one such case in the entire prison would be too many.

But there are certainly more.  I taught classes at Harvard on credibility

assessment and screened hundreds of prospective clients in a fairly high-

fraud area of law (asylum claims).  I am not naive about people making up

stories to get what they want.  These are real cases of innocent people with

long prison sentences.

22. What I *have* been naive about is trusting to good faith and the integrity of prison officials.  I thought that if I was respectful and judicious about who I helped and how, I would be left alone to do my work.  Who could take issue with helping the innocent go free?  Apparently, it is not that simple.

23.  Most Bureau employees do their jobs and try to be fair with inmates. But some officials are not so benign.  They think inmates deserve whatever sort of treatment they see fit to mete out.  These officials are seldom held to account when that treatment amounts to abuse.  Fellow officers are reluctant to break the code of silence, so they stand aside.  And courts are perennially skeptical of prisoners' inexpert claims.  Many judges are quick to credit officious explanations of how harsh measures are necessary, or how convicts always lie and manipulate.  So abuse-prone employees--many of whom would serve well in a culture of accountability--are allowed to run amock and corrode prison life for inmates and officers alike.

24.  I do not have the answer to these problems.  But I at least know it is critical that prison officials be restrained from blocking the courthouse doors, or from barring the prison doors against attorneys seeking to access their clients.  That is exactly what the Defendants are doing to me.  I at least am lucky enough to have a wife and family who can help me overcome the

barriers, and legal skills when I am well enough to use them.  Most inmates are not so lucky.

25.  I respectfully ask that the Court hold the Defendants accountable for intentionally obstructing inmates' access to justice under false pretenses of maintaining security and order.

I, Matthew Muller, declare under penalty of perjury that the foregoing is true and correct.  Done this thirtieth day of July, 2018, in Tucson, Arizona.

Signed: /s/ Matthew Muller
               Matthew Muller

10

EXHIBIT B

                                    **William Fuller <wfuller@mail.pima.edu>**

---

# Matthew Muller # 728755-097

5 messages

---

**William Fuller** <wfuller@mail.pima.edu>                    Mon, Jun 25, 2018 at 12:58 PM
To: Lorri Mitchell <l1mitchell@bop.gov>, TCN/Exec Assistant~ <TCN/ExecAssistant~@bop.gov>

Hello,

I am trying to schedule an independent psychological examination for
Mr. Muller, I wrote Mr. Bacon last week who said he would look into
it.  and I have gotten no further response.  Mr. Muller is not doing
well, and needs to be seen by a doctor who will give an accurate
assessment of his condition.  His father visited yesterday, and tells
me that Mr. Muller is very close to crisis.

In the conversations we've had with Mr. Muller it appears that the
mental health care he's receiving in the SHU is substandard to the
point of indifference.

We have a respected Psychologist, Dr. George Goldman, willing to
examine Mr. Muller as soon as tomorrow, Dr. Goldman is even willing to
meet with Mr. Muller inside your facility.  We just need a response
from someone.

Thank you,

Bill Fuller
Paralegal

---

**Lorri Mitchell** <l1mitchell@bop.gov>                    Mon, Jun 25, 2018 at 1:10 PM
To: William Fuller <wfuller@mail.pima.edu>
Cc: Marlan Bacon <MBacon@bop.gov>, TCN/ExecAssistant~@bop.gov

Mr. Fuller,
Program Statement 6031.04, Patient Care only contemplates an examination by a personal physician, not an
independent mental health evaluation as being requested.  Absent this being at the request/order of a court of
competent jurisdiction we cannot accommodate this request.
Additionally, I have forwarded your concerns of inmate Muller's mental health to Psychology.
Thank you,

*Lorri Mitchell*
*Legal Assistant*
*Federal Bureau of Prisons*
*Federal Correctional Complex Tucson*
9300 South Wilmot Road
Tucson, AZ 85756
(520) 663-5000

SENSITIVE/PRIVILEGED COMMUNICATION
The information contained in this electronic message and any and all accompanying documents constitutes sensitive
information.  This information is the property of the U.S. Department of Justice.  If you are not the intended recipient
of this information, any disclosures, copying, distribution, or the taking of any action in reliance on this information is
strictly prohibited.  If you received this message in error, please notify us immediately to make arrangements for its
return to us.

&gt;&gt;&gt; William Fuller &lt;wfuller@mail.pima.edu&gt; 6/25/2018 12:58 PM &gt;&gt;&gt;
[Quoted text hidden]

---

**William Fuller** &lt;wfuller@mail.pima.edu&gt;        Mon, Jun 25, 2018 at 1:22 PM
To: Lorri Mitchell &lt;l1mitchell@bop.gov&gt;

"In some cases, it is appropriate to assign an inmate to multiple
clinics if this allows better tracking for follow-up by outside
specialists, e.g. psychiatrists and infectious disease consultants"

The policy statement does contemplate the need for outside mental
health providers.  Can we do this without the courts?
[Quoted text hidden]

---

**William Fuller** &lt;wfuller@mail.pima.edu&gt;        Sun, Jul 8, 2018 at 3:46 PM
To: Stacy Scheff &lt;stacy.scheff@gmail.com&gt;

[Quoted text hidden]

---

**William Fuller** &lt;wfuller@mail.pima.edu&gt;        Tue, Aug 7, 2018 at 2:49 PM
To: Stacy Scheff &lt;stacy.scheff@gmail.com&gt;


---------- Forwarded message ----------
From: **William Fuller** &lt;wfuller@mail.pima.edu&gt;
[Quoted text hidden]

EXHIBIT C

TRULINCS 72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

--------------------------------------------------------------------------------

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 06/29/2018 01:19:16 PM

To: Warden Baltizar
Inmate Work Assignment: A-2 Unit Orderly

Dear Warden Baltizar,

I am writing to request that my extradition to Solano County be delayed for health reasons until at least October 1, 2018. I would also like you to please reverse the decision of your staff blocking my expert witness from visiting to examine me.

As you may know, Solano County, California, has requested temporary custody of me under the Interstate Agreement on Detainers (IAD). On about June 21, I exercised my right under IAD Article IV(a) to have at least 30 days in which to oppose transfer.

I am actually eager to meet the Solano charges. But I was just released from the SHU here, where some rather extreme things happened and left me in a poor state of mental health. That ordeal would have affected anybody. The fact that I'm a care level 3 inmate suffering from bipolar illness made it much worse. I need to recover before I can reasonably face new charges and a new institution.

So I am requesting at least three months to regain my health. This is only about 60 days past the earliest date on which Solano County could otherwise take custody. I have hired a local forensic psychiatrist, Dr. Goldman, to examine me and document the medical necessity of this brief delay. He will also submit a time-sensitive expert report in my 28 U.S.C. sec. 2255 motion, in which I face a past-due filing deadline.

For some reason, your staff is blocking my expert witness from conducting his examination. Just to clarify: Dr. Goldman is not visiting to provide medical treatment. He is visiting for legal purposes, as the agent of my local attorney Stacey Scheff and my Sacramento-based attorney Richard Dudek. Ms. Scheff is being forced to obtain a court order directing the prison to allow the examination. It really is well-settled law that access under these circumstances is a matter of right, not of the prison's discretion. The likely result of your staff's opposition is that the Bureau will be liable to me for the cost of obtaining the court order and for damages resulting from the delay in access. Please consider allowing the exam without a court order.

Please also note that it may be against the interests and wishes of the Sacramento U.S. Attorney's Office to transfer me to Solano at this time. They are responsible for opposing my section 2255 motion. Issues affecting that motion may be litigated in Solano County in a way that binds the U.S. Attorney as well. That office may wish to have the first opportunity to litigate those issues. I am not sure whether they apply to IAD transfers, but regulations do provide that "[i]f the inmate... has federal civil proceedings pending, staff must clear the transfer through the U.S. attorney" (2255 motions are considered civil proceedings). 28 C.F.R. sec 527.31(e). They also state that extradition decisions must ensure that "the safety or other interests of the inmate... are not seriously jeopardized, and that federal interests... will not be interefered with, or harmed." 28 C.F.R. sec. 527.31(b). DOJ regulations specify that "[a]uthorization may not be given where substantial concer exists over any of these considerations." Id.

Thank you, sir, for considering that matter. I feel that litigation is always a last resort, but I will do what is needed to protect my health and interests. Hopefully the matter can be resolved amicably without unnecessary expenditure of goverment resources.

Respectfully,
Matthew Muller

INCS  72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

-------------------------------------------------------------------------------------

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 07/02/2018 11:39:22 AM

To: AW Jusina / Legal Department
Inmate Work Assignment: A-2 Unit Orderly

Dear Associate Warden Jusina,

Thank you for taking the time to speak with me at lunch today. I'm writing to follow up on my attorney's request that a psychiatric expert be allowed to visit me on Tuesday, June 26, 2018, to conduct a forensic examination. The expert's report is needed to support my pending section 2255 motion. I also need to document the medical necessity of a short delay in my extradition to Solano County, California.

As we discussed, the legal department denied my attorney Stacy Scheff's request. Perhaps there was some confusion. Dr. Coleman's visit is not for purposes of medical treatment. He is acting as an expert witness and is the agent of my attorney. As you can confirm with your legal staff, it is very well-established law that attorneys and their bona fide agents have a right of access to their incarcerated clients. Ms. Scheff was chagrined at the denial and wanted to file immediately for an injunction in federal court. I asked her to please wait one week--until Thursday, July 5--so that I could clear up any confusion and resolve the matter informally. If she is forced to file, she will request costs, fees and damages from the Bureau, since this should be a very standard and uncontroversial legal visit.

I would greatly appreciate it if you could touch bases with the legal department. Perhaps there was some misunderstanding about the nature of the request. Time is of the essence, in that I must document my section 2255 pleadings as quickly as possible. We need to conduct the examination by the end of next week at the latest. Ms. Scheff can be reached at (520) 471-2765 and at stacy.scheff@gmail.com .

In general, I am trying "keep my head down" and do my time, as you might recall from our talk in your office several months ago. I do need to protect my health and legal interests. I have already bent to the interests of the institution in quite a few matters. There is just no reasonable alternative means of getting this forensic examination done. I hope you will allow it. Thank you for your time and consideration.

Respectfully,

Matthew Muller

TRULINCS  72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

--------------------------------------------------------------------------------

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 07/06/2018 12:58:59 PM

To: AW Jusino / Legal Department
Inmate Work Assignment: A-2 Unit Orderly

Dear Ms. Jusino,

Thank you for taking the time Tuesday to speak with me about my attorney's request that her expert witness Dr. Goldman be allowed to visit me to conduct a psychiatric exam.  From what you explained to me, the prison will only allow the exam to take place if I obtain a court order requiring it to.

I just wanted to check in one last time in hopes this matter can be resolved amicably, without a court order.  It will be both costly and time-consuming for us to obtain such an order.  And it will impose even more delay beyond the two weeks that have passed since Dr. Goldman was first refused entry.

Perhaps if you share with me the reason the prison will not allow Dr. Goldman to visit, I could provide some reassurance.  Is there some security concern?  Otherwise, denying Dr. Goldman access would appear to run contrary to BOP regulations, to BOP Program Statements, and to applicable Supreme Court precedent.  See 28 C.F.R. 543.16 ("[t]he Bureau of Prisons... accords [attorneys'] assistants the same status as attorneys with respect to visiting and correspondence"); BOP Program Statement 1315.07 (same); Procunier v. Martinez, 416 U.S. 396, 419-422 (1974) ("[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid.").

I am also concerned, because I have heard from both staff, and from other inmates who overheard staff, that efforts were being made to transfer me to another BOP facility, but that instead the intention now is to "fast track" an extradition request by Solano County so that I will be shipped away.  The purpose of the psychologist visit does relate to my Solano case and the extradition matter.  So we will be seeking a temporary restraining order barring the BOP from transferring me until the expert witness has had time to visit and produce a report.

Again, I would much rather work this out amicably.  Please let me know if there are some concerns my attorney or I can address to facilitate the visit.  Thank you for your time.

Best,

Matthew Muller

Via Institutional Mail

July 2, 2018

Warden Baltizar
U.S. Penitentiary Tucson
9300 S. Wilmot Road
Tucson, AZ 85756

Subject:   MULLER, Matthew / Reg. No. 72875-097
           Attorney and Expert Witness Visit

Dear Warden Baltizar,

Good day, sir.  I am writing to respectfully request that you
allow my attorney to visit the prison with a psychiatric expert
witness to examine me.  The exam is needed to meet an immediate
deadline in my pending 28 U.S.C. §2255 motion.  I also need it to
document the medical necessity of a short delay in my extradition
to Solano County, California.

As you might know, my attorney Stacey Scheff sought to visit the
facility on Tuesday, June 26, with our expert witness Dr. Goldman.
Your staff declined to allow the appointment.  Just to clarify,
Dr. Goldman's visit is not for purposes of medical treatment.  He
is an expert witness in my §2255 case and needs to conduct a
forensic examination to assess my mental health from 2015 to 2017,
when I was being held in solitary confinement pending trial.  His
report is already overdue and my §2255 motion will be substantially
undermined without it.  Time is of the essence.

I do not know on what grounds your staff denied Dr. Goldman's
visit.  The right of attorneys (and their agents, including expert
witnesses) to access incarcerated clients is very well-established.
See, e.g., Ching v. Lewis, 895 F.2d 608, 610 (9th Cir. 1990)
(striking down Arizona Department of Corrections policy allowing
only non-contact visits by attorneys and their agents).  And
examination by a defense psychiatric expert is very common.

My attorney has prepared a submission to obtain a court order
directing the prison to allow the visit.  But I asked her not to
file it yet, to see if I can resolve the matter informally.  If
she is forced to obtain a court order, it is likely the Bureau
will be ordered to pay me the expense of seeking the injunction.
I do not wish to unnecessarily take up staff time or resources with
litigation.  Please allow my expert to visit and examine me.
Thank you, sir, for considering it.

Respectfully,

Matthew Muller
Attorney: Stacey Scheff - (520) 471-8333

TRULINCS 72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

-------------------------------------------------------------------------------------------------

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 07/09/2018 11:40:33 AM

To: AW Jusino / Pending IAD from Solano County
Inmate Work Assignment: A-2 Unit Orderly

Dear Ms. Jusino,

I am writing in regards to a pending request by Solano County, California, to take custody of me under the Interstate Agreement on Detainers. I was told that at some point in the process I would have 30 days in which my attorney or I could file an opposition to Solano County's request. Could you please let me know what the deadline is for that submission? As I mentioned before, that submission is going to include an expert psychiatric report. But the prison has blocked the expert witness from interviewing me.

Since the delay is being imposed by the prison, please consider extending the deadline for the opposition accordingly. Otherwise, I will need to obtain additional court orders. So far that delay has amounted to 17 days (the examination was originally scheduled for June 23, 2018).

You let me know that the prison would require a court order before allowing the examination to proceed. My attorney was told the same. I tried my best to resolve the matter informally, without litigation. I am only asking for very narrow relief--the court order plus fees and costs that were required to obtain it. If the prison tries to transfer me without giving me a reasonable opportunity to submit an opposition (including the expert report), my attorney stated that she has prepared a more extensive filing that substantially escalates the matter.

Please understand that I could have just started with this approach. There is much that I can do that I have chosen not to. The issue of the expert exam has forced me to disclose facts adverse to the prison that I had not planned to disclose and to take other steps to protect myself.

I had a right to assist inmates with their legal work and limited myself to postconviction matters and helping with certain release issues such as obtaining disability benefits. I was not doing anything that would stir up trouble at the prison. So I admit I am puzzled as to why certain staff went out of their way to stifle my work and punish me. I hope that prison staff will now proceed in the Bureau's best interest--as if a judge were looking over their shoulders assessing whether actions taken are neutral and reasonable or retaliatory and/or unreasonable. If you want me to walk small and disappear back into the inmate population like I'd like to, then please help me by engaging with my attorney, talking out any concerns you have and generally adopting a more conciliatory approach.

Thank you very much, ma'am, for considering it.

Respectfully,

Matt Muller

Staff Request Form / Cop-Out

To: SHU Lieutenant
From: Matthew Muller / #72875-097 / SHU A-120
Date: June 22, 2018

Please be advised that I am not accepting food until I am released from the SHU, that I have no commissary food, and that I am not accepting food from my cellmate. I began declining meals yesterday. I have asked repeatedly for care and for information about why I am being held in the SHU two weeks after my disciplinary matter concluded with no D/S sentence. Again, I request a U.S. District Court Habeas Corpus Form and a BP-10 for a "sensitive" BP-10 filing I can submit directly to Regional Office officials next week. Thank you.

4/27/2018
0700- Req. for rules/procedures
REF 1804270700-1
0700- Req. for phone
REF 1804270700-2
0700 - Req for property

# COP OUTS SUBMITTED

## 4/25/2018

2pm. Request for Law Library Use

Dispo: No response

2pm Request to Use Phones

Dispo: No response

~~1000~~ 1015 - Verbal for Phone Call

5pm Request to See Psych and for Reasonable Accommodation + Meds

Dispo: Saw Dr. Johnson ~ 2p 4/26/2018, said "no meds, no accom, no appeal"

No resp: 2x verbal requests to use phone

## 4/26/2018

No resp | 1804260656-1 - Second request for phone call

1804260656-2 - Denied recreation for being "out of compliance" ← with what?
requested rec. and notice of all rules and procedures

No resp | 1000 - Verbal request for phone call

1804260656-3 - Request to see Psychology ASAP

0700 - Was told I would go to rec. But they skipped me.

0720 - Spoke to C.O. Escobar explained that I did not
know rules had just arrived. He said he'd get me a copy of
the rules, but that I still could not go to recreation.

1804261410-1 - 4-page letter to Dr. Johnson. Request for cell sanitation rules

No resp | 1804261410-2 - Requested to use phone in writing

1915 - Hit "emergency" button. Response = 1950

No resp | 1900 and 1950 - 2x verbal request to use phone

No resp | 2030 1x verbal request

Medical Request

To: Medical
From: Matthew Muller/# 72875-097 / SHU A-120
Date: June 23, 2018

- Please note in my medical records that I stopped eating or accepting food trays on June 21, 2018. My depression has progressed to the point where I have no hunger mechanism. Food doesn't taste like anything, it's just unpleasant textures. So I don't feel like eating and can't really care about what happens if I don't. I've asked again and again for psych help in the SHU. Maybe someone will notice once my external appearance starts to look how I feel inside.
- Again, I would like to see a psychiatrist.
- I don't mean to be a pest, but a lot of my medical requests have been ignored. So I've copied down about 10 of these while I'm up to it and will just keep resubmitting until someone confirms notes have been made, or an appointment. Thanks.

To: Lt. Scheid or the Lt. on Duty for Morning
From: Matthew Muller / Reg. No. 72875-097
Date: May 3, 2018

I am in danger in my current cell. Mr. ~~Smith~~ Gaines is episodically
paranoid-delusional and believes at times - especially late at night -
that I am part of some sort of set-up against him. I
believe he will eventually attack me as a result of his untreated
mental illness. Please move me immediately. Also, Mr. Gaines
is not of my sexual orientation. He usually cells with gay or
transgender inmates. I am not comfortable using the toilet or
shower in front of someone who is sexually interested in males.

+] June 2 (mostly same, "just wanted to make sur...

...sy, so I'll keep it short. I'm losing the fight with ... I can — taking the meds, exercising, keeping busy, trying ...e in the sun through the window. But I'm still ... Food doesn't really taste like anything now, which is a ...e, something that happens shortly before I end up in a ...ld not be in the SHU, I'm not a risk to anybody ... and that's caused entirely by being in the SHU. I've been here ...l heaving. I am really suffering. I am trying not to ...d me to a psychiatric hospital or recommend release from ... reasons — even if the yard is locked down, at least I'd ...ng on for a few days before I can get outside again ...f this pit. Thank you for considering it. I am enclosing ...ent for reference      Best, MM

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

Note: Tried submitting to Jusino or Rhodes, warden ?
~~assistant~~

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: MULLER, Matthew D.        72875-097     A-2/SHU 102    USP Tucson
_____LAST NAME, FIRST, MIDDLE INITIAL_____REG. NO._____UNIT_____INSTITUTION

**Part A– INMATE REQUEST**

I have been requesting to make a time-sensitive call to my attorney Stacey
Scheff. The call must be made before 12pm on Friday, June 1st, 2018, and
I have been submitting requests to call since May 22, 2018. I have not seen a
member of my unit team on the range since then, so I have been asking other staff
to submit it to them. All I need is 10 minutes at the most, probably less. The call
does not need to be pre-arranged. It would be fine to leave a message on voice-
mail, so long as it is a confidential call. Thank you.

5/29/2018
_____DATE_____SIGNATURE OF REQUESTER

**Part B– RESPONSE**

_____DATE_____WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                          CASE NUMBER: _____

                                                   CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
          LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT       INSTITUTION

SUBJECT: _____

_____DATE_____RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP-229(13)
APRIL 1982

USP LVN        PRINTED ON RECYCLED PAPER

To: Dr. Johnson / Psychology     REF: 805010630
From: Matthew Muller / 72875-097
Date: May 1, 2018

Dr. Johnson,

I am in really poor shape. I've given it a few days to see if things stabilize. They have not. I am rapid-cycling, my moods are never this labile when I'm healthy and I do not usually have such strong anxiety. Please help me. I'll risk the four-point restraints, I'll do whatever you want. Please.


May 2 - Johnson

I have waited several days to see if my symptoms stabilize on their own. They have not. They are worse. I need medication. I need treatment. I cannot maintain control. Please help.


May 2 - To - B-Range Officer

I am not safe in my current cell. I like the hell out of Samuel Gaines. But he is suffering from a paranoid delusional episode and thinks I am in on a conspiracy against him. And I have my own mental issues to deal with. I need to be moved ASAP. Thanks.


May 2 - To B-Range Officer

I need light and exercise. I am not safe going to recreation because the officers are putting me in cages with Aryan Brotherhood members who have been harassing and threatening me on the tier. I just need to be able to get outside, for my health. Thank you for anything you can do to get me outside in a safe rec cage

Record of Cop-out
Submitted in envelope 5/29/2018 to Unit Team, SHU A-102
Hello, I don't know whether you have received my requests about a time sensitive call to my atty Stacey Schott regarding something I rec'd about my Solano County crim case. I need to speak w/ her by 12pm Fri 6/1/2018 or at very least have a message. The call does not need to be pre-arranged. I would also greatly appreciate a brief call to my wife letting her know we will be locked down this weekend. Otherwise she will waste a great deal of time and over $500 traveling here. Thank you. Alternatively you could send her a very short e-mail, such as: (email) Thanks for considering it.

Memorandum ((opy)

To: R.L. Rhodes, Warden
From: Matthew Muller /#72875-097 / SHU A-102
Date: June 14, 2018

My attorney reached out to you a few weeks ago to let you
know that my mental health was very poor. I am still struggling.
Based on the past course of my illness, my health will start to improve
once I can get outside in direct sunlight and exercise in an open
space. I understand you are a psychologist yourself and probably
already know that clinical studies and literature support the
therapeutic effects of sun, open air and exercise on depression. I am
set to be released from the SHU and am waiting on your signature.
In addition, my wife, mother and father are traveling here from
Northern California this weekend. It would benefit my health to
see them for more than just two hours through a glass barrier. I
would greatly appreciate it if you could see to it that I am
released from the SHU today or tomorrow.

Thank you for considering it.