STACY SCHEFF (No. 028364)
LAW OFFICE OF STACY SCHEFF
P.O. BOX 40611,
TUCSON, AZ 85717-0611
Tel: (520) 471-8333
Fax: (520) 300-8033
stacy.scheff@gmail.com

Attorney for Matthew D. Muller

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Mathew D. Muller,

       Plaintiff,

    vs.

United States of America;
Robbie L. Rhodes, Warden, Federal
Correctional Institution Tucson;
Juan Baltazar, Warden, Federal Correctional
Complex Tucson; W. Jusino, Associate
Warden, U.S. Penitentiary Tucson;
Lorri Mitchell, Legal Assistant,
U.S. Penitentiary Tucson; Jane/John Does
1-25 employees at USP Tucson,

      Defendants.

No:  4:18-cv-00376-RCC-PSOT

**FIRST AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

## INTRODUCTION

1.    This is an action for narrow injunctive and declaratory relief under the Court's federal question jurisdiction. Plaintiff Matthew Muller, a federal inmate, alleges that Defendants violated the Constitution and agency regulations by refusing to allow an examination by forensic psychologist George Goldman and legal visits by the undersigned's paralegal William Fuller.

2.   Dr. Goldman was employed by Mr. Muller's attorneys to meet with the Plaintiff at U.S. Penitentiary Tucson. He will assess Plaintiff's mental health and produce an expert report for use in time-sensitive criminal and civil court filings. Plaintiff seeks an order allowing this routine legal interview to proceed over Defendants' unexplained objections. He also seeks an order allowing legal visits by Mr. Fuller for case-related purposes.

3.   Defendants' refusal to allow Dr. Goldman and Mr. Fuller access to Plaintiff are the only actions from which Plaintiff seeks relief. However, to provide context, Plaintiff will describe how the Defendants' obstructionism is part of an ongoing pattern of retaliation against Mr. Muller for the pro bono legal help he offers other inmates. As a result of this retaliation, Mr. Muller has been subjected to false disciplinary charges; has been assaulted and raped at the instigation of prison officials; has suffered months of segregated confinement in degrading conditions; and very nearly committed suicide as a result of the severe psychological harm Defendants inflicted upon him.

4.   Plaintiff has sought for nearly a month to reach an informal resolution with Defendants. Prison officials have offered no justification for denying an examination by Dr. Goldman and have offered only pretextual reasons for barring Mr. Fuller. Following six letters, administrative remedy requests and multiple conferences, Defendants will not allow the visits or elaborate on their reasons for refusal.  Given pressing deadlines in the legal matters for which the expert report is needed, Plaintiff had no reasonable alternative but to file this action.

## JURISDICTION

5.     The Court has jurisdiction to hear this matter and provide the requested relief pursuant to its general federal question jurisdiction under 28 U.S.C. §1331.

6.     This Court may also grant relief under the Administrative Procedures Act, 5 U.S.C. § 701 et seq., in conjunction with 28 U.S.C. § 1331.

7.     This Court has jurisdiction to provide mandamus relief pursuant to 28 U.S.C. § 1361.

## PARTIES

8.      The Plaintiff Matthew Muller is, and was at all times during the allegations presented herein, a federal inmate at the U.S. Penitentiary Tucson ("USP Tucson") in the District of Arizona.

9.     The Defendant United States is the sovereign entity having control over the Federal Bureau of Prisons ("BOP") and its parent agency the U.S. Department of Justice ("DOJ").  The United States has waived sovereign immunity in this matter pursuant to 5 U.S.C. § 702.

10.    The Defendant Robbie Rhodes resided at all relevant times in Pima County, Arizona, in the District of Arizona.  He was employed by the BOP as Acting Warden of USP Tucson from at least April 1, 2018, through June 27, 2018.  He is currently Warden of Federal Correctional Institution Tucson. He and his successors are sued in their official capacities.

11.    The Defendant Juan Balthazar currently resides in Pima County, Arizona, in the District of Arizona.  He is employed by the BOP as Warden of the Federal

Correctional Complex Tucson and of USP Tucson.  He and his successors are sued in their official capacities.

12.     The Defendant Assistant warden Jusino resided at all relevant times in Pima County, Arizona, in the District of Arizona.  She is employed by the BOP as an Associate Warden of USP Tucson.  She and her successors are sued in their official capacities.

13.     The Defendant Lorri Mitchell resided at all relevant times in Pima County, Arizona, in the District of Arizona.  She is employed by the BOP as a Legal Assistant at USP Tucson.  She and her successors are sued in their official capacities.

14.     Defendants Does 1-25 resided at all relevant times in Pima County, Arizona, in the District of Arizona.  They are employees and contractors of the BOP at USP Tucson, Federal Correctional Complex Tucson and elsewhere.

## FACTS

15.     Matthew Muller is a former attorney who arrived at USP Tucson hoping to use his legal skills to help wrongly convicted prisoners.  While incarcerated at six different facilities between June of 2015 and April of 2018, Mr. Muller had a perfect record of good conduct.   Up until now, he had filed no lawsuits or administrative complaints against any detention personnel or facility.

### Bop Officials Intimidate Mr. Muller to Prevent Him from Helping Fellow Inmates

16.     Within an hour of Plaintiff's arrival at USP Tucson on June 23, 2017, BOP Special Investigative Supervisor ("SIS") Technicians A. Gallion and, on information and belief, Denise Madrid pulled Mr. Muller into a back room of the receiving area. The officers stated that they knew he had been an attorney.  They threatened that if he gave

legal help to other inmates, he would be subjected to "diesel therapy" — a brutal regimen of bussing from prison to prison with long stretches of segregated confinement in between.

17.     Consequently, Mr. Muller concealed his legal experience from other inmates at first. He eventually came to know an inmate he was convinced was innocent. Mr. Muller felt a moral and religious responsibility to help that inmate, a former police officer named Christopher Eads with a wife and three children.  So he offered to review the case to see how Mr. Eads might be exonerated.

18.     Both during his professional life and in prison, Mr. Muller's legal work has been a manifestation of his political and religious beliefs in equal justice.  Before his career was cut short by psychiatric illness, Mr. Muller worked or interned at eight nonprofit law firms in four metropolitan areas, serving low-income communities. As a faculty member at Harvard Law School, he taught human rights law and was associate director of a clinical program providing free legal services.  Mr. Muller has never charged inmates for his work on their cases.

19.     Mr. Muller was soon helping many different inmates. He provided assistance with everything from postconviction relief to veterans' issues to routine legal services such as drafting powers of attorney.  He filed multiple successful appellate briefs, helped three inmates obtain appointed or pro bono counsel in their habeas corpus cases, won disability benefits for two severely ill inmates who were leaving prison and assisted many inmates whose matters are still pending before the courts.  Mr. Muller also taught introductory law classes and helped add resources to the prison's law library.

20.   Mr. Muller was assisted by his wife, Huei Dai, who obtained information and documents not available through the prison library or research system.  Together and in less than a year, they donated over 2,000 hours of their time and at least $1,200 in expenses towards inmates' legal matters.

21.   Mr. Muller declined to handle certain types of legal matters.  Fearing reprisal, he avoided cases relating to prison conditions or staff members.  Although approached by many inmates seeking advice on civil rights matters or denial of medical care, Mr. Muller told them he could not help due to the likelihood of retaliation.

22.   Plaintiff is aware of many instances of prison staff retaliation, both against complaining inmates in general and against "jailhouse lawyers" in particular.

23.   In about October of 2017, a fellow veteran and neighbor of Mr. Muller's known as "Pilot" helped another inmate successfully sue USP Tucson staff to obtain vital medical care.  Pilot had been a decorated rotary wing operator for U.S. Special Forces and was still in touch with a military attorney who advised him on legal work. Prison staff retaliated against Pilot's successful lawsuit by "shaking down" the entire unit (conducting an invasive search and confiscating minor contraband that is usually tolerated, such as extra food and blankets).  Afterwards, they told inmates "you can thank [Pilot] for this." On information and belief, staff then reported that inmates were threatening Pilot.   He was placed in segregated confinement, purportedly for his protection.  He was later transferred to another prison.

24.   Other retaliation schemes Mr. Muller has witnessed or heard of include: staff planting contraband in a targeted inmate's property or bribing another inmate to do

so; bribing an inmate to falsely report some other misconduct by the targeted inmate; falsely stating an inmate threatened or harassed an officer—especially a female officer; bribing an inmate to attack a targeted inmate and then segregating and/or transferring the target "for his protection"; claiming that an inmate is becoming "too influential" or "too famous" and must be transferred for security reasons; placing a targeted inmate in segregation for investigation of unspecified misconduct or threats; alleging suspicious communications with relatives or the public and restricting the targeted inmate's correspondence and visiting privileges.

25.    To avoid becoming a target of any such scheme, Mr. Muller tried to be as judicious as possible about cases he handled. Mr. Muller also refrained from filing complaints about staff misconduct against him.  This misconduct included officers tampering with his privileged legal mail, failing to deliver law-related books he ordered, and an incident in which officers knowingly restrained him from restroom facilities and Plaintiff was forced to defecate on himself in front of others.  The last incident was in retaliation for Mr. Muller confronting an idle officer about refusing to get up and open a door, forcing inmates to wait outside for so long that an elderly inmate with advanced prostate cancer urinated on himself.

26.    Plaintiff's hope was that if he tolerated such misconduct and worked only on matters that did not directly involve the prison, he would be left alone by USP Tucson staff.  This was not to be the case.

### Bop Officials Retaliate Against Mr. Muller for His Pro Bono Legal Activities

27.    On April 25, 2018, Mr. Muller was called to the lieutenant's office.  There,

he was detained for giving Christopher Eads information about how his family could mount an innocence campaign using social media.

28.    SIS Technician Madrid claimed it was a criminal act for Mr. Muller to provide such information.  She charged him under the BOP's highest offense category, used for such acts as murder and rioting.  Significantly, the high-level charges required automatic segregation of Mr. Muller in the Special Housing Unit ("SHU").  Mr. Muller was thereby prevented from continuing his pro bono legal activities, from completing work on several cases with critical deadlines and from teaching law classes.

29.    Mr. Muller's personal effects were seized and he was searched, handcuffed and brought before a lieutenant for reading of the charges.  He was then escorted to a restricted wing of the prison containing the SHU, where he was strip — searched twice and required to surrender his standard prison uniform and put on an orange tee-shirt, shorts and foam shoes.

30.    In the SHU, Mr. Muller was denied his prescribed psychiatric medication for several days, as well as an antipsychotic he needs episodically.  He sent several requests for help to the SHU psychologist Dr. Shara Johnson.

31.    Mr. Muller has had a long and well-documented struggle with severe bipolar illness.  He is designated by the BOP as a "Care Level 2-MH" inmate requiring an elevated degree of psychiatric care.  Nonetheless, Johnson told him that he was perfectly healthy aside from a vitamin D deficiency.  She refused to provide any care or accommodations for Mr. Muller's psychiatric illness.

32.    When Mr. Muller continued to request help from Dr. Johnson, she had him

escorted from his cell to the SHU lieutenant's office. There, Johnson and several officers surrounded Mr. Muller while Lieutenant K. Schied commanded him to "shut up and get with the program." Schied stated that "if you don't like the SHU, then you should stop doing inmates' [legal] paperwork."

33.    Mr. Muller replied that he was helping inmates he believed were innocent and would continue doing so. Schied stated "There are no innocent inmates here. They're all guilty." Plaintiff responded colloquially "I'l bet you a million dollars there are innocent inmates here." Schied then said "Did you hear that? He just tried to bribe me. That's another shot [disciplinary charge] for attempting to bribe an officer. In fact, I'm going to call SIS right now and have you charged."

34.    Mr. Schied then placed a phone call and began discussing what the most serious offense was that he could level at Mr. Muller. Schied stated that he wanted the FBI liaison contacted to pursue criminal bribery charges. (An FBI investigator did come to the prison and interview Plaintiff. The investigator was professional. But the questions he asked suggested that USP Tucson staff may have attempted to falsely implicate Mr. Muller in an attack against an officer committed months earlier by Mr. Muller's former cellmate.)

35.    Schied completed his call, turned to Plaintiff and stated "I think you need a new cell mate. How about Gaines?" Several officers surrounding Plaintiff chuckled at this suggestion.

**Prison officers instigate sexual and physical assaults against Mr. Muller**

36.    Plaintiff was then taken from Schied's office back to his cell. Officers

collected some of Mr. Muller's belongings and threw away others.  Plaintiff was escorted to a new cell, and saw on the door a large sign with the letters "H.R.A."

37.    Plaintiff later learned that H.R.A. is an acronym for "House and Recreation Alone."  This designation is reserved for particularly violent inmates with a history of assaultive conduct towards other inmates and staff.  The "H.R.A." sign on a cell door warns officers on duty that they are dealing with a high-risk inmate and that that individual is not to be mixed with any other prisoner.

38.    The H.R.A. inmate was removed from the cell and escorted to removed from the cell to go speak with Mr. Schied while Plaintiff was placed in the cell the lieutenant's office while Plaintiff was placed in the cell.  After a short time, the inmate, Sam Gaines, returned and was put in the cell with Mr. Muller.

39.    Mr. Gaines was not initially hostile toward Plaintiff.  However, it quickly became clear that Gaines was profoundly mentally ill.  Mr. Gaines later disclosed that he suffered from paranoid schizophrenia and that the BOP was not giving him all of the medications he needed to control his condition.

40.    Mr. Muller also learned that Mr. Gaines was sexually interested in male and transgender inmates.  Mr. Gaines made several comments about Plaintiff's body and asked various questions of a sexual nature.  Mr. Muller stated that he was accepting of all sexual orientations but was heterosexual and that in any event he was happily married and sexually exclusive with his wife.

41.    Over the next few days, Mr. Gaines's behavior became more bizarre, including both threats and sexual comments.  He slept very little or not at all.  He seemed

lucid for much of the day but spoke almost constantly—sometimes to himself and in apparent response to a running dialog in his head.  Mr. Gaines acknowledged that he "heard voices."  When asked during one of his lucid periods, he stated that at times the voices were telling him to kill Mr. Muller before Mr. Muller killed him.  He became increasingly suspicious of Mr. Muller and frequently commented that he knew Plaintiff and Lieutenant K. Schied were trying to "set him up" somehow.

42.    Between May 1 and May 4, Mr. Muller made numerous verbal requests and submitted at least six written requests to be moved, stating that he was in imminent danger from Gaines.  These included two written requests that he handed directly to Associate Warden Jusino and another associate warden on May 2.

43.    On the night of May 2, Plaintiff went to sleep wearing only boxers due to warm temperatures in the SHU.  He awoke from a deep sleep to find that his boxers had been pulled down, and that Mr. Gaines was behind him and penetrating him with his penis.

44.    Plaintiff pushed Gaines, jumped off the bed and began shouting.  Gaines said words to the effect of "What, you don't like African American men?"  Plaintiff replied that he was not sexually interested in any men.  Gaines stated, "Sure you are, you're just shy."  Gaines then stated "Schied won't never put nobody in this cell if they ain't gonna fuck."

45.    Plaintiff later learned from other inmates that any time Gaines did have a cellmate in the SHU, it was a gay or transgender inmate because he would not accept any other.  Inmates in surrounding cells, such as Michael Hanson, stated that they had

assumed Plaintiff must be gay because he had been put in a cell with Gaines. They advised that SHU staff was aware that Gaines would only accept cellmates he could have sex with.

46.    Mr. Muller did not report the rape at that time—both because he realized that Lieutenant Schied had arranged the situation and was unlikely to help him, and because it is dangerous to be labeled a "snitch" in prison. Contrary to Prison Rape Elimination Act (PREA) implementing regulations, there was no available confidential method of reporting a rape in the SHU. The only avenue for such reporting was the SHU law library computer, which Plaintiff requested to use almost daily but was not allowed to access a single time in 64 days.

47.    Plaintiff told his family about the attack so that they could look up information about HIV/AIDS transmission for him. He instructed them not to report the rape. However, they contacted the warden and told him that SHU staff had caused Plaintiff to be raped. The warden assigned investigation of the matter to Lieutenant Schied and other staff members who had caused or been complicit in the rape. Therefore, Plaintiff declined to cooperate with the investigation.

48.    Gaines' attitude towards Mr. Muller became very hostile after he realized Plaintiff would not have sex with him. He told Mr. Muller he was either going to leave the cell in handcuffs or in a body bag, that it made no difference to Gaines and that Mr. Muller had better get staff to move him if he wanted out alive. Gaines said he did not care what Plaintiff said to get out, but that he had better "not put the police on" him. He showed Plaintiff a knife and kept referring to how he had made it and what it could do.

49.     On May 3 and 4, Plaintiff made repeated verbal and written requests to be moved, stating that he was in imminent danger and that there was a high risk of violence due to Gaines' mental health issues.  He did not sleep between the attack on the night of May 2 and May 4.  Gaines began yelling complaints to the officers such as "You'd better recognize there is a problem right now, or you're going to need a blood [clean-up] crew up in here."  The officers did not respond.

50.     In the late afternoon of May 4, Gaines lunged at Plaintiff and attempted to attack him.  Plaintiff backed away and pushed the cell's emergency button to summon staff assistance.  However, several minutes passed without staff arriving.

51.     The situation escalated further, with Gaines yelling at Plaintiff to get out right away or he would kill him.  Mr. Muller banged on the cell door and yelled into the hall repeatedly.  He saw that there were several officers standing and watching about 15 feet away.  Although they could see that Mr. Muller was in distress, they did not approach the cell.

52.     After another several minutes, officers approached the cell and told Mr. Muller to "stop your bitch-fit" and stated that they would take him out.

53.     Under BOP policy, SHU staff keep and consult detailed records about inmates' institutional history, sexual orientation and affiliations, which they are supposed to use to house inmates with compatible cellmates.  However, this same information can also be used to place inmates in difficult situations. Mr. Muller was next placed with another gay inmate who had a history of violent conduct in prison and problems with cellmates.  On May 8, the inmate attacked Mr. Muller.  Knowing that he would be written

up for fighting if he did more than defend himself, Plaintiff did not punch back, but merely tried to protect himself. Plaintiff was punched at least ten times in the head.

54.     During the beating, Mr. Muller pushed the emergency button, but again no staff members arrived. While on his regular rounds, an officer looked in the cell and saw that Plaintiff was disheveled and bleeding from multiple lacerations to his face. He was removed from the cell.

55.     Again, to avoid being labeled a "snitch" and creating an even more dangerous situation for himself, Mr. Muller did not report that he had been attacked. He told Lieutenant Schied that he had fallen off his bunk, though his facial wounds and bruising were obviously not consistent with that story and it was likely understood what had really happened.

56.     Mr. Muller was finally placed with a non-high-risk cellmate. However, he continued to suffer the effects of the recent attacks and of poor conditions in the SHU in general. Mr. Muller was repeatedly denied outdoor air, light and exercise, and was allowed to go outside just once in 64 days. He therefore endured an almost completely uninterrupted lockdown in a small 7 x 10 foot cell with another prisoner.

57.     Mr. Muller was frequently denied basic supplies such as toilet paper, a standard mattress and meals compliant with his religious diet. The SHU was infested with bedbugs and/or lice, ants and cockroaches. Throughout his time in segregation, Plaintiff had a constellation of bites and welts on his body, each raised and up to two inches in diameter, as well as rashes from contracting ringworm in the SHU. The walls were contaminated with pepper spray residue that caused Plaintiff skin inflammation, and

one cell Mr. Muller occupied had what appeared to be blood smeared on a portion of the wall.

58.    Plaintiff's cell was twice inundated with sewage.  On one occasion the sewage was allowed to stand in the hall outside his cell for over eight hours during the daytime, and Plaintiff had to attempt to eat with the smell of feces and urine permeating the cell.  Plaintiff's cell was flooded with clean or "gray" water four additional times.

***Prison Staff Systematically Block or Delay Mr. Muller's Efforts to Get Help***

59.    Mr. Muller's family hired an attorney to assist with the situation.  That attorney, the undersigned, was initially told she was not allowed to visit Mr. Muller.  Following a demand letter, prison officials eventually allowed the visit.  Mr. Muller's repeated requests to call the undersigned and another attorney handling his criminal matter were usually ignored.  A few calls were later allowed, after weeks of requests.

60.    Properly marked legal mail sent to Mr. Muller arrived opened.  One of three privileged and confidential letters Mr. Muller sent to undersigned counsel never arrived.  It was the only one of the three containing sensitive and detailed information about staff misconduct in the SHU.  Mr. Muller was not allowed a single visit to the SHU law library in 64 days, and staff withheld law-related books sent to Mr. Muller by his wife.

61.    Mr. Muller repeatedly asked for forms on which he could file an administrative remedy request, and for court forms.  None was provided.  Mr. Muller's family sent him copies of remedy request forms they printed from the Internet.  Plaintiff completed several forms and attempted to submit them to Warden Robbie. L. Rhodes and Associate Warden Juan Jusino.  Although he explained that he was unable to obtain forms

from SHU staff, Rhodes and Jusino refused to accept the proffered forms because they were not the official versions printed on carbon paper.

62.     Mr. Muller next attempted to send a confidential and urgent remedy request to the BOP Regional Office.  It included details about the rape and other misconduct by SHU staff.  Mr. Muller submitted the form via legal mail on June 3, 2018.  Despite a request for expedited processing and assistance, Mr. Muller has not heard from the Regional Office or any official about this matter in over two months.  This failure to respond is consistent with Mr. Muller's legal mail having been intercepted and discarded.

***Prison Staff Nearly Kill Mr. Muller Through Their Deliberate Indifference to His Mental Health Crisis***

63.     Mr. Muller's mental health deteriorated rapidly in the SHU.  He continued to request mental health treatment, as did his family and attorney in letters to the warden.

64.     In response to one letter, Dr. Johnson saw Plaintiff for ten minutes.  Mr. Muller disclosed his symptoms and stated that he believed he was on the wrong medication.  Unlike at previous meetings, Dr. Johnson listened somewhat sympathetically.  But she did not provide any treatment or make any attempts to ameliorate his situation.

65.     By mid-June, Plaintiff was suffering severe depression and was highly suicidal.  He sent messages to Ms. Johnson stating that his situation was dire and that he needed to be admitted to a psychiatric hospital.  Barring that, he asked at least to be released from the SHU, stating "I am safe in general population and am not a threat to anyone but myself."  The requests were ignored.

66.     Unable to get help, Plaintiff's health deteriorated further, and he made definite plans to kill himself.  His preparations included a series of letters to be given to his family and others after he was dead, explaining why it was best that he die.

67.     Plaintiff's cellmate Cody Jackson had observed Mr. Muller sink further into depression.  He wrote messages to Dr. Johnson and Warden Rhodes (who also happens to be a trained psychologist) stating that Mr. Muller had severe depression and that he feared for his safety.  No action was taken.

68.     Mr. Jackson became suspicious when Mr. Muller was evasive about the letters he was writing.  When Plaintiff was away from the cell, Mr. Jackson opened several sealed envelopes and read the letters.  He ascertained Mr. Muller's plans and confronted him about them.  He seized various items from Mr. Muller and convinced him to wait a short time longer, as it was likely they would both soon be released from the SHU.

69.     Mr. Jackson was released from the SHU to general population first. Together with some other inmates, he convinced Mr. Muller's regular psychologist Dr. Moreno to intervene.  Dr. Moreno met with Mr. Muller in the SHU on June 27, 2018 and obtained his release that day.

70.      Mr. Muller later learned that he had for weeks been cleared to return to general population, but that unknown officials did not want to relief him and were looking for some grounds to transfer him.   After Mr. Muller's release, many inmates commented to him "we never thought we'd see you again, we'd heard you were getting shipped [to another prison]."

71.     Shortly before his release from the SHU, Mr. Muller received an additional incident report written by Defendant Lorri Mitchell.  It included false charges that Mr. Muller was doing legal work for pay contrary to prison rules.

72.     After his release from the SHU, Plaintiff learned that the inmate he had been trying to help, Christopher Eads, was forced into a cell into a cell with a dangerous inmate.  Mr. Eads understood this to be in retaliation for fighting his case and for seeking help from Mr. Muller.  Mr. Eads was attacked and seriously injured, sustaining facial injuries that caused vision problems and will require facial reconstructive surgery.  Mr. Eads has since been transferred to another BOP prison in New Jersey.

***Prison Officials Refuse to Allow A Legal Visit by Forensic Psychologist George Goldman***

73.     On April 21, 2018, the undersigned's paralegal William Fuller contacted prison officials to arrange a forensic examination of Mr. Muller.  The exam, to be conducted by respected Tucson psychologist Dr. George Goldman, would document Mr. Muller's poor state of mental health in the SHU.  It would also support claims about his mental health made in his motion under 28 USC § 2255 and in another pending criminal matter.  Both matters were time-sensitive, and Plaintiff so informed the Defendants.

74.     It was then—and it remains now—crucial that Dr. Goldman examine Mr. Muller as soon as possible in order to assess and document the apparent causal link between Mr. Muller's symptoms and restrictive conditions of confinement.  Neuropsychological evidence of this link will dissipate as time passes.

75.     After receiving no response from prison officials, Mr. Fuller again

contacted the prison on June 26 to inquire about the status of the earlier request. Defendant Lorri Mitchell replied that the prison would not allow Dr. Goldman to examine Mr. Muller without a court order.

76.     On information and belief, Ms. Mitchell did not consult with the USP Tucson Warden or with the BOP Western Regional Counsel before pronouncing this decision, in violation of BOP policy and procedures.

77.     Between June 28 and July 20, 2018, Plaintiff and the undersigned made repeated attempts to negotiate a visit by Dr. Goldman and to ascertain and address any concerns Defendants had about the visit.  Defendants declined to give any reason for their refusal, only restating that they would not allow the visit to proceed unless a court ordered otherwise.

78.     Plaintiff and the undersigned sent Defendants a total of six letters via electronic mail and hand delivery.  The letters cited Bureau policy indicating Dr. Goldman's legal visit should be allowed.  The letters asked whether any further assurance of Dr. Goldman's history, conduct or qualifications was needed.  Defendants did not respond.  Plaintiff advised Defendants that he would seek a temporary restraining order (TRO) directing that the visit be allowed, as well as court costs and attorney's fees he incurred in filing an action.  Defendants offered no reply other than to restate that Dr. Goldman's legal visit would not be allowed.

***Defendants Refuse to Allow Any Unaccompanied Visit by The Undersigned's Paralegal, Imposing Additional Costs and Delays on Plaintiff***

79.     On July 20, Mr. Fuller sought to visit the prison in order to obtain Mr.

Muller's signature on final documents and to collect exhibits from Mr. Muller.  Plaintiff wished to file this action and a TRO request as soon as possible.  Defendants refused to allow Mr. Fuller to visit without the undersigned present, citing his "background and history."

80.    On information and belief, Defendants did not consult with the BOP Western Regional Counsel prior to taking this action and did not act from any actual belief that Mr. Fuller posed an unacceptable threat to institutional security.

81.    Mr. Fuller is a former Bureau of Prisons prisoner with a perfect record of good conduct while incarcerated at BOP facilities.  Following release, he went on to hold a supervisory position of trust at a major mobile carrier while also managing over a dozen rental properties, about half of which he owns.  Mr. Fuller has been working as paralegal for nearly two years, and is an honor student with a near-perfect GPA in Pima Community College's legal studies program.  He has upheld all conditions of his supervised release, has been a productive and upstanding citizen in the five years since his release, and ultimately plans to become an attorney specializing in criminal and prison law matters.  He has maintained a perfect record of conduct in the five-plus years since his release.  He is now studying to become an attorney, with plans to specialize in criminal and prisoner rights matters.

82.    Various circumstances made it clear that the multiple delays imposed by Defendants were not in the nature of ordinary administrative friction or bureaucratic neglect.  Rather, they were consistent with an intention to actively interfere with Plaintiff's right of access to counsel in retaliation for exercising his right of access to the

courts, his report of staff misconduct and his pro bono legal activities.  For example, Mr.

Muller was told confidentially by a source with personal knowledge and whose identity

he will disclose under seal, that other officials were attempting to "fast track" his transfer

or extradition.  The individual was not absolutely certain of the reasons for this, but stated

that it appeared to be because "it would be more convenient to have you gone."

83.    Consistent with that statement, officials have obstructed Mr. Muller's efforts

to delay his transfer for health reasons and sought to prevent him from exercising his

rights to challenge the transfer.  First and foremost, they have slowed or blocked

altogether Mr. Muller's ability to access professional legal services — including a

forensic mental health expert and a trained paralegal.  Second, Defendants attempted to

waive Mr. Muller's rights to challenge extradition by creating a document that purported

to be a request from Mr. Muller that the transfer proceed.  Plaintiff never made any such

request.  Finally, Defendants advised Mr. Muller that the requesting agency had not yet

filed all required paperwork and that therefore Mr. Muller did not yet need to file an

opposition to the request.  In fact, the paperwork had been filed and Defendants approved

the transfer request without so advising Mr. Muller.

84.    On about July 2, 2018, Defendant Mitchell subjected Mr. Fuller to an

invasive background examination.  Standard BOP forms request that legal visitors

provide consent to any such check.  However, Ms. Mitchell performed the investigation

without such authorization.  Then, using the information she had obtained from official

government databases, Ms. Mitchell contacted Mr. Fuller's probation officer and

requested that he be cited for violating the terms of his probation.  On information and

belief, Ms. Mitchell claimed Mr. Fuller was in technical violation because he had e-mailed her from an address other than the one listed in his probation records.

85.    Despite Mitchell's efforts, Mr. Fuller demonstrated how the additional address had already been reported.  However, Ms. Mitchell's actions did succeed in adding time and trouble to the undersigned's handling of this matter.  In this, they are emblematic of Defendants' active efforts to obstruct and delay Plaintiff's access to counsel and the courts.

86.    Legal visits at USP Tucson are visually monitored by prison staff at all times.  Legal visitors are subject to a metal detector search and search of their personal effects upon entry and exit.  Visitors can also be searched with a sophisticated electronic device that detects the presence of drugs.  Inmates are fully strip-searched before and after legal visits and usually must change into a jumpsuit and foam shoes to enter the visiting room.  Any items they carry in or out with them are subject to search.

87.    Consistent with the importance of maintaining inmates' access to counsel, BOP regulations suggest that visitor screening for attorneys and their assistants is to be more permissive than screening for social visitors.  Nonetheless, social visitors with more serious and/or more recent criminal backgrounds than Mr. Fuller's have been approved by USP Tucson staff for visiting privileges.

88.    In requiring the presence of the undersigned at all visits, Defendants failed to follow BOP procedures for restricting legal visits, acted arbitrarily and capriciously, and imposed additional costs for representation on Plaintiff.  They also delayed the filing of this action by approximately one week.

## CLAIMS FOR RELIEF

<u>FIRST CAUSE OF ACTION</u>:

VIOLATION OF PLAINTIFF'S FIRST AND SIXTH AMENDMENT RIGHTS

86.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

87.  Defendants' practices unjustifiably obstruct the availability of professional representation and other legal services to Mr. Muller.

88.     Plaintiff has suffered actual and ongoing injury as a result of Plaintiff's refusal to allow Dr. Goldman's and Mr. Fuller's legal visits.

89.     First, the delay in the forensic examination has reduced its usefulness and legal persuasiveness.  It was crucial for Mr. Muller's mental health to be assessed when his symptoms were at their worst.  Dr. Goldman's examination was to include tests that measure present symptoms such as cognitive slowing.  Such "real-time" tests are more strongly corroborative of actual psychiatric illness than a patient's self-report of past symptoms.  Due to his release from the SHU, Plaintiff is now recovering from the worst of his symptoms and tests will likely reflect less severe symptoms.

90.     Second, on July 18, 2018, a U.S. Magistrate Judge for the Eastern District of California recommended a partial denial of Plaintiff's 28 U.S.C. § 2255 motion, which motion included claims relating to Mr. Muller's mental health.  Mr. Muller had planned on submitting Dr. Goldman's expert report in support of his § 2255 claims.  If the examination had proceeded as originally scheduled, Dr. Goldman could have submitted it in time to influence the decision on Plaintiff's motion.   It was expected that Dr. Goldman's report would corroborate Plaintiff's claims that after a year in restrictive

solitary confinement, he was too severely depressed to enter a knowing, intelligent and voluntary guilty plea.

91.    Third, on about July 12, the senior deputy district attorney of Solano County, California, refused the request of Mr. Muller's criminal attorney Richard Dudek for a three-month delay in proceedings.  The delay was requested for mental health reasons, but Plaintiff was unable to submit an expert report in support of his request, as he had previously informed Solano County he would.  Accordingly, Defendants' unlawful action likely played a role in Solano County's refusal.

92.    Fourth, Plaintiff has incurred additional legal expenses due to the requirement that the undersigned attend every legal visit.  The filing of this action was also delayed by at least one week.

SECOND CAUSE OF ACTION:

VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT

93.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

94.    Defendants' actions violated the U.S. Constitution as set forth above, and therefore amount to agency action that violates the Administrative Procedures Act.

95.    Defendants also acted contrary to federal regulations and agency policy in refusing Dr. Goldman's and Mr. Fuller's legal visits.  Defendants' actions were arbitrary and capricious, failed to follow mandatory agency procedures and constitute abuses of discretion, in violation of the Administrative Procedures Act.

96.    Plaintiff has suffered actual and ongoing injury as a result of Defendants' violations of the Administrative Procedure Act, as set forth above.

THIRD CAUSE OF ACTION:

UNLAWFUL RETALIATION IN VIOLATION OF THE FIRST AMENDMENT

99.    These adverse actions were taken because of plaintiff's exercise of his right to access the courts, to report staff misconduct against him and/or to undertake pro bono legal activities.   If not for his exercise of these rights, plaintiff would not have taken the adverse actions above.

100.   The above actions would have dissuaded inmates of ordinary firmness from free exercise of their rights and did so dissuade plaintiff in regard to his exercise of at least some rights.

101. The above actions were not actually taken in furtherance of any legitimate penological goal.

### **RELIEF REQUESTED**

WHEREFORE Plaintiff requests that the Court grant the following relief:

A. Issue a declaratory judgment stating that:

1. By refusing to allow a legal visit by a forensic expert acting through Plaintiff's civil and criminal attorneys, Defendants unjustifiably obstructed the availability of professional legal services to Plaintiff, in violation of the First and Sixth Amendments of the U.S. Constitution.

2. The visit by Plaintiff's expert was to be allowed under BOP regulations, and by refusing it Defendants acted arbitrarily and capriciously, abused their discretion and failed to follow mandatory agency procedures, in violation of the Administrative Procedures Act.

3. By refusing under pretext of security concerns to allow a legal visit by a paralegal supervised by Plaintiff's attorney, Defendants unjustifiably obstructed the availability of professional legal services to Plaintiff, in violation of the First and Sixth Amendments of the U.S. Constitution.

4. The visit by the undersigned's paralegal was to be allowed under BOP regulations, and by refusing it Defendants acted arbitrarily and capriciously, abused their discretion and failed to follow required agency procedures, in violation of the Administrative Procedures Act.

5.     The Defendants interfered with Plaintiff's access to professional legal services to retaliate against and impede his exercise of protected rights, including his exercise of the right of access to the courts, his reports of official misconduct, and his pro bono legal activities.

B. Issue an injunction ordering Defendants Baltazar, Jusino and Mitchell to:

1. Allow unaccompanied legal visit during standard business hours by Dr. George Goldman, with the first appointment to be available as soon as feasible and not later than four days from the date of any order entered by the Court in this matter.

2. Allow unaccompanied legal visits during standard business hours by paralegal William Fuller, provided that Mr. Fuller remains under the supervision of attorney Stacy Scheff, although Ms. Scheff need not be present at any visit.

C. Grant such other relief to which it may appear Plaintiff is entitled.

Dated:  August 7, 2018


STACY SCHEFF
Attorney for Plaintiff
Matthew Muller

## VERIFICATION

I, Matthew Muller, swear under penalty of perjury that the foregoing information is true and correct.

_Matthew Muller_

Done this 7th day of ~~July~~ August in Tucson, Arizona.