STACY SCHEFF (No. 028364)
LAW OFFICE OF STACY SCHEFF
P.O. BOX 40611,
TUCSON, AZ 85717-0611
Tel: (520) 471-8333
Fax: (520) 300-8033
stacy.scheff@gmail.com

Attorney for Matthew D. Muller

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Matthew D. Muller**, <br> Plaintiff, <br>  v. <br> **United States of America**; <br> **Juan Baltazar**, Warden, Federal Correctional Complex Tucson; <br> **Robbie L. Rhodes**, Warden, Federal Correctional Institution Tucson; <br> **Thahesha L. Jusino**, Associate Warden, U.S. Penitentiary Tucson; <br> **Lora R. Molinar**, Supervisory Correctional Systems Specialist, U.S. Penitentiary Tucson; <br> **Lori A. Mitchell**, Legal Assistant, U.S. Penitentiary Tucson, <br><br>  Defendants. | No:  4:18-cv-00376-RCC-PSOT <br><br><br> **CONSOLIDATED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM** |

Plaintiff Matthew Muller, via counsel, hereby requests a preliminary injunction

seeking two things: 1. To order the Federal Bureau of Prisons to allow Mr. Muller to

receive an independent psychiatric examination, to determine his current mental state. 2.

To temporarily block a planned extradition to California to stand trial in the state for the

same crimes for which he is now incarcerated. Plaintiff brings this motion pursuant to

the provision of Rule 65, Fed.R.Civ.P. The grounds in support of this Motion are that

Plaintiff will suffer immediate and irreparable injury, loss, and damage unless the threatened action of defendants is enjoined and restrained by this Court. This Motion is supported by the below Memorandum of Points and Authorities.

## Certification of Efforts to Resolve Disputes and Provide
## Notice That Plaintiff Will Seek TRO

(Pursuant to Fed. R. Civ. P. 65(b) and LRCiv 7.2(j))

- Exhibit A: Declaration of Matthew Muller in Support of Motion for Temporary Restraining Order and Preliminary Injunction

- Exhibit B: Emails with Defendant Mitchell

- Exhibit C: Record of Correspondence Attempting to Resolve Disputes and Advising of Intent to Seek TRO

Pursuant to Federal Rule of Civil Procedure 65(b), the undersigned certifies that she and Plaintiff have made extensive efforts to resolve this matter informally with Defendants and have duly advised Defendants of this request for preliminary relief. Plaintiff and the undersigned have made over ten contacts with Defendants regarding the requested psychological examination.

The initial requests for the assessment were made on June 25 and 28, 2018.  On June 29, Plaintiff sent Defendant Baltazar, current Warden of USP Tucson, a detailed letter requesting reasons for the refused legal visit and an informal resolution to the matter.  On July 2, 2018, Plaintiff discussed the matter in person with Associate Warden Jusino and also sent a detailed letter repeating requests made to Warden Baltazar.  On July 3, Plaintiff spoke with Ms. Jusino again to confirm that officials would not change

their position or give more information about their refusal to allow a psychological examination.  On July 6, Plaintiff sent another letter to Ms. Jusino and the USP Tucson legal department, emphasizing his desire to avoid litigation and asking what reasons Defendants had to refuse what should be a routine legal visit.  On July 9, Plaintiff sent a final letter requesting informal resolution and advising Defendants he would seek a temporary restraining order and legal fees should they force him to file this action.  On or about July 11, 2018, Plaintiff filed a formal request for administrative remedy direct to the USP Tucson Warden. He requested expedited processing in view of the matters time sensitivity.  No response has been received, other than to advise the undersigned that her paralegal may not visit the prison unaccompanied in order to obtain Plaintiff's signature on documents needed for this filing.

Various other informal contacts have been made by the undersigned and her staff.

Attached as Exhibit C is records of messages and letters sent to Defendants.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This is a civil rights action seeking narrow injunctive and declaratory relief under the Court's federal question jurisdiction.  The Plaintiff, Matthew Muller, is a federal inmate at U.S. Penitentiary ("USP") Tucson, where the Defendants are employed.  Those Defendants and their subordinates detained Mr. Muller and consigned him to segregated confinement for helping an innocent man seek exoneration.  They locked the Plaintiff in a cell with dangerous inmates they knew and intended would attack Mr.

Muller, causing him to be beaten and raped.  Defendants and their subordinates denied Mr. Muller care when their mistreatment drove him to depression and near-suicide. Then they falsified Mr. Muller's health records to cover up their misconduct and make it appear that he was in good health.  Now, the Defendants are seeking to transfer Mr. Muller—knowing the serious risk it poses to his life—before outside investigators can uncover the full extent of the corruption that led to Mr. Muller's ordeal.

Mr. Muller seeks only to temporarily halt this transfer until his health has stabilized and he can learn whether he has been infected with the HIV/AIDS virus and requires treatment for the same.  This transfer is imminent and Mr. Muller requires a temporary restraining order to avoid a threat to his life and other irreparable harm.  He also requests an order requiring Defendants to allow an independent forensic psychologist to visit Mr. Muller and assess his condition.  Plaintiff has sought this examination for the past two months and Defendants have blocked it without justification**.**

## STATEMENT OF FACTS AND OF THE CASE

Mr. Muller is a Marine Corps veteran, a former attorney and a past faculty member at Harvard Law School.  His legal career focused on public interest law and access to justice, and his *pro bono* activities in prison have continued to reflect those values.  First Am. Compl. ¶¶ 17, 20-22 (Verified by Plaintiff).  Mr. Muller was forced by psychiatric illness to retire from the practice of law, was later disbarred as a result of attempting to keep working while ill and ultimately was incarcerated over events related

to his mental health.  Plaintiff had no prior criminal record.  He worked primarily in the nonprofit sector and was engaged continuously in one form of public service or another for over two decades, excepting periods of severe depression.

Upon arriving at USP Tucson, Mr. Muller was almost immediately threatened by prison officials.  He was warned that those officials knew he had been a lawyer and would be retaliated against if he helped any prisoners with their legal work.  *Id*. at ¶¶ 18-19.   Mr. Muller was initially dissuaded.  But he eventually decided he had to take the risk in order to help inmates he believed were wrongly convicted.  *Id*. at ¶¶ 20-28. Mr. Muller's work quickly branched out to helping inmates with a variety of legal matters, though never anything directly adverse to prison officials due to his fear of retaliation.  *Id*.

Nevertheless, prison officials eventually retaliated against Mr. Muller for his *pro bono* activities.  They lodged false disciplinary charges against him.  *Id*. at ¶¶ 29-30. Plaintiff was consigned to segregated confinement, where prison officials intentionally caused Mr. Muller to be beaten and raped.  *Id*. at ¶¶ 34-60.  This maltreatment nearly killed the Plaintiff, driving him to depression and a near-suicide.  *Id*. at ¶¶ 69-78.  A prison psychologist falsified Mr. Muller's mental health records to cover up her deliberate indifference to his psychiatric crisis, inventing therapy sessions with notes of conversations that never happened.  *Id*. at ¶¶ 72-73.

Now, the Defendants are blocking a legal visit by an independent forensic psychologist retained to document Mr. Muller's true psychological condition.  *Id*. at

¶¶ 83-85.  The Defendants are also seeking to quickly transfer Plaintiff away from USP Tucson, before he can participate in an investigation into misconduct against him.  *Id*. at ¶¶ 90-104.  In the process, they have deprived Mr. Muller of his rights under the Interstate Agreement on Detainers Act ("IADA").  Further, they are violating state and federal law as well as Bureau of Prisons ("BOP") policy by tendering Plaintiff directly to out-of-state authorities with no extradition hearing.  That transfer is now imminent, and poses a serious threat to Mr. Muller's life and safety.  *Id*. at ¶¶ 104.

To avoid irreparable injury, Plaintiff requests a preliminary order staying any transfer at least until a hearing is held in this matter.  He further requests that Dr. George Goldman, a respected Tucson forensic psychologist, be allowed a legal visit with Mr. Muller in order to preserve transient psychological evidence and to assess his mental condition and fitness for transfer.  Dr. Goldman's expert opinion is particularly called for in view of Plaintiff's falsified mental health records—which is just one of several such falsifications by BOP officials Plaintiff will prove in the course of this matter.  Those officials should not be allowed to stack additional wrongs on top of those already inflicted on Mr. Muller.  They especially should not be allowed to do so in furtherance of an apparent cover-up effort.

## ARGUMENT

I. **PLAINTIFF IS ENTITLED TO A TEMPORARY RESTRAINING ORDER BECAUSE HIS CLAIMS WILL LIKELY SUCCEED ON THE MERITS AND IRREPARABLE HARM IS NEAR-CERTAIN ABSENT PRELIMINARY RELIEF**

Within the Ninth Circuit, the standard for issuing a temporary restraining order is

substantially the same as that for granting preliminary injunctions. *Stuhlburg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Plaintiffs seeking a preliminary injunction generally must show that (1) their claims are likely to succeed on the merits; (2) they will likely suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) the public interest favors an injunction. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *American Trucking Associations Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

The Ninth Circuit allows the above factors to be weighed using a sliding scale approach, whereby a strong showing in one factor may counterbalance a weaker showing in another. *E.g. Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2010); *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) ("plaintiffs must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and balance of hardships tipping in their favor").

Even without the benefit of this flexible approach, all four *Winter* factors weigh in favor of the requested temporary restraining order, and relief should be granted.

### A.   Without a TRO, Plaintiff Will Suffer Irreparable Harm in Multiple Legal Proceedings and Could Be Placed at High Risk of Suicide

As set forth in the complaint, it is key that Dr. Goldman assess the Plaintiff as soon as possible, and Defendants have already succeeded in delaying the exam for five weeks. Compl. ¶¶ 73-78.  The symptoms Dr. Goldman seeks to document are by their nature transient. *See generally H.S. Akiskal, Mood disorders: Clinical features*, in

PLAINTIFF'S CONSOLIDATED
MOTION AND MEMORANDUM                    7   *Muller v. United States* et al.

*Kaplan & Sadock's* COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 1693 (B.J. Sadock et al., 9th ed. 2009).  Patients suffering from serious depression typically exhibit marked cognitive impairments that correlate with other depressive symptoms and are measurable through objective tests. Muriel D. Lezak et al., NEUROPSYCHOLOGICAL ASSESSMENT 329-30 (4th ed. 2004).  Several of these tests are designed to detect malingering by patients trying to simulate psychopathology.  *Id.* at 760-61, 768 (noting the Weschler Intelligence Scales and Bender-Gestalt tests as examples).

These objective tests could provide strong validation of Plaintiff's history of depressive illness and will prove his symptoms are in no way faked or exaggerated. Plaintiff's depressive symptoms are currently improving and at some point will no longer be corroborable by these tests. Pl.'s Decl. ¶¶ 12, 17. Further passage of time will also make it more difficult for Plaintiff to prove a causal link between restrictive conditions of confinement and his severe depression. *See Id.* at ¶. 18; *cf. Jones v. Ryan*, 583 F.3d 626, 635 (9th Cir. 2009) (noting expert's testimony that passage of time between conduct at issue and mental exam diminished the relevance of the exam findings).

Further, Plaintiff will ultimately need to show that Defendants' interference with his access to courts "frustrated... or impeded" a non-frivolous claim. *Lewis v. Casey*, 518 U.S. 343 351-53 (1996); *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (applying *Lewis* "actual injury" requirement to interference cases). If Defendants are allowed to continue stalling the expert exam until Mr. Muller's condition improves further, then

objective tests of present symptoms may not corroborate his depression. This, in turn, will make it difficult to demonstrate that any objective evidence of depression ever existed at all, and that he suffered actual injury from Defendants' blocking an exam while his symptoms were at their worst.

Plaintiff has recently suffered a near-suicide and is in poor psychiatric health. Pl.'s Decl. ¶ 12. His temporary transfer away from USP Tucson is imminent, and needs the expert report to demonstrate the medical necessity of a delay in the transfer to allow for recover. *Id*. at ¶¶ 12-13. Without such a delay, Plaintiff's mental health is likely to again decline and he will be at heightened risk of suicide. *Id.*; *see* also *Darring v. Kincheloe*, 783 F.2d 874, 876-77 (9th Cir. 1986) (noting that a prisoner's request for injunctive relief will become moot if he is transferred).

Finally, as set forth in the next section, Plaintiff will succeed in showing ongoing violations of his constitutional right of access to courts. As a matter of law, the continuing deprivation of constitutional rights amounts to irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *American Trucking Associations*, 559 F.3d at 1058-59.

**B.    Plaintiff Will Succeed in Showing Defendants Have <u>Interfered With His Access to Courts</u>**

1.    The Right of Access to the Courts and to Counsel Are Among the Most Well- Established of Prisoners' Rights

The Supreme Court has pronounced that "[i]t is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S.

817, 821 (1977); *accord Silva v. Di Vittorio*, 658 F.3d 1090, 1101-02 (9th Cir. 2011) ("[u]nder the First Amendment, a prisoner has both a right to meaningful access to the courts and a broader right to petition the government for a redress of his grievances").

It is just as axiomatic that a prisoner's right to access legal services is an indispensable corollary of the right of access to the courts.  *See*, *e.g.*, *Hatfield v. Bailleaux*, 290 F.2d 632, 637 (9th Cir. 1961) (access to courts necessarily includes access to lawyers)[1].  For this reason, prison "[r]egulations and practices that unjustifiably obstruct the availability of professional legal representation or other aspects of the right of access to the courts are invalid."  *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), overruled in part on other grounds, *Thornburgh v. Abbott*, 490 U.S. 401 (1989).

2.      Defendants' Interference with Dr. Goldman's Legal Visit is Interference With Plaintiff's Access to Counsel and to Courts

Defendants have violated Plaintiff's right to meaningfully access the courts and his counsel free from unjustifiable official interference.  Plaintiff has made clear that Dr. Goldman's legal visit is not for purposes of providing care, and is needed urgently for several pending legal matters—including this one.  Nonetheless, Defendants have refused to offer any justification for disallowing the visit and have persisted in their demand that Plaintiff obtain a court order.  This requirement exists nowhere in BOP

---

[1] Some courts, including at least one Supreme Court decision, have treated the right of access to counsel as an independent constitutional right, rather than one appurtenant to the right of access to the courts.  *See*, *e.g.*, *Padilla v. Yoo*, 678 F.3d 748, 752-54 (9th Cir. 2010); *Hamdi v. Rumsfeld*, 542 U.S. 507, 539 (finding that citizens held as enemy combatants "unquestionably" have a right of access to counsel).

policy and is an impediment aimed explicitly at Mr. Muller. *Procunier*, 416 U.S. at 419. It is also a rather stale ploy that courts first saw through decades ago. See *Straub v. Monge*, 815 F.2d 1467, 1470 (11th Cir.), *cert. denied* 484 U.S. 946 (1987) (striking down a prison rule requiring inmates to obtain a court order to use the law library for anything besides criminal appeals). Defendants are no more likely than past officials to fool a judge with this obstructionist device.

Meaningful access to courts necessarily includes access to forensic experts retained by counsel, who are frequently integral to a case. *See generally*, *e.g., Richter v. Hickman*, 578 F.3d 944 (9th Cir. 2009). Indeed, BOP regulations themselves recognize not only inmates' right of access to lawyers, 28 C.F.R. § 543.13, but also their right of access to professionals working with lawyers—even law students. 28 C.F.R. §§ 543.15-543.16. The BOP "accords such assistants the same status as attorneys with respect to visiting and correspondence." 28 C.F.R. § 543.16(a). Defendants' restrictions on legal visits are therefore contrary not just to the Constitution, but to the BOP's own regulations—making them a multipronged violation of the Administrative Procedures Act. *See* 5 U.S.C. § 706.

Defendants also failed to follow prescribed procedures for restricting legal visits. *See* Federal Bureau of Prisons, Program Statement 1315.07: Legal Activities, Inmate (Nov. 5, 1999) (requiring consultation with Regional Counsel prior to any restriction on legal visits). And they failed to state any rationale for their decision to bar legal visits by a forensic psychologist acting as an expert witness and not a care provider. *See*

*Arrington v. Daniels*, 516 F.3d 1106, 1114 (9th Cir. 2008) (failure to state rationale for decision rendered BOP action arbitrary and capricious in violation of the APA).  Given these myriad violations, Mr. Muller's claims that the BOP interfered with his access to counsel are likely to succeed on their merits.

### C. The Equities Tip Sharply Toward Plaintiff, Who Stands to Lose Everything, and Away from Defendants, Who Lose Nothing If A TRO Is Granted

Absent immediate relief, the harm to Plaintiff will mount as it becomes less and less possible for a forensic expert to detect and document his present symptoms. Defendants will have succeeded in depriving him of the best evidence for overturning a 40-year prison sentence.  They will also have left him without strong medical evidence of the need to delay his imminent transfer.  This exposes Mr. Muller to a heightened risk of being overwhelmed by psychiatric illness and committing suicide.

The Defendants, by contrast, lose nothing to which they are otherwise entitled. They have put forth no justification for their forensic expert blockade. They have not acted pursuant to any standing policy.  Indeed, all BOP policies appear to point the other direction.  The balance of the equities therefore tips entirely toward the Plaintiff and a grant of preliminary relief. *See*, *e.g., Benda v. Grand Lodge*, 584 F.2d 308, 315 (9th Cir. 1978) ("[i]f the balance of harm tips decidedly toward the plaintiff" and at least some showing is made on the remaining factors, relief may be granted).

Indeed, Defendants have stated that they will readily comply if a court orders Dr. Goldman's assessment to proceed.  *See* Exhibit B (including correspondence in which

Defendant Mitchell states the prison will allow an exam with a court order).

### D.     The Public Interest Always Favors Protection of Constitutional Rights

Finally, the public interest will be served by a grant of preliminary relief.  It is by now axiomatic that it is in the public interest for government officials such as the Defendants to obey the Constitution and other laws. *E.g. Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir. 2001) (observing that it is in the public interest to uphold prisoners' constitutional rights); *City of Los Angeles v. Lyons*, 461 U.S. 95, 136 (1983) (noting that in cases involving government actors, courts "have much greater latitude in granting injunctive relief in furtherance of the public interest... than when only private interests are involved") (internal quotations omitted); *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) ("it is always in the public interest to protect constitutional rights").  The public interest is even more strongly implicated where—as here—the Constitutional rights at issue involve access to the courts, and hence the ability to vindicate all other protected rights.

## II.     THE REQUESTED PRELIMINARY RELIEF IS CONSONANT WITH RULE 65 AND THE PRISON LITIGATION REFORM ACT

A TRO under the terms Plaintiff has requested is properly tailored under the Prison  Litigation Reform Act and addresses only the harm caused to Mr. Muller. See *Lewis v.  Casey*, 518 U.S. 343 (1996); *Gomez v. Vernon*, 255 F.3d 1118, 1130-31 (9th Cir. 2001).  District Courts elsewhere in the Ninth Circuit have granted similar preliminary relief safeguarding prisoners' access to counsel. *E.g. Johnson v. Sullivan*, No. 1:06-cv-01089-ALA, 2008 U.S. Dist. LEXIS 105935, 2008 WL 5396614, *7 (E.D.

Cal., Dec. 23, 2008) (ordering multiple measures to stem a prison's interference with access).

### A. Plaintiff Has Made Extensive Efforts to Reach Informal Resolution, and Has Notified Defendants of the Filing of This Motion

Mr. Muller and the undersigned have diligently attempted to reach an out-of-court resolution with USP Tucson officials.  As set forth in the Verified Complaint, these efforts have included in-person conferences, e-mail communications and six detailed letters citing constitutional and BOP authority.  Replying to an initial contact, Defendants stated that inmates were not allowed visits for treatment by outside physicians.  Plaintiff immediately clarified that Dr. Goldman's visit was legal in nature, that he was adjunct to Plaintiff's attorney, and that the visit was not for medical or mental health care.  Defendants declined to further explain their reasons for refusing the legal visit.  They stated only that they would require a court order.  These efforts have continued for over a month—beginning from June 25, 2018—and included notice two weeks ago that Plaintiff would seek a TRO.

Plaintiff filed a formal administrative remedy request three weeks ago, although for reasons described below this was not required.  There has been no reply and Defendants have not relented.  The Court may now act to prevent further irreparable injury to Plaintiff.

### B. No Administrative Remedy is "Available" Within the Meaning of the Prison Litigation Reform Act

The Supreme Court has held that the text of the Prison Litigation Reform Act

("PRLA") requires an inmate to exhaust only those grievance procedures that are meaningfully "available" to a prisoner to address the grieved matter. *Ross v. Blake*, 136 S.Ct. 1850, 1859 (2016) (citing 42 U.S.C. S 1997e(a)).  The Court noted that "the ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose.'" *Id.* at 1858 (quoting and citing various dictionary definitions).

In this case, the BOP remedy program offers no relief that addresses the time-sensitivity of the forensic psychological examination.  It would take up to six months to completely exhaust purported remedies.  *See* 28 C.F.R. § 542.14 et seq. (providing timelines for initial remedy requests and appeals).  Given the transient nature of depressive episodes in individuals suffering from bipolar disorder, the symptoms prompting the need or justification for a forensic examination would likely be gone by the time a final administrative appeal was decided.  The purported remedy would be akin to a nine-month appeal process for a female prisoner denied a prenatal medical intervention.  Such a remedy is not "available" within the meaning of 42 U.S.C. §1997e(a), because it is not capable of use to redress the complained-of matter.  Accordingly, the PLRA exhaustion requirement is no bar to the Court granting either temporary or ultimate relief in this matter.

C.  **Even if an Administrative Remedy Were Available, the <u>"Irreparable Harm" Exception Would Apply</u>**

As set forth elsewhere in this motion, Plaintiff would suffer irreparable harm if the forensic examination is further delayed.  In enacting the PLRA, Congress intended to incorporate well-established administrative law exceptions to the exhaustion

requirement.  *See Ross*, 136 S.Ct. at 1863 (Breyer, J., concurring) ("Congress intended the term 'exhausted' to mean what the term means in administrative law, to include administrative Law's well-established exceptions to exhaustion") (internal quotations and citations omitted).  These well-established exceptions encompass situations in which an individual would suffer irreparable harm if required to fully exhaust remedies.  Such is the case here.

> D.    **The PLRA Did Not Abrogate Court's Authority to Grant Temporary Relief Pursuant to Rule 65**

Courts retain their traditional equitable discretion to grant temporary relief pending exhaustion of administrative remedies.  *Jackson v. District of Columbia*, 254 f.3d 262, 267-68 (D.C. Cir. 2001).  The Supreme Court has held that since the text of the PLRA contained no provision barring preliminary injunctions pending exhaustion, Congress did not overturn the usual practices of litigation allowing such relief.  *See Jones v. Bock*, 549 U.S. 199, 214-17, 220-22 (2007) (referring specifically to practices allowed under the Federal Rules of Civil Procedure).  Accordingly, the Court may, pursuant to its authority under Rule 65, issue a TRO allowing the forensic examination to proceed.

III.    **PLAINTIFF SHOULD NOT BE REQUIRED TO POST SECURITY BECAUSE DEFENDANTS WILL SUFFER NO DAMAGES**

Typically, litigants obtaining a temporary restraining order are asked to post security against any damages their opponents may sustain. Fed. R. Civ. P. 65(c). However, the individual Defendants in this case—U.S. government employees sued in

their official capacities—will suffer no damages if the requested interim relief is granted.  In addition, Plaintiff suffers from a life-threatening illness, the severity of which could be exacerbated if relief is not granted.  *See*, *e.g.*, *Elliot v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996) (noting that district courts have discretion to waive the Rule 65(c) bond requirement where "the balance of the equities weights overwhelmingly in favor of the party seeking the injunction").

District courts have wide discretion in fashioning the amount of any bond to be posted, and "the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).  Such is the case in this action.  No posting of security should be required.

## CONCLUSION

For all the foregoing reasons, Plaintiff's motion should be granted and a temporary restraining order issued.

Dated: August 24, 2018

S. Scheff

STACY SCHEFF
Attorney for Plaintiff
Matthew Muller

EXHIBIT A

STACY SCHEFF
LAW OFFICE OF STACY SCHEFF
P.O. BOX 40611, TUCSON AZ 85717-0611
Tel: (520) 471-8333
Fax: (520) 300-8033
stacy.scheff@gmail.com
State Bar No. 028364

Attorney for Matthew Muller

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mathew D. Muller,<br><br>            Plaintiff,<br><br>      vs.<br><br>United States of America;<br>Robbie L. Rhodes, Warden, Federal<br>Correctional Institution Tucson;<br>Juan Baltazar, Warden, Federal Correctional<br>Complex Tucson; W. Jusino, Associate<br>Warden, U.S. Penitentiary Tucson;<br>Lorri Mitchell, Legal Assistant,<br>U.S. Penitentiary Tucson; Jane/John Does<br>1-25 employees at USP Tucson,<br><br>            Defendants. | CASE NO.: 4:18-cv-00376-RCC-PSOT<br><br>**DECLARATION** |

### DECLARATION OF MATTHEW MULLER IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

I, Matthew Muller, declare under penalty of perjury:

1. I am the plaintiff in this case.  I make this declaration in support of my

motion for a preliminary injunction and temporary restraining order ("TRO").

2. I have read the averments made in the complaint and verify under penalty of perjury that they are true. I adopt those facts as part of this supporting declaration.

3. As stated in the Verified Complaint, I was subjected to segregated confinement because I was giving legal help to another inmate I believe was wrongfully convicted. At least seven officials at U.S. Penitentiary Tucson--ranging from correctional officers to senior prison management--have told me explicitly that I should stop helping inmates with their legal matters. Some officials were threatening, and some were just trying to help me avoid trouble from other officials. But they all were clear that I would be retaliated against if I did not stop helping inmates.

4. Based on these contacts and on my observations of what has happened to other inmates who give legal help, there is an unwritten policy at USP Tucson of punishing inmates who offer legal assistance to others. This custom applies whether or not an inmate accepts money for his services (I did not), and whether or not an inmate limits his assistance to legal matters not involving prison staff (I did so limit myself).

5. On about April 30, 2018, I was confronted by Lieutenant Schied in the Special Housing Unit ("SHU") where I was detained.  He told me that if I did not like the difficult conditions in the SHU, then I should stop helping inmates with their legal work.  When I stated that I would continue to help any inmate I believed to be innocent, Schied yelled at me, threatened me with false disciplinary and criminal charges, and forced me into a cell with a dangerous inmate he either knew would harm me or bribed to harm me.

6. On about May 2, 2018, I was raped by that inmate.  Even after that, I still could not get moved out of the cell--until on May 4 he assaulted me again and I was moved.

7. I was then put into a cell with a different, almost equally volatile inmate. He attacked me, leaving me with multiple bleeding lacerations to my face and various contusions and swelling.

8. The physical impacts of these attacks were not pleasant.  But they were nothing compared to the mental agony I endured from the combined effect of the attacks, the degrading conditions of confinement, and the refusal of proper treatment for my long-time psychiatric illness.  Things got so bad that my parents hired an attorney, Stacy Scheff, just to help me get treatment and

3

survive the SHU.  They are both retired public school teachers who have two other adult children unable to work because of psychiatric illness.  So, it is a big expense for my family.

9. Even with an attorney, I could not get the help I needed.  At first, prison officials blocked me from even seeing Stacy.  Then they kept me from calling her.  One of the three letters I sent to her via confidential legal mail--the most important letter--never arrived.  It was hard for me to do much of anything while I was that depressed, so the different obstacles the prison threw up were successful in keeping her from helping me much.

10. After begging for psychiatric treatment again and again, I finally gave up and could no longer endure the mental suffering.  I made plans to kill myself.  And I am quite sure I would have, if my cellmate Cody Jackson had not become suspicious.  He opened up some sealed envelopes while I was away from the cell, read suicide notes I had written and figured out my plans to kill myself.  Cody contacted my lawyer Stacy, and together with her and some other inmates managed to get another Bureau psychologist to have me released from the SHU so that I could begin to recover.

11. In part because of my detention in the SHU, I am currently dealing with an extradition request from Solano County, California. I had been in the middle of negotiating a resolution to those charges when I was sent to the SHU in April. I asked SHU officials again and again to allow me to contact my attorney for that process, but it was weeks before that was allowed. As a result, negotiations broke down and Solano County continued with their extradition request.

12. Right now, as a result of everything that happened in the SHU, I am in poor mental health. I have recovered a good bit in the month since my release. But I am far from being ready to deal with the stress of transferring to a new institution and facing a new case.

13. Based on my health history, I think there is a high likelihood that the stress of that process would cause me to relapse into a serious depressive episode with high suicidality. The transfer will never be easy. But a few more months to recover could well be the difference between a difficult process and a lethal one.

14. I have tried requesting a delay in my extradition for mental health reasons. But I need to prove that it is really needed. So Stacy arranged for a

psychological examination that would help me prove the need and also serve at least two other purposes.

15. First, I had a pending § 2255 motion that I wanted to support with a mental health examination.  I was in solitary confinement for nearly two years during my federal criminal proceedings.  Much like what happened in the SHU here, I became severely depressed.  I pleaded guilty not because I was guilty, but because I did not care what happened to me.  I did not contest any of the untrue things people were saying about me.  My depression made me think I was worthless and so deserved to have bad things happen to me and said about me.  I was planning to commit suicide anyhow, so it didn't matter to me whether I was free or imprisoned for life.  It seemed easiest and cheapest for my family for me to just plead guilty.  So that is what I did.

16. The one silver lining about how bad my depression got in the SHU was that it was very similar to the way things happened in jail during my trial. So I wanted an expert to examine me while I was in that state of depression, and then testify and report on whether he thought I would be competent to plead guilty under those circumstances.  The expert could use tests and analyses to prove how depressed I was.  From what I understand, there are

certain cognitive impairments consistent with depression that could be measured.  But only if the expert assessed me while I was depressed.

17. If the prison had not blocked my legal visit like they did, I would have had a chance to have my mental health  and cognition assessed under circumstances very relevant to my § 2255 claims.  I am still suffering from depression now, I believe, even if it is not as bad as a month ago.  It is horrible being depressed, so I am doing everything I can to recover.  At the same time, I still want to be assessed while I am measurably depressed.  So I need a psychological examination as soon as possible.

18. Even more important than my own case, I hope to prove how restrictive confinement often causes depression or makes it much worse.  And how severe depression, in turn, causes people to plead guilty when they are not.  I thought that what happened in my case was very rare.  But I have already interviewed two inmates at USP Tucson who experienced the same.  They both committed a lesser offense they were accused of--one very minor--but ended up pleading guilty to major crimes because depression left them without the will to fight or to care what happened to them.

19. Since I have such a well-documented history of suicidal depression, and because I was in very poor mental health following confinement in the SHU, I

figured I could make the best of a bad situation.  I wanted to get an assessment right away to show how someone in my condition has no business making decisions that affect their lives and the lives of their families.

20.  Of course, a mental health examination would also prove how much I suffered as a result of things that happened in the SHU.  That is not why I wanted the exam, but it is probably a reason why prison officials are trying to block it.  But suing the Bureau of Prisons for damages is one of the last things on my mind right now.  I am just trying to get healthy and survive the next few months.  I only want to be left alone for a while, so I can get better.

21. Once that happens, I do plan to continue helping inmates with their cases--especially their § 2255 motions.  I think any jurist would be as shocked as I was to learn how many cases there are of probable innocence among inmates here.  Just one such case in the entire prison would be too many.  But there are certainly more.  I taught classes at Harvard on credibility assessment and screened hundreds of prospective clients in a fairly high-fraud area of law (asylum claims).  I am not naive about people making up stories to get what they want.  These are real cases of innocent people with long prison sentences.

22. What I *have* been naive about is trusting to good faith and the integrity of prison officials.  I thought that if I was respectful and judicious about who I helped and how, I would be left alone to do my work.  Who could take issue with helping the innocent go free?  Apparently, it is not that simple.

23.  Most Bureau employees do their jobs and try to be fair with inmates. But some officials are not so benign.  They think inmates deserve whatever sort of treatment they see fit to mete out.  These officials are seldom held to account when that treatment amounts to abuse.  Fellow officers are reluctant to break the code of silence, so they stand aside.  And courts are perennially skeptical of prisoners' inexpert claims.  Many judges are quick to credit officious explanations of how harsh measures are necessary, or how convicts always lie and manipulate.  So abuse-prone employees--many of whom would serve well in a culture of accountability--are allowed to run amock and corrode prison life for inmates and officers alike.

24.  I do not have the answer to these problems.  But I at least know it is critical that prison officials be restrained from blocking the courthouse doors, or from barring the prison doors against attorneys seeking to access their clients.  That is exactly what the Defendants are doing to me.  I at least am lucky enough to have a wife and family who can help me overcome the

barriers, and legal skills when I am well enough to use them.  Most inmates are not so lucky.

25.  I respectfully ask that the Court hold the Defendants accountable for intentionally obstructing inmates' access to justice under false pretenses of maintaining security and order.

I, Matthew Muller, declare under penalty of perjury that the foregoing is true and correct.  Done this thirtieth day of July, 2018, in Tucson, Arizona.

Signed: /s/ Matthew Muller
                Matthew Muller

10

EXHIBIT B

 **PimaCommunityCollege**

**William Fuller <wfuller@mail.pima.edu>**

---

# Matthew Muller # 728755-097

5 messages

---

**William Fuller** <wfuller@mail.pima.edu>                                    Mon, Jun 25, 2018 at 12:58 PM
To: Lorri Mitchell <l1mitchell@bop.gov>, TCN/Exec Assistant~ <TCN/ExecAssistant~@bop.gov>

Hello,

I am trying to schedule an independent psychological examination for
Mr. Muller, I wrote Mr. Bacon last week who said he would look into
it.  and I have gotten no further response.  Mr. Muller is not doing
well, and needs to be seen by a doctor who will give an accurate
assessment of his condition.  His father visited yesterday, and tells
me that Mr. Muller is very close to crisis.

In the conversations we've had with Mr. Muller it appears that the
mental health care he's receiving in the SHU is substandard to the
point of indifference.

We have a respected Psychologist, Dr. George Goldman, willing to
examine Mr. Muller as soon as tomorrow, Dr. Goldman is even willing to
meet with Mr. Muller inside your facility.  We just need a response
from someone.

Thank you,

Bill Fuller
Paralegal

---

**Lorri Mitchell** <l1mitchell@bop.gov>                                       Mon, Jun 25, 2018 at 1:10 PM
To: William Fuller <wfuller@mail.pima.edu>
Cc: Marlan Bacon <MBacon@bop.gov>, TCN/ExecAssistant~@bop.gov

Mr. Fuller,
Program Statement 6031.04, Patient Care only contemplates an examination by a personal physician, not an
independent mental health evaluation as being requested.  Absent this being at the request/order of a court of
competent jurisdiction we cannot accommodate this request.
Additionally, I have forwarded your concerns of inmate Muller's mental health to Psychology.
Thank you,


*Lorri Mitchell*
*Legal Assistant*
*Federal Bureau of Prisons*
*Federal Correctional Complex Tucson*
9300 South Wilmot Road
Tucson, AZ 85756
(520) 663-5000


SENSITIVE/PRIVILEGED COMMUNICATION
The information contained in this electronic message and any and all accompanying documents constitutes sensitive
information.  This information is the property of the U.S. Department of Justice.  If you are not the intended recipient
of this information, any disclosures, copying, distribution, or the taking of any action in reliance on this information is
strictly prohibited.  If you received this message in error, please notify us immediately to make arrangements for its
return to us.

>>> William Fuller <wfuller@mail.pima.edu> 6/25/2018 12:58 PM >>>
[Quoted text hidden]

---

**William Fuller** <wfuller@mail.pima.edu>                    Mon, Jun 25, 2018 at 1:22 PM
To: Lorri Mitchell <l1mitchell@bop.gov>

"In some cases, it is appropriate to assign an inmate to multiple
clinics if this allows better tracking for follow-up by outside
specialists, e.g. psychiatrists and infectious disease consultants"

The policy statement does contemplate the need for outside mental
health providers.  Can we do this without the courts?
[Quoted text hidden]

---

**William Fuller** <wfuller@mail.pima.edu>                    Sun, Jul 8, 2018 at 3:46 PM
To: Stacy Scheff <stacy.scheff@gmail.com>

[Quoted text hidden]

---

**William Fuller** <wfuller@mail.pima.edu>                    Tue, Aug 7, 2018 at 2:49 PM
To: Stacy Scheff <stacy.scheff@gmail.com>


---------- Forwarded message ----------
From: **William Fuller** <wfuller@mail.pima.edu>
[Quoted text hidden]

EXHIBIT C

TRULINCS 72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

-------------------------------------------------------------------------------

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 06/29/2018 01:19:16 PM

To: Warden Baltizar
Inmate Work Assignment: A-2 Unit Orderly

Dear Warden Baltizar,

I am writing to request that my extradition to Solano County be delayed for health reasons until at least October 1, 2018. I would also like you to please reverse the decision of your staff blocking my expert witness from visiting to examine me.

As you may know, Solano County, California, has requested temporary custody of me under the Interstate Agreement on Detainers (IAD). On about June 21, I exercised my right under IAD Article IV(a) to have at least 30 days in which to oppose transfer.

I am actually eager to meet the Solano charges. But I was just released from the SHU here, where some rather extreme things happened and left me in a poor state of mental health. That ordeal would have affected anybody. The fact that I'm a care level 3 inmate suffering from bipolar illness made it much worse. I need to recover before I can reasonably face new charges and a new institution.

So I am requesting at least three months to regain my health. This is only about 60 days past the earliest date on which Solano County could otherwise take custody. I have hired a local forensic psychiatrist, Dr. Goldman, to examine me and document the medical necessity of this brief delay. He will also submit a time-sensitive expert report in my 28 U.S.C. sec. 2255 motion, in which I face a past-due filing deadline.

For some reason, your staff is blocking my expert witness from conducting his examination. Just to clarify: Dr. Goldman is not visiting to provide medical treatment. He is visiting for legal purposes, as the agent of my local attorney Stacey Scheff and my Sacramento-based attorney Richard Dudek. Ms. Scheff is being forced to obtain a court order directing the prison to allow the examination. It really is well-settled law that access under these circumstances is a matter of right, not of the prison's discretion. The likely result of your staff's opposition is that the Bureau will be liable to me for the cost of obtaining the court order and for damages resulting from the delay in access. Please consider allowing the exam without a court order.

Please also note that it may be against the interests and wishes of the Sacramento U.S. Attorney's Office to transfer me to Solano at this time. They are responsible for opposing my section 2255 motion. Issues affecting that motion may be litigated in Solano County in a way that binds the U.S. Attorney as well. That office may wish to have the first opportunity to litigate those issues. I am not sure whether they apply to IAD transfers, but regulations do provide that "[i]f the inmate... has federal civil proceedings pending, staff must clear the transfer through the U.S. attorney" (2255 motions are considered civil proceedings). 28 C.F.R. sec 527.31(e). They also state that extradition decisions must ensure that "the safety or other interests of the inmate... are not seriously jeopardized, and that federal interests... will not be interefered with, or harmed." 28 C.F.R. sec. 527.31(b). DOJ regulations specify that "[a]uthorization may not be given where substantial concer exists over any of these considerations." Id.

Thank you, sir, for considering that matter. I feel that litigation is always a last resort, but I will do what is needed to protect my health and interests. Hopefully the matter can be resolved amicably without unnecessary expenditure of goverment resources.

Respectfully,
Matthew Muller

LINCS  72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

-------------------------------------------------------------------------------

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 07/02/2018 11:39:22 AM

To: AW Jusina / Legal Department
Inmate Work Assignment: A-2 Unit Orderly

Dear Associate Warden Jusina,

Thank you for taking the time to speak with me at lunch today.  I'm writing to follow up on my attorney's request that a psychiatric expert be allowed to visit me on Tuesday, June 26, 2018, to conduct a forensic examination.  The expert's report is needed to support my pending section 2255 motion.  I also need to document the medical necessity of a short delay in my extradition to Solano County, California.

As we discussed, the legal department denied my attorney Stacy Scheff's request.  Perhaps there was some confusion. Dr. Coleman's visit is not for purposes of medical treatment.  He is acting as an expert witness and is the agent of my attorney.  As you can confirm with your legal staff, it is very well-established law that attorneys and their bona fide agents have a right of access to their incarcerated clients.  Ms. Scheff was chagrined at the denial and wanted to file immediately for an injunction in federal court.  I asked her to please wait one week--until Thursday, July 5--so that I could clear up any confusion and resolve the matter informally.  If she is forced to file, she will request costs, fees and damages from the Bureau, since this should be a very standard and uncontroversial legal visit.

I would greatly appreciate it if you could touch bases with the legal department.  Perhaps there was some misunderstanding about the nature of the request.  Time is of the essence, in that I must document my section 2255 pleadings as quickly as possible.  We need to conduct the examination by the end of next week at the latest.  Ms. Scheff can be reached at (520) 471-0156 and at stacy.scheff@gmail.com .

In general, I am trying "keep my head down" and do my time, as you might recall from our talk in your office several months ago.  I do need to protect my health and legal interests.  I have already bent to the interests of the institution in quite a few matters.  There is just no reasonable alternative means of getting this forensic examination done.  I hope you will allow it.  Thank you for your time and consideration.

Respectfully,

Matthew Muller

TRULINCS  72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

---------------------------------------------------------------------------------------------------------

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 07/06/2018 12:58:59 PM

To: AW Jusino / Legal Department
Inmate Work Assignment: A-2 Unit Orderly

Dear Ms. Jusino,

Thank you for taking the time Tuesday to speak with me about my attorney's request that her expert witness Dr. Goldman be allowed to visit me to conduct a psychiatric exam. From what you explained to me, the prison will only allow the exam to take place if I obtain a court order requiring it to.

I just wanted to check in one last time in hopes this matter can be resolved amicably, without a court order. It will be both costly and time-consuming for us to obtain such an order. And it will impose even more delay beyond the two weeks that have passed since Dr. Goldman was first refused entry.

Perhaps if you share with me the reason the prison will not allow Dr. Goldman to visit, I could provide some reassurance. Is there some security concern? Otherwise, denying Dr. Goldman access would appear to run contrary to BOP regulations, to BOP Program Statements, and to applicable Supreme Court precedent. See 28 C.F.R. 543.16 ("[t]he Bureau of Prisons... accords [attorneys'] assistants the same status as attorneys with respect to visiting and correspondence"); BOP Program Statement 1315.07 (same); Procunier v. Martinez, 416 U.S. 396, 419-422 (1974) ("[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid.").

I am also concerned, because I have heard from both staff, and from other inmates who overheard staff, that efforts were being made to transfer me to another BOP facility, but that instead the intention now is to "fast track" an extradition request by Solano County so that I will be shipped away. The purpose of the psychologist visit does relate to my Solano case and the extradition matter. So we will be seeking a temporary restraining order barring the BOP from transferring me until the expert witness has had time to visit and produce a report.

Again, I would much rather work this out amicably. Please let me know if there are some concerns my attorney or I can address to facilitate the visit. Thank you for your time.

Best,

Matthew Muller

<u>Via Institutional Mail</u>

July 2, 2018

Warden Baltizar
U.S. Penitentiary Tucson
9300 S. Wilmot Road
Tucson, AZ 85756

Subject:   <u>MULLER, Matthew / Reg. No. 72875-097</u>
           <u>Attorney and Expert Witness Visit</u>

Dear Warden Baltizar,

Good day, sir.  I am writing to respectfully request that you allow my attorney to visit the prison with a psychiatric expert witness to examine me.  The exam is needed to meet an immediate deadline in my pending 28 U.S.C. §2255 motion.  I also need it to document the medical necessity of a short delay in my extradition to Solano County, California.

As you might know, my attorney Stacey Scheff sought to visit the facility on Tuesday, June 26, with our expert witness Dr. Goldman. Your staff declined to allow the appointment.  Just to clarify, Dr. Goldman's visit is not for purposes of medical treatment.  He is an expert witness in my §2255 case and needs to conduct a forensic examination to assess my mental health from 2015 to 2017, when I was being held in solitary confinement pending trial.  His report is already overdue and my §2255 motion will be substantially undermined without it.  Time is of the essence.

I do not know on what grounds your staff denied Dr. Goldman's visit.  The right of attorneys (and their agents, including expert witnesses) to access incarcerated clients is very well-established. See, <u>e.g.</u>, <u>Ching v. Lewis</u>, 895 F.2d 608, 610 (9th Cir. 1990) (striking down Arizona Department of Corrections policy allowing only non-contact visits by attorneys and their agents).  And examination by a defense psychiatric expert is very common.

My attorney has prepared a submission to obtain a court order directing the prison to allow the visit.  But I asked her not to file it yet, to see if I can resolve the matter informally.  If she is forced to obtain a court order, it is likely the Bureau will be ordered to pay me the expense of seeking the injunction. I do not wish to unnecessarily take up staff time or resources with litigation.  Please allow my expert to visit and examine me. Thank you, sir, for considering it.

Respectfully,

Matthew Muller

Attorney: Stacey Scheff - (520) 471-8333

TRULINCS 72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

-------------------------------------------------------------------------------------------------

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 07/09/2018 11:40:33 AM

To: AW Jusino / Pending IAD from Solano County
Inmate Work Assignment: A-2 Unit Orderly

Dear Ms. Jusino,

I am writing in regards to a pending request by Solano County, California, to take custody of me under the Interstate Agreement on Detainers. I was told that at some point in the process I would have 30 days in which my attorney or I could file an opposition to Solano County's request. Could you please let me know what the deadline is for that submission? As I mentioned before, that submission is going to include an expert psychiatric report. But the prison has blocked the expert witness from interviewing me.

Since the delay is being imposed by the prison, please consider extending the deadline for the opposition accordingly. Otherwise, I will need to obtain additional court orders. So far that delay has amounted to 17 days (the examination was originally scheduled for June 23, 2018).

You let me know that the prison would require a court order before allowing the examination to proceed. My attorney was told the same. I tried my best to resolve the matter informally, without litigation. I am only asking for very narrow relief--the court order plus fees and costs that were required to obtain it. If the prison tries to transfer me without giving me a reasonable opportunity to submit an opposition (including the expert report), my attorney stated that she has prepared a more extensive filing that substantially escalates the matter.

Please understand that I could have just started with this approach. There is much that I can do that I have chosen not to. The issue of the expert exam has forced me to disclose facts adverse to the prison that I had not planned to disclose and to take other steps to protect myself.

I had a right to assist inmates with their legal work and limited myself to postconviction matters and helping with certain release issues such as obtaining disability benefits. I was not doing anything that would stir up trouble at the prison. So I admit I am puzzled as to why certain staff went out of their way to stifle my work and punish me. I hope that prison staff will now proceed in the Bureau's best interest--as if a judge were looking over their shoulders assessing whether actions taken are neutral and reasonable or retaliatory and/or unreasonable. If you want me to walk small and disappear back into the inmate population like I'd like to, then please help me by engaging with my attorney, talking out any concerns you have and generally adopting a more conciliatory approach.

Thank you very much, ma'am, for considering it.

Respectfully,

Matt Muller

Staff Request Form / Cop-Out

To: SHU Lieutenant
From: Matthew Muller / #72875-097 / SHU A-120
Date: June 22, 2018

Please be advised that I am not accepting food until I am released from
the SHU, that I have no commissary food, and that I am not accepting
food from my cellmate. I began declining meals yesterday. I have asked
repeatedly for care and for information about why I am being held in
the SHU two weeks after my disciplinary matter concluded with no
D/S sentence. Again, I request a U.S. District Court Habeas Corpus
Form and a BP-10 for a "sensitive" BP-10 filing I can submit directly
to Regional Office officials next week. Thank you.

# COP OUTS SUBMITTED

4/27/2018
0700- Req. for rules/procedures
REF 1804270700-1
0700- Req for phone
REF 1804270700-2
0700- Req for property

## 4/25/2018

2pm. Request for Law Library Use

Dispo: No response

2pm Request to Use Phones

Dispo: No response

1000 1015 - Verbal for Phone Call

5pm Request to See Psych and for Reasonable Accommodation + Meds

Dispo: Saw Dr. Johnson ~ 2p 4/26/2018, said "no meds, no accom, no appeal"

No resp 2x verbal requests to use phone

## 4/26/2018

No resp 1804260656-1 - Second request for phone call

1804260656-2 - Denied recreation for being "out of compliance" ← with what? requested rec. and notice of all rules and procedures

No resp 1000 - Verbal request for phone call

1804260656-3 - Request to see Psychology ASAP

0700 - Was told I would go to rec. But they skipped me.

0720 - Spoke to C.O. Escobar explained that I did not know rules had just arrived. He said he'd get me a copy of the rules, but that I still could not go to recreation.

1804261410-1 - 4-page letter to Dr. Johnson. Request for cell sanitation rules

No resp 1804261410-2 - Requested to use phone in writing

1915 - Hit "emergency" button. Response = 1950

No resp 1900 and 1950 - 2x verbal request to use phone

No resp 2030 - 1x verbal request

## Medical Request

To: Medical
From: Matthew Muller/# 72875-097 / SHU A-120
Date: June 23, 2018

- Please note in my medical records that I stopped eating or accepting food trays on June 21, 2018. My depression has progressed to the point where I have no hunger mechanism. Food doesn't taste like anything, it's just unpleasant textures. So I don't feel like eating and can't really care about what happens if I don't. I've asked again and again for psych help in the SHU. Maybe someone will notice once my external appearance starts to look how I feel inside.
- Again, I would like to see a psychiatrist.
- I don't mean to be a pest, but a lot of my medical requests have been ignored. So I've copied down about 10 of these while I'm up to it and will just keep resubmitting until someone confirms notes have been made, or an appointment. Thanks.

To: Lt. Scheid or the Lt. on Duty for Morning
From: Matthew Muller / Reg. No. 72875-097
Date: May 3, 2018

I am in danger in my current cell. Mr. ~~Muts~~ Gaines is episodically paranoid-delusional and believes at times - especially late at night - that I am part of some sort of set-up against him. I believe he will eventually attack me as a result of his untreated mental illness. Please move me immediately. Also, Mr. Gaines is not of my sexual orientation. He usually cells with gay or transgender inmates. I am not comfortable using the toilet or shower in front of someone who is sexually interested in males.

+) June 2 (mostly
same, "just wanted to make suc...

usy, so I'll keep it short. I'm losing the fight with
I can - taking the meds, exercising, keeping busy, trying
e in the sun through the window. But I'm still
Food doesn't really taste like anything now, which is a
e, something that happens shortly before I end up in a
ld not be in the SHU, I'm not a risk to anybody
and that's caused entirely by being in the SHU. I've been here
l heaving. I am really suffering. I am trying not to
d me to a psychiatric hospital or recommend release from
reasons - even if the yard is locked down, at least I'd
ing on for a few days before I can get outside again
f this point. Thank you for considering it. I am enclosing
ent for reference.                        Best, MM

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

Note: Tried submitting to Jusino or Rhodes, warden &amp; accomps

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: MULLER, Matthew D.    72875-097    A-2/SHU 102    USP Tucson
     LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

**Part A- INMATE REQUEST**

I have been requesting to make a time-sensitive call to my attorney Stacey Scheff. The call must be made before 12pm on Friday, June 1st, 2018, and I have been submitting requests to call since May 22, 2018. I have not seen a member of my unit team on the range since then, so I have been asking other staff to submit it to them. All I need is 10 minutes at the most, probably less. The call does not need to be pre-arranged. It would be fine to leave a message on voice-mail, so long as it is a confidential call. Thank you.

5/29/2018
DATE                                    SIGNATURE OF REQUESTER

**Part B- RESPONSE**

DATE                                      WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                  CASE NUMBER: _____

                                           CASE NUMBER: _____

**Part C- RECEIPT**

Return to: _____
     LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

DATE                        RECIPIENT'S SIGNATURE (STAFF MEMBER)          BP-229(13)
                          PRINTED ON RECYCLED PAPER                                APRIL 1982

USP LVN

COP-OUT COPIES

Copy

REF: 805010630

TO: Dr. Johnson / Psychology

From: Matthew Muller / 72875-097

Date: May 1, 2018

Dr. Johnson,

I am in really poor shape. I've given it a few days to see if things stabilize. They have not. I am rapid-cycling, my moods are never this labile when I'm healthy and I do not usually have such strong anxiety. Please help me. I'll risk the four-point restraints, I'll do whatever you want. Please.

May 2 - Johnson

I have waited several days to see if my symptoms stabilize on their own. They have not. They are worse. I need medication. I need treatment. I cannot maintain control. Please help.

May 2 - To - B-Range Officer

I am not safe in my current cell. I like the hell out of Samuel Gaines. But he is suffering from a paranoid delusional episode and thinks I am in on a conspiracy against him. And I have my own mental issues to deal with. I need to be moved ASAP. Thanks.

May 2 - To B-Range Officer

I need light and exercise. I am not safe going to recreation because the officers are putting me in cages with Aryan Brotherhood members who have been harassing and threatening me on the tier. I just need to be able to get outside, for my health. Thank you for anything you can do to get me outside in a safe rec cage

Record of Cop-out
Submitted in envelope 5/29/2018 to Unit Team, SHU A-102
Hello, I don't know whether you have received my requests about a time
sensitive call to my att. Stacey Schott regarding something I rec'd about my Solano
County crim case. I need to speak w/ her by 12pm Fri 6/1/2018 or at very least have
a message. The call does not need to be pre-arranged. I would also greatly appreciate a
brief call to my wife letting her know we will be locked down this weekend. Otherwise she
will waste a great deal of time and over $500 traveling here. Thank you. Alternatively
you could send her a very short e-mail, such as: [email] Thanks for considering it.

Memorandum (Copy)

To: R.L. Rhodes, Warden
From: Matthew Muller / #72875-097 / SHU A-102
Date: June 14, 2018

My attorney reached out to you a few weeks ago to let you know that my mental health was very poor. I am still struggling. Based on the past course of my illness, my health will start to improve once I can get outside in direct sunlight and exercise in an open space. I understand you are a psychologist yourself and probably already know that clinical studies and literature support the therapeutic effects of sun, open air and exercise on depression. I am set to be released from the SHU and am waiting on your signature. In addition, my wife, mother and father are traveling here from Northern California this weekend. It would benefit my health to see them for more than just two hours through a glass barrier. I would greatly appreciate it if you could see to it that I am released from the SHU today or tomorrow.

Thank you for considering it.