STACY SCHEFF (No. 028364)
LAW OFFICE OF STACY SCHEFF
P.O. BOX 40611,
TUCSON, AZ 85717-0611
Tel: (520) 471-8333
Fax: (520) 300-8033
stacy.scheff@gmail.com

Attorney for Matthew D. Muller

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Matthew D. Muller**, | No: 4:18-cv-00376-RCC-PSOT |
| Plaintiff, | |
| v. | |
| **United States of America**; | **FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF (VERIFIED*)*** |
| **Juan Baltazar**, Warden, Federal Correctional Complex Tucson; | |
| **Robbie L. Rhodes**, Warden, Federal Correctional Institution Tucson; | |
| **Thahesha L. Jusino**, Associate Warden, U.S. Penitentiary Tucson; | |
| **Lora R. Molinar**, Supervisory Correctional Systems Specialist, U.S. Penitentiary Tucson; | |
| **Lori A. Mitchell**, Legal Assistant, U.S. Penitentiary Tucson, | |
| Defendants. | |

## INTRODUCTION

1.      This is an action for narrow injunctive and declaratory relief under the

Court's federal question jurisdiction.   Plaintiff Matthew Muller is an inmate at U.S.

Penitentiary ("USP") Tucson, where the Defendants are employed.   He alleges that

Defendants violated the Constitution and Bureau of Prisons ("BOP") policy by refusing to allow a legal visit by Dr. George Goldman—a respected forensic psychologist and expert witness retained for Mr. Muller's legal matters.  Plaintiff further alleges that prison officials are illegally attempting to expedite Mr. Muller's transfer away from USP Tucson, knowing that the transfer poses great risks to Plaintiff's health and safety.  These attempts to remove Mr. Muller come as federal officials begin their investigation of attacks and retaliation against him by USP Tucson staff.

2.     This action seeks only to allow Mr. Muller to access his legal team and to delay his transfer until it is safe.  However, to provide context and show actual and imminent injury, Plaintiff will describe how Defendants' obstructionism is part of an ongoing pattern of retaliation against Mr. Muller for his protected activities.  As a result of this retaliation, Mr. Muller has been subjected to false disciplinary charges; has been assaulted and raped at the instigation of prison officials; has suffered months of segregated confinement in degrading conditions; and very nearly committed suicide as a result of the severe psychological harm Defendants inflicted upon him.

3.     Dr. Goldman was employed by Mr. Muller's attorneys to meet with Plaintiff at U.S. Penitentiary Tucson.  He will assess Plaintiff's mental health and produce an exert report for use in time-sensitive criminal and civil matters, including this action.  Plaintiff

seeks an order allowing this routine legal interview to proceed over Defendants' unexplained objections. He also seeks a delay in any transfer away from USP Tucson until such a transfer poses no serious threat to his health and safety, and until mandatory procedures allowing him to contest such a transfer have been followed.

4.     Plaintiff has sought for over a month to reach an informal resolution with USP Tucson officials. Defendants have offered no justification for denying an examination by Dr. Goldman or for expediting Mr. Muller's transfer and refusing to follow standard procedures. Following a series of letters, messages, remedy requests and in-person conferences, Defendants still will not elaborate on the reasons for their actions. Given the threat to Mr. Muller's safety and pressing deadlines in his legal matters, Plaintiff had no reasonable alternative but to file this action.

## JURISDICTION

5.     The Court has jurisdiction to hear this matter and provide injunctive and declaratory relief pursuant to its general federal question jurisdiction under 28 U.S.C. § 1331.[1]

---

[1] *See Ministerio Roca Solida v. McKelvey*, 820 F.3d 1090, 1093-96 (9th Cir. 2016) (holding that an official capacity federal question suit is the proper vehicle for seeking injunctive relief that requires agency employees to act in conformance with agency policy and federal law); *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 404-05 (1971) (Harlan, J., concurring) (observing that where Congress has extended jurisdiction over the

6.     The Court may also grant relief under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*, in conjunction with 28 U.S.C. § 1331.[2]  The Court may also grant interim relief pending review under 5 U.S.C. § 705.[3]

7.     The Court also has jurisdiction to grant equitable relief pursuant to 28 U.S.C. § 1343(a)(4) with respect to all Defendants except the United States, to the extent those Defendants' actions are *ultra vires.*[4]

///

_____

subject matter of a suit, the "availability of federal equitable relief against threatened invasions of constitutional interests" is "presumed... absent congressional restrictions"); *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231-32 (10th Cir. 2005) (federal prisoners can seek "an injunction, based on the federal courts' equity jurisdiction, to enforce" federal rights).

[2] *See Califano v. Sanders*, 430 U.S. 99, 105 (noting that the APA does not include a jurisdictional grant but that 28 U.S.C. § 1331 "confer[s] jurisdiction on federal courts to review agency action"); *Gallo Cattle Co. v. U.S. Department of Agriculture*, 159 F3d 1194, 1198 (9th Cir. 1998) (same); *see also Trudeau v. Federal Trade Commission*, 456 F.3d 178, 186-87 (D.C. Cir. 2006) (holding that 28 U.S.C. § 702 waives sovereign immunity as to all injunctive actions against federal agencies and their officials—including but not limited to APA claims—and that unlike other APA provisions, the waiver is not premised on "final agency action" and can extend to interim action and unexhausted claims).

[3] The statute provides:  to the extent necessary to prevent irreparable injury, the reviewing court... may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve the status or rights pending conclusion of the review proceedings.

[4] *See, e.g., Sterling v. Constantin,* 287 U.S. 378, 401 (1972); *Larson v. Domestic* and *Foreign Commerce Corp.,* 337 U.S. 682, 690 (1949) (finding jurisdiction and no sovereign immunity where "the conduct against which specific relief is sought is beyond the office's powers and is, therefore, not the conduct of the sovereign").

8.     This Court has jurisdiction to provide mandamus relief pursuant to 28 U.S.C. § 1361.[5]

### PARTIES[6]

9. The Plaintiff Matthew Muller is, and was at all times during the allegations presented herein, a federal inmate at the U.S. Penitentiary Tucson ("USP Tucson") in the District of Arizona.

10.     The Defendant United States of America is the sovereign entity having control over the Federal Bureau of Prisons and its parent agency the U.S. Department of Justice ("DOJ").  The United States has waived sovereign immunity in this matter pursuant to 5 U.S.C. § 702.[7]

---

[5] *See Nova Stylings, Inc. v. Ladd,* 695 F.2d 1179, 1180 (9th Cir. 1983).

[6] Plaintiff is proceeding with a narrow, forward-looking action aimed at securing due process and removing obstacles to his access to the courts.  Past acts are discussed to show the need for injunctive relief.  However, he is not seeking to establish liability of particular individuals for past conduct, nor respondent superior liability of their supervisors.  *See*, *e.g.*, *Hoptowit v. Spellman*, 753 F.2d 779, 782 (9th Cir. 1985) (finding that the "personal conduct of the principal named defendants" was not the focus of an injunctive action); *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (the proper inquiry in an injunctive action is "broader and more generalized" than in damages actions, and the focus is on "the combined acts or omissions of officials"); *Ryles v. Felker*, No. CIV-S-08-0074-LKK, 2008 U.S. Dist. LEXIS 107591 *8 (E.D. Cal., Apr. 28, 2008) (citing *Hoptowit* and other cases).

[7] The statute provides in relevant part: The United States may be named as a defendant in any [official capacity action against agency officials], and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall

11.     The Defendant Juan Baltazar currently resides in Pima County, Arizona, in the District of Arizona.  He is employed by the BOP as Warden of Federal Correctional Complex ("FCC") Tucson, located in the District of Arizona at 9300 South Wilmot Road, Tucson, Arizona.  He is sued in his individual capacity and he and his successors are sued in their official capacities.  Warden Baltazar is chief executive officer of USP Tucson or is acting as such.  *See* 28 C.F.R. § 500.1(a).  His official duties include administration of the following matters, pursuant to and consistent with federal law and national BOP policy: (1) authority to grant or deny non-inmates entry to USP Tucson (28 C.F.R. § 511.17); (2) authority to develop and administer site-specific policies and procedures for correspondence with inmates at USP Tucson (28 C.F.R. § 540.10 *et seq*.); (3) authority to develop and administer site-specific policies and procedures for legal visits to inmates at USP Tucson, consistent with federal law and national BOP policy (28 C.F.R. §§ 540.40, 543.10 *et seq*.); (4) authority to authorize and administer the transfer of inmates to the temporary custody of state authorities, consistent with federal law and national BOP policy (28 C.F.R. § 527.30 *et seq*.).  As Warden and chief executive officer of USP Tucson, Mr.

specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.

Baltazar is the official who can most appropriately respond to any court order granting

injunctive relief.  *See* 5 U.S.C. § 702.

12.    The Defendant Robbie L. Rhodes resides in Pima County, Arizona, in the

District of Arizona.   He is currently employed by the BOP as Warden of Federal

Correctional Institute Tucson, located in the District of Arizona.   He was previously

employed as Acting Warden of USP Tucson, located in the District of Arizona at 9300

South Wilmot Road, Tucson, Arizona.  He is sued in his individual capacity and he and his

successors are sued in their official capacities.   While acting as Warden of USP Tucson,

Mr. Rhodes's duties included those set forth in the preceding paragraph.

13.    The Defendant Thahesha L. Jusino resides in Pima County, Arizona, in the

District of Arizona.  She is employed as an Associate Warden at USP Tucson, located in

the District of Arizona at 9300 South Wilmot Drive, Tucson, Arizona.  She is sued in her

individual capacity and she and her successors are sued in their official capacities.  As an

Associate Warden, Ms. Jusino serves "as a deputy to the Warden" and "is responsible for

exercising control and supervision over various aspects of the institution's functions." U.S.

Bureau of Prisons Website, Associate Warden Position Description, *available at*:

https://www.bop.gov/foia/docs/associatewardenpositiondescription.pdf   (last   accessed

Aug. 14, 2018).  Certain duties of the Warden are delegable to Associate Wardens.  *See,*

*e.g.*, 28 C.F.R. §§ 523.11, 540.101, 545.22 (pertaining to such duties as the retroactive award of good conduct time).  On information and belief, authority to administer legal visits to Mr. Muller has been delegated to Ms. Jusino by Warden Baltazar.

14.     The Defendant Lora R. Molinar resides in Pima County, Arizona, in the District of Arizona.  She is employed by the BOP as a Supervisory Correctional Systems Specialist ("SCSS") at USP Tucson, located in the District of Arizona at 9300 South Wilmot Drive, Tucson, Arizona.  She is sued in her individual capacity and she and her successors are sued in their official capacities.  Ms. Molinar's duties as an SCSS include "oversight of the institution's Inmate Records Office, Mail Room, and Receiving and Dispatch functions."  U.S. Office of Personnel Management, USAJobs.gov, Posting for BOP SCSS Position, *available at: https*://www.usajobs.gov/GetJob/ViewDetails/ 506479300 (last accessed Aug. 14, 2018).  The SCSS "is accountable for all functions of the above referenced offices, which include the intake and releasing systems, ... ensuring the mail room staff process and deliver inmate mail and packages within prescribed time frames, [and] coordination of prisoners' transfer...." *Id.*

15.     The Defendant Lorri A. Mitchell resides in Pima County, Arizona.  She is employed by the BOP as a Legal Assistant at USP Tucson, located in the District of Arizona

at 9300 South Wilmot Drive, Tucson, Arizona.  She is sued in her individual capacity and she and her successors are sued in their official capacities.  On information and belief, her duties as Legal Assistant include correspondence with inmates' legal representatives and making certain determinations about whether legal visits and inmate legal activities are authorized under BOP policy.

16.     Defendant United States of America is the true party in interest in this injunctive action.  Defendants Jusino, Molinar and Mitchell are named as the direct agents of the BOP actions at issue.  Defendant Baltazar is named as their supervisor who has knowledge of these actions and has ratified them, and as the Defendant with authority to ensure compliance with any order of this Court granting interim or final injunctive relief.

## FACTS[8]

17.     Matthew Muller is a former attorney who arrived at USP Tucson hoping to use his legal skills to help wrongfully convicted prisoners.  While incarcerated at six different facilities between June of 2015 and April of 2018, Mr. Muller had a perfect record

---

[8] The facts pleaded give rise to multiple causes of action that are not directly brought in this suit.  However, those causes of action and associated facts are relevant to other claims asserted, including the actual or imminent injury requirement of Plaintiff's interference with access to courts claim.  *See Lewis v. Casey*, 518 U.S. 343, 352-53 (1996).  The facts pleaded also relate to the showing of official conduct so arbitrary or egregious that it "shocks the conscience" for purposes of Plaintiff's substantive due process claim.  *See City of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998).

of good conduct.  Before the present action, he had filed no lawsuits nor any complaints against jail or prison personnel.

## I.   USP TUCSON OFFICERS INTIMIDATE MR. MULLER TO DISSUADE HIM FROM EXERCISING HIS RIGHTS

18.   Within an hour of Plaintiff's arrival at USP Tucson on June 23, 2017, Special Investigative Supervisor ("SIS") Technician Anthony D. Gallion and, on information and belief, Denise M. Madrid pulled Mr. Muller into a back room of the receiving area.  The officers stated that they knew he had been an attorney.  They threatened that if he gave legal help to other inmates, he would be subjected to "diesel therapy"—a brutal regimen of bussing from prison to prison with long stretches of segregated confinement in between.

19.   Fearing retaliation, Mr. Muller initially avoided involvement in any legal work.  He hid his background as an attorney from other inmates and told the few who already knew about his history that he could not help them.  However, Mr. Muller eventually came to believe that particular inmates he knew were innocent and had been convicted due to misconduct by certain officials and prosecutors.  Mr. Muller felt a moral and religious obligation to help these inmates—in particular a former Indiana police officer names Christopher Eads with a wife and three children.  Plaintiff discussed the matter with a prison staff member he trusted.  That officer advised Mr. Muller he would be at lower risk of retaliation as long as he refrained from working on complaints or cases involving

the prison.  Plaintiff decided it would be worth the risk to proceed.  He reviewed Mr. Eads's

case to see how he might be exonerated.

20.     Both during his professional life and in prison, Mr. Muller's legal work has

been an expression of his political and religious beliefs in equal justice.  Before his career

was cut short by psychiatric illness, Mr. Muller worked or interned at eight nonprofit law

firms in four metropolitan areas, serving low-income communities.  As a faculty member

at Harvard Law School, he taught human rights law and was associate director of a clinical

program providing free legal services.

21.     Mr. Muller was soon helping many different inmates.  He provided assistance

with everything from postconviction relief, to veterans' issues, to routine legal services

such as drafting powers of attorney.  He filed multiple successful appellate briefs (two of

them relating to interference with inmate legal mail by USP Tucson staff); helped three

inmates obtain *pro bono* or appointed counsel in their habeas corpus cases; won disability

benefits for two severely ill inmates who were leaving prison; and assisted many other

inmates whose matters are still pending before the courts—and whose chances of securing

relief have been irreparably harmed by the Defendants' conduct towards Mr. Muller and

his unavailability to complete work on their cases.

///

22.     Mr. Muller was assisted by his wife, Huei Dai, who obtained information and documents not available through the prison library or research system.   Together and in less than a year, they donated over 2,000 hours of their time and at least $1,200 in expenses towards inmates' efforts to secure justice.   Although falsely cited by Defendant Lorri Mitchell for supposedly charging inmates to perform legal work—and disciplined without any hearing or opportunity to present evidence—Mr. Muller has never accepted compensation for his work on inmates' cases.

23.     Plaintiff declined to handle certain types of legal matters.   Fearing retaliation, he avoided cases relating to prison conditions or employees.   Although approached by many inmates seeking advice on civil rights matters or denial of medical and mental health care, Mr. Muller told them he could not help due to the likelihood of retaliation.

24.     Plaintiff is aware of many instances of retaliation by Defendants and USP Tucson employees, both against inmates in general and against "jailhouse lawyers" in particular.   On information and belief, there is a policy and custom at USP Tucson (1) of retaliation against inmates for their protected speech and activities, (2) of coworkers' failure to report such retaliation in violation of national BOP policy, and (3) of active concealment of retaliation and misrepresentations by BOP employees to protect fellow staff members.   *See* Corrections Information Council, U.S. Penitentiary Tucson Inspection

Report 18-19, 23 (Apr. 4, 2017) ("CIC Report") (stating that retaliation by USP Tucson

staff is common, that senior management is aware of the problem and that more than half

of interviewed inmates reported being harassed, threatened or abused by staff) (attached in

relevant part as Exhibit A).[9]

25.     For example, in about October of 2017, a fellow veteran and neighbor of Mr.

Muller's known as "Pilot" helped another inmate successfully sue USP Tucson staff to

obtain vital medical care.  Pilot had been a decorated rotary wing operator for U.S. Special

Forces and was still in touch with a military attorney who advised him on legal work.

Prison staff retaliated against Pilot's successful lawsuit by "shaking down" his entire unit

(conducting an invasive search and confiscating minor contraband that is usually tolerated,

such as extra food and blankets).  Afterwards, they told inmates "you can thank [Pilot] for

this."   On information and belief, BOP employees then reported that inmates were

_____

[9] This and other USP Tucson policies and customs are identified for purposes of
background only.  Plaintiff respectfully submits that in an injunctive action involving a
federal agency, it is not a precondition to relief that federal officials being sued in their
official capacities acted pursuant to any policy or custom of the agency.  This requirement
applies in actions for damages under 42 U.S.C. § 1983 against state actors sued in their
official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  The Graham Court
explained that this rule was required in such § 1983 damages actions because the
government entity—and not just the individual actor—will be responsible for money
damages.  Therefore, it is required to prove that a policy or custom of the government entity
played some role in the violation. *Id.*  This consideration does not exist in injunctive actions
against federal employees sued in their official capacities, where the injunctive relief
sought requires action within the scope of those employees' duties. *See, e.g., Ministerio
Roca Solida v. McKelvey*, 820 F.3d 1090, 1093-96 (9th Cir. 2016) (distinguishing between
Bivens actions for damages, in which officials in their individual capacities, and federal
injunctive actions for prospective relief, in which officials.

threatening Pilot.    He was placed in segregated confinement—purportedly for his

protection—and eventually transferred to a distant prison.

26.    Other retaliation schemes Mr. Muller has witness or has knowledge of

include: staff planting contraband in a targeted inmate's property or bribing another inmate

to do so, *see* CIC Report at 18-19 (noting incidents of staff planting contraband on inmates);

bribing an inmate to falsely report some other misconduct by the targeted inmate; falsely

stating an inmate threatened or harassed an officer—especially a female officer; bribing an

inmate to attack a targeted inmate and then segregating and/or transferring the target

purportedly for his protection; claiming that an inmate is becoming "too influential" or "too

famous" and must be transferred for security reasons; placing a targeted inmate in

segregation on a false pretense of investigating alleged misconduct or threats; and alleging

suspicious communications with relatives or the public and restricting the targeted inmate's

correspondence and visiting privileges.

27.    To avoid becoming a target of any such scheme, Mr. Muller tried to be as

judicious as possible about cases he handled.    Mr. Muller also refrained from filing

complaints about staff misconduct against him.    This misconduct included officers

tampering with his privileged legal mail, *see* CIC Report at 30 (noting that a "large majority

of surveyed inmates" reported problems with sending and receiving legal mail); failing to

deliver law-related books he ordered; and an incident in which officers knowingly restrained him from restroom facilities and Plaintiff was forced to defecate on himself in front of others.  The last incident was in retaliation for Mr. Muller confronting an idle officer about refusing to get up and open a door, forcing inmates to wait outside for so long that an elderly inmate with advanced prostate cancer urinated on himself.

28.     Plaintiff's hope was that if he tolerated such misconduct and worked only on matters that did not directly involve the prison, he would be left alone by USP Tucson staff. This was not to be the case.

## II.     BOP OFFICALS RETALIATE AGAINST MR. MULLER FOR HIS *PRO BONO* LEGAL ACTIVITIES.

29.     On April 25, 2018, Mr. Muller was called to the lieutenant's office.  There, he was cited and detained for giving Christopher Eads information about how his family could coordinate an innocence campaign using social media.  SIS Technician Madrid claimed it was a criminal act for Mr. Muller to provide such information.  She charged him under the BOP's highest offense category, used for such acts as murder and rioting. Significantly, the high-level charges required automatic segregation of Mr. Muller in the Special Housing Unit ("SHU").  Mr. Muller was thereby prevented from continuing his *pro*

///

*bono* legal activities, from completing work on several cases with critical deadlines and from teaching law classes.

30.     Mr. Muller's personal effects—including all of his legal materials—were seized and he was searched, handcuffed and escorted to a restricted wing of the prison containing the SHU.  There, he was strip-searched twice and required to surrender his standard prison uniform and don "SHU clothes": pink-orange shorts, a tee shirt and foam shoes.

31.     In the SHU, Mr. Muller was denied his prescribed psychiatric medication for several days, causing withdrawal symptoms.  He was further denied an antipsychotic he required episodically at times of stress.  Plaintiff sent several requests for mental health assistance to SHU psychologist Shara M. Johnson.

32.     Mr. Muller has had a long and well-documented struggle with bipolar illness. He is designated by the BOP as a "CARE2-MH" inmate requiring an elevated degree of psychiatric care.  *See generally* Bureau of Prisons Program Statement 5310.16 (May 1, 2014) (describing classification levels and prescribing treatment and protections for inmates assigned a mental health care level).

33.     Despite this designation, Dr. Johnson told Mr. Muller he did not need help and was perfectly healthy aside from a vitamin D deficiency.  She refused to provide any

care or accommodations for Mr. Muller's psychiatric illness.  She failed to follow Bureau procedures to ensure continuity of care for CARE2-MH inmates transferred to the SHU. *See id*.

34.     When Mr. Muller continued to request help from Dr. Johnson, she requested that he be called before the lieutenant.   In Lieutenant Schied's office, Dr. Johnson, Correctional Officer ("C.O.") Medina and several other officers arrayed themselves around Mr. Muller.  Lieutenant Kenneth M. Schied commanded Plaintiff to "shut up and get with the program."   Mr. Muller reiterated that he needed psychological care and outdoor exposure to ensure his health did not deteriorate further.  He stated that he had been denied recreation several times for supposedly violating rules nobody would tell him, such as where in the cell a towel may be hung.  Lieutenant Schied replied "you were given the SHU rules, you just refused to sign for them," knowing the statement to be false.  He then said "if you don't like the SHU, then you should stop doing inmates' [legal] paperwork."

35.     Mr. Muller replied that he was helping inmates he believed were innocent and would continue doing so.  Schied stated "There are no innocent inmates here.  They're all guilty."  Plaintiff responded, using a common colloquialism, "I'll bet you a million dollars there are innocent inmates here."  Schied then said "Did you hear that?  He just

tried to bribe me.  That's another shot [disciplinary charge] for attempting to bribe an officer.  In fact, I'm going to call SIS right now and have you charged."

36.     Lieutenant Schied then placed a phone call and began discussing with the party on the line what the most serious offense was that he could level at Mr. Muller.  Schied stated that he wanted the FBI liaison contacted to pursue criminal bribery charges.

37.     Schied completed his call, turned to Plaintiff and stated "I think you need a new cellmate.  How about Gaines?"  Several officers surrounding Plaintiff chuckled at this suggestion.

**A.     USP Tucson Officers Instigate Sexual and Physical Assaults Against Mr. Muller**

38.     Plaintiff was then taken from Schied's office back to his cell.  Officers collected some of Mr. Muller's belongings and threw away others.  Plaintiff was escorted to a new cell, which had on its door a sign with the letters "H.R.A."

39.     Plaintiff later learned that H.R.A. is an acronym for "House and Recreation Alone."  This designation is reserved for particularly violent inmates with a history of assaultive conduct towards other inmates and staff.  The "H.R.A." sign on a cell door warns officers on duty that the occupant is a high-risk inmate and that the individual is not to be mixed with any other prisoner.

40.     The H.R.A. inmate was removed from the cell and escorted to speak with Lieutenant Schied.  Plaintiff was ordered to go in the cell.  After a short time, the H.R.A. inmate—Samuel Gaines—returned and entered the cell with Mr. Muller.

41.     Mr. Gaines was not initially hostile toward Plaintiff.  However, it became clear after about a day that Gaines was profoundly mentally ill.  Mr. Gaines later disclosed that he suffered from paranoid schizophrenia, and that he was not being given the medications he needed to control his condition.

42.     Mr. Muller also learned that Gaines was sexually interested in male and transgender inmates.  On information and belief, SHU staff was aware of this fact.  Mr. Gaines made several comments about Plaintiff's body and asked various questions of a sexual nature.  Mr. Muller stated that he was accepting of all sexual orientations but was heterosexual, and that in any even he was happily married and exclusive with his wife.

43.     Over the next few days, Mr. Gaines demonstrated various behaviors consistent with severe psychiatric illness.  He appeared to sleep very little or not at all.  At times he was threatening toward Plaintiff.  Mr. Gaines seemed lucid much of the time, but spoke almost constantly—sometimes to himself and in apparent response to a running dialog in his head.  Mr. Gaines acknowledged that he "heard voices."  When asked by Plaintiff, he stated that at times the voices were telling him to kill Mr. Muller before Mr.

Muller killed him.  Gaines became increasingly suspicious of Mr. Muller and frequently commented that he knew that Plaintiff and Lieutenant Schied were trying to "set him up" somehow.

44.     Between May 1 and May 4, Mr. Muller made numerous verbal requests and submitted at least six written requests to be moved, stating that Gaines was threatening and unstable and that Plaintiff was in imminent danger from him.  These included two written requests he handed directly to Associate Warden Jusino and another associate warden when they made their regular rounds of the SHU, on May 2 or 3.  During those rounds, the associate wardens and other USP Tucson officials observed that the cell had an "H.R.A." sign on the door but was occupied by two inmates.  On information and belief, the officials were aware that the sign indicated that the cell was only supposed to contain one inmate, who was not to be mixed with any others.  Plaintiff still was not removed from the cell.

45.     Inmates transferred to the SHU must submit requests to the property officer to receive items from their regular general population property.  That property is collected upon their transfer and stored while the inmate remains in the SHU.  BOP policy provides that inmates are entitled to possess certain general population property in the SHU. Authorized property includes hygiene items, medical supplies, legal and writing materials, reading materials and certain food items.  Plaintiff submitted a request list for about 50

items from his property, including his prescription medication, a leg brace needed for a military service-connected injury, his legal materials and other items.

46.     In response to this request, Officer Medina brought Plaintiff seven items: a radio with the battery removed, broken headphones, an empty address book, deodorant, and three tubes of petroleum jelly-based products.  Plaintiff puzzled over why the last three items were included.  Then he remembered that besides their intended purpose, some inmates used these products as lubricants to have sex with other inmates.  On information and belief, Officer Medina was suggesting Mr. Muller would need them.

47.     On the night of May 2, Plaintiff went to sleep wearing only boxers due to hot temperatures in the SHU.  He awoke from a deep sleep to find that his boxers had been pulled down, and that Mr. Gaines was behind him and penetrating him with his penis.

48.     Plaintiff pushed Gaines, jumped off the bed and began shouting.  Gaines said words to the effect of "What, you don't like African American men?"  Plaintiff replied that he was not sexually interested in any men.  Gaines stated, "Sure you are, you're just shy."  Gaines commented that "Schied won't never put nobody in this cell who ain't gonna fuck."

49.     Plaintiff later learned from other inmates that any time Gaines did have a cellmate in the SHU, it was a gay or transgender inmate.  If an inmate was not someone Gaines could have sex with, he would threaten to attack them if SHU staff placed them in

his cell.  On information and belief, he did in fact attack at least one inmate under such circumstances.  Inmates in surrounding cells, including one known as "Ohio Mike," stated that they had assumed Mr. Muller must be gay because he had been put in a cell with Gaines.  Ohio Mike and others advised that SHU staff were aware Gaines would only accept cellmates he could have sex with.

50.     Mr. Muller did not report the rape at that time—both because he realized that Lieutenant Schied had arranged the situation and was unlikely to help him, and because it is dangerous to be labeled a "snitch" in prison.  Contrary to Prison Rape Elimination Act ("PREA") implementing regulations, there was no available confidential method of reporting a rape in the SHU.  *See* 28 C.F.R. § 115.51.  The only avenue for such reporting was via a confidential PREA message system on the SHU law library computer, which Plaintiff requested to use almost daily but was not allowed to access a single time in 64 days.

51.     The day after the rape, Gaines's attitude towards Mr. Muller became very hostile.  He told Mr. Muller he could either leave the cell in handcuffs or in a body bag and that he had better get staff to move him if he wanted out alive.  Plaintiff certainly agreed that leaving the cell would be best.  But he did not know how to make staff move him when he had already stated he was in imminent danger and asked to be moved several times.

Gaines said that he did not care what Plaintiff said to get out, but that he had better "not put the police on [him]." He threatened Mr. Muller with a knife he had made and described how he could use it in a way that damaged internal organs too severely to be repaired even with rapid surgical intervention.

52.     From May 3 to 4, Plaintiff made repeated verbal and written requests to be moved, stating that he was in imminent danger and that there was a high risk of violence due to Gaines's mental health issues. Gaines began yelling to the officers to remove Plaintiff from the cell, making such statements as "You'd better recognize there's a problem right now, or you're going gonna need a blood [clean-up] crew up in here." The SHU officers still refused to remove Mr. Muller.

53.     In the late afternoon or evening of May 4, Gaines read one of the written requests that Mr. Muller had left inserted in the door slot for staff to pick up. The request stated that in addition to being physically threatened, Plaintiff also feared he could be sexually assaulted by Gaines.   (In fact, Mr. Muller already had been so assaulted.) Although the request did not explicitly report the rape, Gaines felt that Plaintiff was "ratting him out" by mentioning sexual issues. He became enraged and lunged at Mr. Muller. Plaintiff backed away and pushed the cell's emergency button to summon staff assistance.

A few minutes passed while Gaines and Plaintiff held each other at bay.  But no staff arrived.

54.     The situation escalated further and Gaines lunged again, telling Plaintiff to get out immediately or he would kill him.  Mr. Muller banged repeatedly on the cell door and yelled into the hall.  He saw that there were a number of officers standing and watching about 15 feet away.  Although it was apparent that a dangerous altercation was in progress, they did not immediately approach the cell.  Instead, the officers stood by and watched.

55.     After some time passed, officers approached the cell and told Plaintiff to "stop your bitch-fit."  It appeared the officers were waiting to see whether Gaines would physically assault Plaintiff, giving him time to do so and only intervening once it seemed unlikely Gaines would actually attack.  Officers directed Muller to "cuff up" so that they could take him out.  Although it was clear that Gaines was the aggressor, they required Plaintiff to don handcuffs first—leaving him vulnerable should Gaines decide to attack.  Mr. Muller was taken to another cell.

56.     On the next day, May 5, Plaintiff's mother traveled from Sacramento to Tucson because she had not heard from him.  Plaintiff was denied all outside contacts when first detained in the SHU.  Mr. Muller was in a critical phase of challenging his federal conviction and was also negotiating with prosecutors from Solano County, California.  He

repeatedly requested permission to contact his attorney and family.  Plaintiff was denied

any telephone call and was not even provided stamps with which to send a letter.  When

Plaintiff told Lieutenant Schied that he urgently needed to call his attorney, Schied told Mr.

Muller he was lying because the USP Tucson legal department had no record of open cases

for Mr. Muller.  He threatened to write Plaintiff up for lying to staff if he did not stop

requesting legal calls.

57.     At the visit, Plaintiff informed his mother about the sexual assault so that he

could ask her to look up information about HIV/AIDS transmission and countermeasures.

(He had also submitted a request to health services asking about the same, but received no

reply.)  Mr. Muller told his family that it was not safe for him to report the rape while he

was still in the SHU.  He instructed them not to report it.  However, Plaintiff's mother

contacted Defendant Rhodes and told him that SHU staff had caused Mr. Muller to be

raped.  Rhodes assigned investigation of the matter to Lieutenant Schied and Dr. Johnson.

Due to the conflict of interest and his fear of further retaliation should he go "on the record"

about the rape, Plaintiff declined to make any statements and did not cooperate with the

investigation.

///

///

**B.     Mr. Muller Faces Degrading Conditions and Ongoing Violence in the SHU**

58.     Plaintiff was next placed with another inmate with a sexual preference for men and who had a history of violent conduct and conflicts with cellmates.  Under BOP policy, SHU staff keep and consult detailed records about inmates' institutional history, sexual orientation and group affiliations.  Many SHU officers are also personally familiar with the characteristics of various inmates they oversee.  National BOP policy provides that this information is to be used to ensure inmate safety and place prisoners with compatible cellmates.  However, on information and belief, at USP Tucson, there is a custom or practice of intentionally or recklessly disregarding the near-certain threat of violence, and placing inmates like Plaintiff in the path of danger.

59.     On May 8, 2018, Mr. Muller's new cellmate became enraged because he (incorrectly) believed Plaintiff was keeping food somewhere in the room and was at fault for ants and other pests in the cell.  The situation quickly escalated and the inmate attacked Plaintiff.  Mr. Muller had been warned by other inmates that staff sometimes placed disfavored prisoners in a position where they would be attacked.  Then, they cited them for fighting when they were forced to defend themselves.  Above all, Plaintiff wanted to spend no more time in the SHU than necessary.  So he defended himself only by attempting to block punches.

60.     Mr. Muller pushed the emergency button as the beating began.   However, officers did not respond.   By the time an officer arrived on his regular rounds, the inmate had managed to land about 10 to 12 punches to Mr. Muller's head, and Plaintiff was bleeding from multiple lacerations and had various other moderate wounds.   Officers removed Mr. Muller from the cell.

61.     Again, to avoid being labeled a "snitch" and because he expected no help from SHU staff, Mr. Muller did not report the attack.   Instead, he told Lieutenant Schied that he had fallen off his bunk, though Plaintiff's facial wounds were obviously inconsistent with this story and, on information and belief, Schied understood what had really happened.

62.     Mr. Muller was finally placed with a less volatile cellmate.   However, he continued to suffer the effects of the recent attacks and of poor conditions in the SHU in general.

63.     On information and belief, USP Tucson SHU staff have a custom or practice of denying inmates outdoor recreation.   They effect this by means of various requirements and procedures intended to make it difficult for prisoners to qualify for outdoor recreation.   Plaintiff had informed SHU staff that outdoor exercise and sun exposure were critical to his psychological health.   He had even requested a reasonable accommodation to excuse him from the various local requirements used to keep down the number of inmates

attending recreation.  Nonetheless, Plaintiff was repeatedly denied outdoor recreation and was able to go outside just once in 64 days.  He therefore endured an almost completely uninterrupted lockdown in a small 7 x 10-foot cell with another prisoner.

64.    Mr. Muller was frequently denied basic supplies such as toilet paper, a serviceable mattress and meals compliant with his religious diet.  The SHU was infested with bedbugs and/or lice, ants and cockroaches.  Throughout his time in segregation, Plaintiff had a constellation of bites and welts on his body, raised and up to two inches in diameter, as well as rashes from chemical irritants and from contracting ringworm in the SHU.  The walls were contaminated with pepper spray residue that caused Plaintiff skin inflammation, and one cell Mr. Muller occupied had what appeared to be blood smeared on a portion of the wall.

65.    Plaintiff's cell was twice inundated with sewage.  On one occasion the sewage was allowed to stand in the hall outside his cell for over eight hours during the daytime.  Plaintiff had to attempt to eat with the smell of feces and urine permeating the cell.  Mr. Muller's cell was flooded with "gray water" four additional times.

## C.    Prison Staff Systematically Block or Delay Mr. Muller's Efforts to Get Help

66.    Mr. Muller made multiple efforts to have his problems in the USP Tucson SHU addressed.  He repeatedly asked for forms on which he could file an administrative

remedy request and for court forms.  None was provided.  Eventually, Mr. Muller's family

sent him copies of remedy request forms they had downloaded from the BOP website,

including Form BP-229(13).  Plaintiff completed several of these forms and in late May

2018, handed them directly to Defendants Robbie Rhodes and Thahesha Jusino when they

made their weekly rounds in the SHU.  The Defendants handed the forms back to Mr.

Muller, stating that they would not be accepted because they were not the versions printed

on colored paper with carbon paper copies attached.  Mr. Muller explained that the matter

was urgent and that he had repeatedly requested the version of the forms they required, but

nobody would provide them.  Rhodes and Jusino still refused to accept the remedy requests.

67.     Close to the end of May, Plaintiff was able to buy a Form BP-230(13) printed

on carbon paper from another inmate in exchange for ten dollars in postage stamps.  On

June 3, 2018, Mr. Muller used the form to submit an emergency, sensitive remedy request

for confidential mailing directly to the BOP Western Regional Office.   Although

regulations provided for a response within 5 days and various other protective measures,

*see* 28 C.F.R. § 115.31 *et seq.*, as of August 6—over two months later—Plaintiff still had

heard nothing back from the Regional Office.  The failure to respond is consistent with Mr.

Muller's legal mail having been delayed or discarded by prison officials.

68.     Mr. Muller's family eventually hired an attorney to assist with the situation. Mail to and from that attorney, the undersigned, was subject to interference by prison officials.  Properly marked legal mail was delivered to Mr. Muller having already been opened outside his presence.  One of three letters Mr. Muller sent the undersigned via legal mail—a substantial message containing instructions, requests for help and detailed information about misconduct by BOP employees—was never delivered.  Mr. Muller repeatedly requested confidential phone calls with his attorneys, but was allowed to make only one such call during his 64 days in the SHU.  He was also denied access to the SHU law library, and law-related books sent to Mr. Muller by his wife were withheld from him.

**III.  Prison Staff Nearly Kill Mr. Muller Through Their Deliberate Indifference to His Mental Health Crisis**

69.     Mr. Muller's mental health deteriorated rapidly in the SHU.  He made at least twenty written requests for mental health treatment, and both his family and attorney sent letters to the warden advising that Plaintiff was in the midst of a mental health crisis.

70.     Following actions taken against him by Lieutenant Schied, Mr. Muller received no response to his requests for care.  In response to a letter from Plaintiff's attorney to the warden, Dr. Johnson saw Mr. Muller for approximately 10 minutes on May 25, 2018. Mr. Muller stated that his mental health was deteriorating rapidly and that based on his experience he would likely soon be suffering severe depression and suicidal urges.  Dr.

Johnson listened, but did not take any action to ameliorate Mr. Muller's health situation. She misreported in Mr. Muller's medical records that he was not suffering from any psychiatric symptoms.

71.     BOP policies and procedures for the SHU and for mental health care recognize that inmates with psychiatric illness are likely to suffer and deteriorate when faced with restrictive housing conditions.  *See*, *e.g.*, BOP Program Statement 5310.16, Treatment and Care of Inmates With Mental Illness (May 1, 2014) ("The Bureau recognizes that an inmate's mental health may deteriorate during a restrictive housing placement" and directs that employees should "strive to avoid prolonged placement of inmates with serious mental illness in settings such as Special Housing Units").  Nevertheless, while in the SHU Mr. Muller did not receive even the level of mental health care he had been provided in general population.

72.     For example, policy provides for CARE2-MH inmates to be seen at least once per month by a mental health provider.  *Id*.  On May 8, 2018, Dr. Johnson purported to meet this requirement.  She recorded in Mr. Muller's mental health records that she met with Mr. Muller on this date at 11:59am, although no such meeting actually occurred on or around that date and time.  The notes in Dr. Johnson's falsified report include a fabricated account of matters discussed during the purported meeting.  It included several derogatory

remarks, including that "MULLER raised his voice and began demanding medication. The contact was terminated at that point." Notably, the meeting notes reported that Mr. Muller's grooming and physical appearance were normal. In fact, Mr. Muller had been attacked that morning and bore obvious lacerations and large contusions on his face, as recorded in photographs possessed by Defendants. On information and belief, any minimally competent mental health provider would have noted such obvious injuries in session notes and inquired into their cause.

73. Dr. Johnson invented other contacts and check-ins with Mr. Muller and entered them into his medical records. For example, in one record Dr. Johnson claimed that she visited with Mr. Muller on May 29, 2018 at his door in the SHU and that Plaintiff "smiled and nodded affirmatively when asked if he was doing OK." This contact never took place. In fact, according to Plaintiff's own contemporaneous records, he sent a written request to Dr. Johnson that day stating that his depression had become severe, that he was a threat to himself and asking to be sent to a psychiatric hospital. On information and belief, Dr. Johnson's reports of her care-giving activities for Mr. Muller and many other inmates will be revealed as manifestly false if those reports are compared to security camera video of her movements and activities in the SHU.

///

74.     By mid-June, Plaintiff was suffering severe depression and was highly suicidal.   He continued sending messages to Dr. Johnson, stating that his situation had become dire and reiterating that he needed to be admitted to a psychiatric hospital.   He stated that he was a threat to himself and that at very least he should be released from the SHU so that he could attempt to recover in general population.   Similar requests were also made Defendant Rhodes, who was employed as a psychologist by the BOP before he rose to the office of Warden.   The Plaintiff's then-cellmate Cody Jackson also submitted a request stating that Mr. Muller had become severely depressed.   The requests were ignored.

75.     Refused help, Plaintiff's health deteriorated further, and he developed a plan and fixed timeline to kill himself.   His preparations included a series of letters to be given to his family and others after he was dead, explaining why it was best that he die.

76.     Plaintiff's cellmate Mr. Jackson had observed Mr. Muller sink further into depression.   He wrote additional requests to both Dr. Johnson and Warden Rhodes, stating that Plaintiff needed urgent help and that he feared for Mr. Muller's safety.   No action was taken.

77.     Mr. Jackson grew suspicious when Mr. Muller, who had been almost totally inactive, became intent on writing a large number of letters he would not discuss.   When Plaintiff was away from the cell, Mr. Jackson opened several sealed envelopes and read the

letters.  He ascertained Mr. Muller's plans to kill himself and confronted him about them.

Mr. Jackson seized various items from Mr. Muller and convinced him to wait a short time

longer before attempting suicide, while he tried to get help.

78.    Mr. Jackson was released from the SHU to general population with a few

days of that.  Together with others, he convinced Mr. Muller's regular psychologist Dr.

David Moreno to intervene.  Dr. Moreno met with Mr. Muller in the SHU in June 27, 2018.

He obtained Plaintiff's release from the SHU almost immediately.

79.    Mr. Muller later learned that he had for weeks been cleared to return to

general population, but that unknown officials did not want to release him.  Instead, they

hoped to transfer him away from USP Tucson.  After Plaintiff's release, many inmates

commented to him "we didn't think we'd see you again, they said you were getting shipped

[to another prison]."

80.    Shortly before his release from the SHU, Mr. Muller received an additional

incident report written by Defendant Lorri Mitchell.  It included false charges that Mr.

Muller was performing legal work for pay.  On information and belief, the charges were in

bad faith and were brought without reasonable cause to believe the allegations were true.

The charges were later sustained without Mr. Muller being given an opportunity for a

hearing, to present witnesses or to meaningfully dispute the charges.

81.     After release from the SHU, Plaintiff learned that the inmate he had been trying to help, Christopher Eads, was intentionally forced into a cell with a dangerous inmate.  This happened immediately after Mr. Eads had overcome his charges, and he understood it to be in retaliation for fighting his case and for seeking help from Mr. Muller.  Mr. Eads was attacked and seriously injured.   He sustained facial injuries causing permanent vision impairment and will require facial reconstructive surgery.  Mr. Eads has since been transferred to another BOP prison in New Jersey.

## IV.     DEFENDANTS BLOCK MR. MULLER'S EFFORTS TO LITIGATE AND ATTEMPT TO TRANSFER HIM WITHOUT DUE PROCESS

82.     Mr. Muller's detention in the SHU caused him to miss deadlines and suffer prejudice in multiple pending matters.  As Mr. Muller attempted to ameliorate the damage to his legal interests, Defendants interfered with his efforts.

### A.     Prison Officials Refuse to Allow a Legal Visit by Forensic Psychologist Dr. George Goldman

83.     On April 21, 2018—while Mr. Muller was still confined in the SHU—the undersigned's paralegal William Fuller contacted prison officials to arrange a forensic examination of Mr. Muller.  The exam, to be conducted by respected Tucson psychologist Dr. George Goldman, would document Mr. Muller's poor state of mental health in the SHU. This would in turn support claims relating to Plaintiff's motion for relief under 28 U.S.C.

§ 2255 and claims relating to a criminal matter pending in Solano County, California.  It would also support an action for damages against several of the Defendants and other officials at USP Tucson for the mistreatment Mr. Muller suffered in the SHU.

84.     It was crucial then—and it remains crucial now—that Dr. Goldman examine Mr. Muller as soon as possible.  Dr. Goldman was to assess and document any causal link between restrictive conditions of confinement and/or the mistreatment Plaintiff suffered, and Mr. Muller's psychological symptoms.  Objective neuropsychological evidence of this link dissipates as time passes.  Defendants Jusino and Mitchell were informed of the time-sensitive nature of the requested legal visit.

85.     After multiple inquiries, Defendant Mitchell replied on June 26 that the prison would not allow Dr. Goldman to examine Mr. Muller without a court order.  She cited a BOP program statement relating to patient care.  The policy cited dealt with medical care generally rather than mental health care, and pertained to receiving treatment from outside physicians.  It did not pertain to psychological examinations or to legal visits by expert witnesses.  Within two days, Plaintiff and Mr. Fuller replied that the purpose of the requested visit was not for treatment, but rather was legal in nature.  They reiterated that Dr. Goldman was seeing Mr. Muller for a forensic psychological exam.  The visit was still declined.

86.     Between June 28 and July 20, 2018, Plaintiff and the undersigned made repeated attempts to negotiate a visit by Dr. Goldman and to ascertain and address any legitimate concerns Defendants had about the visit.  On June 29 and July 2, Plaintiff sent Defendants Baltazar, Jusino and Mitchell detailed messages emphasizing the legal nature of the requested visit.  Plaintiff cited BOP policy stating that such visits should be allowed.  These messages also advised that the forensic examination was needed to meet a deadline in Mr. Muller's § 2255 case, and was further needed to justify a delay on in a pending extradition.  The messages referenced Plaintiff's recent ordeal in the SHU, stated that he needed time to recover from the psychological fallout before extradition, and stated that Dr. Goldman's report would substantiate the need for this delay.

87.     Plaintiff spoke with Defendant Jusino regarding the matter on July 2 and on either July 5 or 6, 2018.  He explained verbally that the visits were for legal purposes, not for treatment.  On July 2, Plaintiff also hand-delivered to Defendants Jusino and Baltazar written letters describing the matter and relevant BOP policy in detail.  He also spoke with Defendant Baltazar, but was told he needed to "use the chain of command" and speak with Ms. Jusino about the matter.  Ms. Jusino stated that Dr. Goldman's visit still would not be allowed without a court order, and that this was the legal department's final position on the matter.

88.     Plaintiff sent Defendants a total of six letters about the legal visit via electronic mail and hand delivery, and the undersigned and her paralegal made additional contacts by phone and e-mail.  *See* Exhibit B (record of correspondence between Plaintiff and Defendants).  Defendants were asked repeatedly whether there was any security or other concern they had about Dr. Goldman's visit, or any requirement that needed to be fulfilled.  Their position did not change.  Plaintiff advised Defendants Jusino and Baltazar that he would be forced to seek a temporary restraining order and would seek reimbursement of legal costs they were imposing upon him.  Defendants reiterated that Dr. Goldman's legal visit would not be allowed.

89.     In most of their communications with Defendants, Plaintiff and the undersigned emphasized that Mr. Muller was in mental distress due to the rape, assaults and denials of care he suffered in the SHU.  They advised that Plaintiff had a history of severe depression and suicide attempts, and that his current poor state of health combined with the stress of transfer could cause him to deteriorate and be at high risk of suicide.  They stated that the forensic exam would substantiate this high risk.  Plaintiff explained that Dr. Goldman's report was needed to buttress his expected request under the Interstate Agreement on Detainers Act ("IADA") that his pending transfer be delayed for mental

health reasons.  Defendants did not change their position.  Instead, they denied Mr. Muller

any opportunity to submit a request under the IADA at all.

**B.      Defendants Deprive Mr. Muller of His Rights Under the IADA and Approve His Imminent Transfer While Knowing It Poses a Serious Threat to His Life**

90.      Beginning on or about March 30, 2018, authorities in Solano County, California, initiated a request for Mr. Muller to be transferred temporarily to their custody pursuant to the Interstate Agreement on Detainers Act, 18 U.S.C. App. 2.  The process was marked by serious irregularities.  First, Mr. Muller was summoned to sign documents he was initially told were merely acknowledgments that an outside agency had lodged a detainer against him, requesting that he be surrendered to their custody at the end of his sentence.  On closer inspection, the documents were actually a request made to look as if it had been composed by Plaintiff.  The request, if signed, would have waived Mr. Muller's rights under the IADA.  Further, the warrant and charging documents from Solano County were not for Mr. Muller, but for a Solano County resident with a similar name but a completely different date of birth, middle name, physical description, and identification numbers.

91.      Mr. Muller said he did not wish to sign the documents and asked why all of the paperwork had been prepared.  Officer J. Maddalozzo, the BOP specialist handling the

matter, stated that Vallejo authorities asked that the request be made to appear as if it had

come from Mr. Muller.  He made comments indicating that he found this request unusual,

but was just trying to comply with the outside agency's wishes.

92.    On June 21, while in the SHU, Mr. Muller was given an IADA

acknowledgment to sign by Officer Maddalozzo.  The acknowledgment stated that Solano

County was proceeding with a prosecutor-initiated request, and that at some point in the

process Plaintiff would have 30 days in which to petition the Warden for the Solano request

to be denied.  Mr. Muller asked whether the 30-day period had started yet.    Officer

Maddolozzo stated that the period would begin once Solano County finished submitting

required paperwork, but that they had not done so yet.

93.    Around that time, Plaintiff also received a packet of documents from Solano

County.  This appeared to be in satisfaction of the requirement that Mr. Muller be provided

with various documents underlying the IADA proceedings.    However, several of the

documents referenced in the cover letter—including the court-certified warrant—were not

in the packet.  Further, there were several mistakes in the documents, including incorrect

addresses and names.  Plaintiff also could not discern whether several of the documents

pertained to him or the Solano County resident under whose name the case was still listed

on the Superior Court of California docket.

94. When Mr. Muller was released from the SHU on June 27, 2018, he did not know where the Solano matter stood. He was in very poor health and had nearly committed suicide approximately a week earlier. Mr. Muller had and has every intention of responding to Solano County's charges as soon as he is able. However, he had previously become too severely depressed to meaningfully assist in his own defense, and failed to oppose false allegations made against. He wished to arrive in Solano County in sufficient health to mount a defense and to weather the more restrictive conditions of confinement he anticipated in county jail.

95. Accordingly, Mr. Muller's communications to Defendants Baltazar, Jusino and/or Mitchell on June 29, July 2, July 5, July 6 and July 9 all referenced the pending IADA transfer. Mr. Muller stated that he did not oppose the transfer but would request a modest delay in order to recover his health following the ordeal he suffered in the SHU. These communications also stated that Dr. Goldman's requested legal visit was needed to prove that Plaintiff's poor mental health necessitated a delay. This was particularly true because Dr. Johnson had falsified Mr. Muller's records and stated that his mental health was fine.

96. Several of the above communications stated that the undersigned intended to submit a formal, well-documented request for a delay in any transfer. They also advised

that Plaintiff was waiting for Dr. Goldman's forensic report before submitting the request. The messages inquired into the IADA process and its timeline. On July 2, 2018, Defendant Jusino advised Mr. Muller that he needed to speak with someone in the Receiving and Dispatch department ("R & D") for those details.

97.    On July 3, Plaintiff sent a message to R & D asking whether the 30-day period had begun yet. He was advised that Solano County had not yet perfected its request. On July 10, Mr. Muller checked in again to find out whether Solano County had submitted all required paperwork. Defendant Molinar replied that the matter was still pending with Solano and that she "will notify you of any further action." The reply was ambiguous and suggested that Ms. Molinar either did not understand the process or was intentionally being evasive. So Mr. Muller sent a message to Officer Madolozzo on July 11, reiterating that he needed to know if the 30 days had started because he wished to submit a formal request that he was trying to support with a forensic psychologist's report. The message was answered by the department head, Ms. Molinar, who wrote "There is no action required by you... It is up to the District Attorney as to who they wish to pursue the matter. You will be notified by staff, no need to bombard everyone with the same matter."

98.    In two separate messages, Ms. Molinar had avoided directly answering Plaintiff's straightforward questions about deadlines. She also evaded the question when

it was put to her in person, although the content of that conversation confirmed to Mr. Muller that Ms. Molinar understood the IAD procedure and the 30-day provision of Article IV(a). Mr. Muller was also aware that as supervisor of USP mail operations, Ms. Molinar had reasons to act against him.  On information and belief, these reasons included retaliation for helping inmates with their cases, relating to missing legal mail, missed deadlines, and the effect that these activities of the USP Tucson mailroom had on inmate legal actions.

99.     To be certain of the deadline, Mr. Muller attempted to contact Officer Maddolozzo directly.  He sent a message to him via another officer, and on July 14 received a written reply stating "I spoke with officer Maddolozzo and he said you are good on the deadline because he still has not received all the paperwork that he needs from other agency."

100.    Since it appeared he would have at least until August 13 to submit any request, Mr. Muller did not ask again about the deadline until the beginning of August. During this time, he remained in poor health and continued to be unsuccessful in obtaining a legal visit with Dr. Goldman.

101.    On August 6, 2018, Mr. Muller obtained documents showing that Defendant Molinar had approved the IADA request on July 26, 2018.  The documents also appeared

to reflect that the IADA approval was based at least in part on a subsequently recalled warrant.  Mr. Muller immediately submitted a written inquiry asking why he had been misinformed about the deadline despite the many e-mail, written and in-person requests he made to follow up on the matter.  Defendant Molinar composed a report claiming Mr. Muller had sent only a single e-mail concerning the matter.  It also claimed he had been properly informed of the deadline.  All IADA approval documents were signed by Ms. Molinar, purportedly on the authority of Warden Baltazar.

102.   On August 14, Mr. Muller sent another e-mail message to Ms. Molinar advising that her department had violated several IADA procedural provisions.   He reiterated that he was in poor mental and that transfer at this time posed a serious risk to his life.  BOP Program Statement 5800.15, the Correctional Systems manual (9/23/2016) provides that inmates subject to a prosecutor-initiated request under Article IV of the IADA are entitled to an extradition hearing.  *Id.* at § 608 (providing an exception for inmate-initiated Article III IADA-transfers but not for Article IV prosecutor-initiated transfers); *see* also *id*. at Ch. 9 (providing an exception to the extradition requirement for federal prisoners inside Arizona who are subject to a detainer for service of an unsatisfied prison sentence, but not for prisoners' subject to a detainer for an untried indictment, information

or complaint).  Mr. Muller asked Ms. Molinar how the matter would now proceed and when he would be turned over to Arizona authorities for an extradition hearing.

103.   Ms. Molinar replied on August 15 that she intended to turn Plaintiff directly over to California authorities and that no extradition hearing was required.  She wrote that "This matter is between you [and] the state to resolve..." and advised that she would do nothing further.  Mr. Muller wrote back, citing and quoting the sections of the Correctional Systems Manual requiring an extradition hearing in his case.  He received no reply.

104.   Mr. Muller has since learned that Solano County could dispatch deputies at any time to take custody of Mr. Muller.   Mr. Muller has sent multiple messages to Defendants advising them of all relevant circumstances, including his health and the extradition hearing required under BOP procedure and Arizona law.  He has received no replies and understands that his transfer is imminent, notwithstanding the threat to his safety.

///

///

///

///

1
2

## CLAIMS FOR RELIEF[10]

3

105.    Plaintiff submits that the foregoing factual allegations—taken as true and

4
5

construed in the light most favorable to the Plaintiff[11]—together with the additional

6

allegations below "meet the low threshold for proceeding past the pleading stage,"[12] are

7
8

"sufficient to warrant ordering defendants to file an answer"[13] and "plausibly suggest an

9

///

10
11

_____

12

[10] The Courts of Appeals have advised district courts to exercise caution not to prematurely
dismiss prisoner's complaints under the § 1915A screening mechanism.  *See, e.g.*, *Byrd v.*

13

*City of Maricopa*, 845 F.3d 919, 922-25 (9th Cir. 2017) (reversing the district judge's sua

14

sponte dismissal under § 1915A and ordering the district court to appoint counsel on

15

remand); *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011).  This advice is especially
appropriate given the departure this mechanism represents from American courts'

16

traditional adherence to "the principle of party presentation.  That is, we rely on the parties

17

to frame the issues for decision and assign to courts the role of neutral arbiter...."  *Greenlaw*

18

*v. United States*, 554 U.S. 237, 243 (2008) (noting that when courts do depart from this

19

role, it has usually been to benefit pro se litigants).  This is particularly so where, as here,
the opposing party is uniquely well-situated to protect its interests and exercise its

20

prerogative to raise or waive issues according to those interests.  *See id.* at 244 (noting the

21

special characteristics of the United States as a party to litigation and the fact that it is "the

22

richest, most powerful, and best represented litigant to appear before us") (quotations

23

omitted).
[11] *See, e.g.*, *Wilson v. Hewlett Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Ashcroft v.*

24

*Iqbal*, 556 U.S. 662, 678 (2009) (referring to "the tenet that a court must accept as true all

25

of the [factual] allegations contained in a complaint").

26

[12] *Wilhelm v. Rotman*, 680 F.3d 1113, 1123 (9th Cir. 2012).
[13] *Byrd v. Maricopa County Board of Supervisors*, 845 F.3d 919, 922 (9th Cir. 2017)

27

(reversing district court's sua spone dismissal under 28 U.S.C. § 1915A and directing that

28

the district court appoint counsel on remand).

entitlement to relief"[14]

///

///

///

///

///

---

[14] Plaintiff respectfully submits that the *Bell Atlantic Corp. v. Twombly* pleading requirement contemplates that factual allegations—to be taken as true—need only "plausibly suggest an entitlement to relief." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011), cert. denied 566 U.S. 981 (2012). The question of plausibility relates to whether these assumed facts "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. The *Twombly* and *Iqbal* Courts specifically disclaimed any notion that thy were "impos[ing] a probability requirement at the pleading stage." *Twombly*, 550 U.S. 544, 556 (2007); *see* also *Iqbal*, 556 U.S. at 678 ("[t]he plausibility standard is not akin to a probability requirement"). Indeed, a "complaint may proceed even if it strikes a savvy judge that actual proof of [the facts asserted] is improbable and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556; *see* also Byrd, 845 F.3d at 925 ("conjecture is not enough to dismiss a complaint under section 1915A"); *Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (stating that dismissing even unlikely claims "without any factual development is to disregard the age-old insight that many allegations might be strange, but true") (quotations omitted).The Supreme Court has held that at the pleading stage, courts may consider "more likely explanations" for a defendants' conduct only while accepting as true the well-pleaded factual allegations of the plaintiff. *See Iqbal*, 556 U.S. at 681-82. Further, regardless of what explanation is most likely, a claim may be dismissed only if the plaintiff fails to establish any plausible entitlement to relief at all. *Twombly*, 550 U.S. at 570; Starr, 652 F.3d at 1216 ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint" succeeds in stating a claim).

# FIRST CAUSE OF ACTION

(As to Defendants United States, Baltazar, Rhodes, Jusino and Mitchell[15])

## INTERFERENCE WITH ACCESS TO THE COURTS[16]

(In Violation of the First Amendment)

106.   Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

---

[15] The APA's waiver of sovereign immunity, codified at 18 U.S.C. § 702, extends to all claims for injunctive relief—not just APA claims—against U.S. agencies and agency employees acting in their official capacities. *See, e.g.*, *Trudeau v. FTC*, 456 F.3d 178, 186-87 (D.C. Cir. 2006).

[16] The Ninth Circuit recognizes two types of prisoner access to courts claims: "those involving prisoners' right to affirmative *assistance* and those involving prisoners' rights to litigate without active *interference*." *Silva v. DiVittorio*, 658 F.3d 1090, 1101-02 (9th Cir. 2011) (emphases in original).   These two types of claims have distinct features and requirements.   Most significantly, the right to affirmative assistance extends only through the pleading stage, while the right to litigate free from interference extends to all stages of a case.   *Id.* at 1102-03.   Plaintiff's claim is the latter sort—claiming freedom from interference with access—and his rights extend to all stages of his pending or anticipated cases.   Further, cases stating what conditions satisfy prisons' obligations to provide affirmative assistance under *Bounds v. Smith*, 430 U.S. 817, 828 (1977), are inapposite as to what conditions uphold prisoners' right to litigate without unreasonable interference. For example, *United States v. Wilson* involved a claim under *Bounds* that a pro se defendant did not have access to a law library.   *See* 690 F.2d 1267 (9th Cir. 1982).   The court found that the defendants' access to standby counsel who could do research for him satisfied the affirmative obligation under *Bounds* to provide access.   *Id.* at 1271.   However, Wilson did not involve a freedom-from-interference claim.   It cannot stand for the proposition that so long as an inmate is represented by counsel, prisons may—for any reason and using all available means—interfere with that inmate's right to meaningfully litigate a claim. The Supreme Court makes a second distinction in access to courts claims: between those

1

2

107.   Defendants, through their actions and inactions, have unjustifiably interfered

3

with Plaintiff's right to adequate and meaningful access to the courts.[17]

4

_____

5

claiming damages and those seeking injunctive relief.  It imposes varying requirements
depending on whether a claim is forward-looking, aimed at restoring access where "official
action is presently denying an opportunity to litigate" and the goal is to allow the plaintiff
to litigate his claim "once the frustrating condition has been removed"; or whether the
claim is backwards-looking, seeking damages for an action that has already been impeded
"no matter what official action may be in the future." *Christopher v. Harbury*, 536 U.S.
403, 413-14 (2002).  This distinction is significant, because plaintiffs seeking damages for
past denials of access must plead the frustrated claim with greater particularity and make a
clear showing of actual injury.  *Id.* at 416-17; *Lewis v. Casey*, 518 U.S. 343, 351-53;
*Phillips v. Hust*, 477 F.3d 1070, 1076 (9th Cir. 2007).  On the other hand, plaintiffs seeking
injunctive relief to remove present obstructions need not plead the impeded claim as
definitively.  They may proceed on a likelihood of future harm without proving past harm
to their claims.  *Lewis*, 518 U.S. at 349-50 (noting that courts may remedy "past or
imminent official interference" and referring to "actual or imminent harm" to impeded
claims); *see* also *Johnson v. Avery*, 396 U.S. 483, 484, 489-90 (1969).  Such injunctive
actions necessarily involve speculative harm given their forward-looking nature.  *See*
Christopher, 536 U.S. at 413-14.

6

7

8

9

10

11

12

13

14

15

16

17

18

[17] Unlawful interference with access to the courts includes any "practices that unjustifiably
obstruct the availability of professional representation or other aspects of the right of access
to the courts." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), overruled in part on other
grounds, *Thornburgh v. Abbott*, 490 U.S. 401 (1989).  Numerous cases have established
that mental health experts can be an indispensable part of such access—including cases
finding them so essential as to require appointment of such experts at public expense. *E.g.*
*Ake v. Oklahoma*, 470 U.S. 68, 83 (1985) (holding that the defendant had an affirmative
right to a competent psychiatrist to present a mental defense).  It is a much more modest
proposition that litigants enjoy a right to consult such experts at their own expense without
interference by government officials.  In particular, 28 U.S.C. § 2255 movants seeking to
show they were prejudiced by trial counsel's failure to obtain a psychological expert
usually must be examined by such an expert to show the failure affected their case. *See*,
*e.g.*, *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017); *Turner v. Duncan*, 158 F.3d
449, 456-57 (9th Cir. 1998).

19

20

21

22

23

24

25

26

27

28

108.   In order to effectively to effectively present and litigate his legal claims, Mr. Muller requires an expert witness to conduct a forensic psychological examination of him.[18]

109.   As set forth above, Defendants have refused to allow Mr. Muller's forensic expert to examine him—without explanation and in violation of BOP policy directing that inmates be allowed to access counsel as well adjunct professionals working with counsel.[19]

110.   Absent the requested injunctive relief, Mr. Muller faces "actual or imminent harm" to his legal claims and is suffering from ongoing and "imminent official interference" with his access to the court.  *Lewis v. Casey*, 518 U.S. 343, 349-50 (1996).[20]

111.   First, the delay in the forensic examination has reduced its usefulness and legal persuasiveness in all matters in which it was to be or will be used.  It was crucial for Mr. Muller's mental health to be assessed when his symptoms were at their worst.  Dr. Goldman's examination was to include tests that measure present symptoms such as cognitive slowing.  Real-time neuropsychological tests are more probative of mental illness

---

[18] *See generally*, *Weeden and Turner*, supra; *Richter v. Hickman*, 578 F.3d 944 (9th Cir. 2009) (noting that forensic expert was integral to presentation of the case).

[19] *See* 28 C.F.R. §§ 543.13-543.16; Federal Bureau of Prisons, Program Statement 1315.07: Legal Activities, Inmate (Nov. 5, 1999).

[20] The *Lewis v. Casey* "actual injury" requirement—better termed the "actual or imminent injury" requirement—encompasses forward-looking claims for injunctive relief, which by their nature involve ongoing and speculative harms rather than past injuries.

than a patient's self-report of past symptoms. Evidence of Mr. Muller's psychological injuries still exists, but will continue to dissipate as time passes.

112. Second, Mr. Muller has pending in federal court a motion for relief under 28 U.S.C. § 2255, which motion includes claims relating to Plaintiff's mental health.[21] Mr. Muller has sought an examination with Dr. Goldman to substantiate those claims. The expert report Dr. Goldman is expected to produce will aid Mr. Muller both at the pleading phase[22] of his motion—to persuade the Court that his case merits an evidentiary hearing— and ultimately to prove whether Plaintiff's severe depression rendered him unable to knowingly, intelligently and voluntarily plead guilty.[23]

113. Third, Mr. Muller claims in a subsequent cause of action that Defendants deprived him of substantive and procedural due process, violating the Fifth Amendment,

---

[21] *See United States v. Muller*, No. 2:15-cr-00205-TLN (E.D. Cal.), ECF No. 61.

[22] Although the examination sought does happen to be integral to effective presentation of Plaintiff's § 2255 claims at the pleading phase, his right to be free from official interference with his case extends beyond this phase. *See Silva v. DiVittorio*, 658 F.3d 1090, 1102-03 (9th Cir. 2011).

[23] Plaintiff respectfully submits that because this a forward-looking action for injunctive relief, detailed pleading of the impeded legal claim is not required. *See Christopher v. Harbury*, 536 U.S. 403, 416-17 (2002). However, out of an abundance of caution, Plaintiff respectfully requests that the Court take judicial notice of ECF Nos. 60-61 in *United States v. Muller*, No. 2:15-cr-00205-TLN (E.D. Cal.) (Motion under 28 U.S.C. § 2255 and Supplement to Motion). Plaintiff hereby incorporates the claims set forth in those documents into his claim of interference with access to the courts.

when they approved his transfer to an external agency.  Both of these claims include consideration of whether such a transfer poses a threat to Mr. Muller's life or safety due to his mental health.  An expert examination is needed to substantiate Plaintiff's allegations that it does.

114.   Fourth, Plaintiff has a prospective Eighth Amendment "failure to protect" claim against Kenneth Schied and others known and unknown (collectively the "prospective defendants").  He will suffer prejudice to his claim if he cannot preserve evidence relating to his current mental health.  That evidence is relevant both to damages and to corroborating Mr. Muller's account of the ordeal he suffered in the USP Tucson SHU.

115.   For purposes of demonstrating the viability of this claim, Plaintiff submits that the prospective defendants knew that Samuel Gaines would sexually and/or physically assault Mr. Muller if they were housed in a cell together.  The prospective defendants had the authority and obligation to refrain from housing Plaintiff with Mr. Gaines.  Nonetheless, the prospective defendants placed Plaintiff with Gaines.  The prospective defendants had a duty to respond to Mr. Muller's repeated assertions that he was in danger from Gaines, but failed to do so.  As a result, Plaintiff was sexually assaulted by Gaines.  Due to the

prospective defendants' acts and omissions, Mr. Muller suffered physical and psychological injuries, the full extent of which have yet to be determined.

116.   Mr. Muller is currently scheduled to be released from BOP custody in 2050. On information and belief he will return to USP Tucson if he is temporarily transferred to Solano County, California.  Mr. Muller's mental health is relevant to many legal matters, ranging from postconviction relief to testamentary capacity to prison disciplinary proceedings.   The issue of his access to ancillary legal services in general, and to independent forensic psychologists in particular, is likely to recur.

117.   On information and belief, Defendant Baltazar is aware of Mr. Muller's assertions concerning his rape, assault and denial of care in the SHU; of his various claims and legal issues arising therefrom; of Mr. Muller's mental health issues; of this action and of Plaintiff's pending postconviction and state criminal matters; and of Defendants Mitchell and Jusino's refusal to allow forensic psychologist Dr. Goldman to examine Plaintiff.  Defendant Baltazar has had sufficient time to consider these matters and has not reversed the decision of his subordinates or has directed the decision himself.

///

///

///

## SECOND CAUSE OF ACTION

(As to All Defendants, As Specified Below)

### ARBITRARY AND EGREGIOUS OFFICIAL CONDUCT

(Fifth Amendment Substantive Due Process Violations)

118.    Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

119.    The Defendants and/or their subordinates retaliated against Mr. Muller for providing *pro bono* legal help to an inmate he believed to be innocent.  They confined him to restrictive housing and knowingly caused him to be raped and beaten by other inmates. They denied Mr. Muller care when he fell into psychiatric crisis and nearly killed himself as a result of their conduct.   Defendants and/or their subordinates falsified Plaintiff's official mental health records to state that he was well, covering up the harm they had caused.  Then Defendants and/or their subordinates interfered with Plaintiff's access to the forensic psychological expert he needed to substantiate his poor mental health and to take legal action ameliorating the harm he had been forced to endure.   Finally, Defendants and/or their subordinates deprived Mr. Muller of his right to contest his transfer under the IADA and in an extradition hearing, and approved his transfer knowing it to pose a threat to his life and safety.

120.    Whether as direct agents of the harm done to Mr. Muller or as supervisors of those involved, Defendants are aware of the above-described conduct and its effect on Plaintiff.

121.    Despite having adequate time and information to fully consider the potential consequences of their conduct, Defendants have continued to obstruct Mr. Muller's access to a forensic psychologist, have failed to act to ameliorate the harm Plaintiff suffered, and, on information and belief, are proceeding with his transfer away from USP Tucson.

122.    Mr. Muller requires access at his own expense to an independent forensic psychologist who can document the mental health fallout of his recent ordeal and provide the expert evidence Plaintiff requires to pursue legal relief needed to protect his life and safety.

123.    Defendants United States, Baltazar, Rhodes, Jusino and Mitchell have deprived Plaintiff of his fundamental liberty interest by interfering with his right to access legal and professional services needed to protect his life and safety.[24]

124.    Mr. Muller has a right to be transferred from USP Tucson only under circumstances that pose no serious threat to his life or safety.[25]

---

[24] *See Raich v. Gonzales*, 500 F.3d 850, 861-62 (9th Cir. 2007).
[25] *See, e.g.*, *Fitzharris v. Wolff*, 702 F.2d 836, 839 (9th Cir. 1983).

FIRST AMENDED COMPLAINT          - 55 -          *Muller v. United States* et al.

125.   By proceeding with his transfer, Defendants United States, Baltazar and Molinar have deprived Plaintiff of his fundamental liberty interest in being transferred from USP Tucson only under circumstances that pose no serious threat to his life or safety.

126.   For the reasons previously stated, Plaintiff submits that the above violations are likely to recur whether or not he is temporarily transferred out of BOP custody.

### THIRD CAUSE OF ACTION

### ARBITRARY AND CAPRICIOUS AGENCY ACTION

### NOT IN CONFORMANCE WITH REQUIRED PROCEDURE

### (Violations of the APA[26])

127.   Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

128.   The Bureau of Prisons is an "agency" within the meaning of 5 U.S.C. § 551(1) in that it is an authority of the Government of the United States.

129.   Defendants' denial of a legal visit by Dr. Goldman is an agency action within the meaning of 5 U.S.C. sec. 551(13) in that it is a final disposition of Plaintiff's request that Dr. Goldman be admitted.  It is also a sanction in that it is a limitation or condition

---

[26] The Court has jurisdiction pursuant to 28 U.S.C. § 1331; the cause of action arises from 5 U.S.C. § 704; sovereign immunity is waived under 5 U.S.C. § 702; standards for judicial review of the relevant agency action are provided by 5 U.S.C. § 706.

affecting the freedom of a person, to wit, the freedom of Dr. Goldman and Mr. Muller to meet.  It is also a withholding of relief as it is a failure to recognize Mr. Muller's claimed right to meet with Dr. Goldman.[27]

130.   Defendants' action has denied Mr. Muller's claimed right to reasonably unobstructed access to legal services.  As a consequence he is unable to offer relevant expert evidence in several legal matters.[28]

131.   Defendants' decision is not merely tentative or interlocutory, in that they have affirmed it repeatedly and Defendant Baltazar has authority pursuant to his office to make a final decision.  No adequate administrative remedy is available for Defendants' final action, in that the evidence sought to be documented by Dr. Goldman's examination will have dissipated before the only available administrative process has completed, and/or Mr. Muller will suffer irreparable harm if forced to wait on this remedy.

132.   The final agency action unjustifiably interfered with Mr. Muller's access to professional legal services and other aspects of his right of access to the courts, in violation of the First Amendment and the APA.

---

[27] *See* 5 U.S.C. § 551(6), (10) and (11).

[28] *See Bennet v. Spear*, 520 U.S. 154, 178 (1997).

133.   Defendants' refusal to admit Dr. Goldman for a legal visit was arbitrary and capricious in that it was contrary to federal regulations and BOP policy providing that such legal visits by professionals working in conjunction with attorneys are to be allowed.[29]

134.   Defendants' refusal to admit Dr. Goldman was also arbitrary and capricious in that they failed to state any rationale for this decision.  Although Defendants initially suggested that Dr. Goldman could not be admitted for purposes of providing treatment to Mr. Muller, Plaintiff quickly clarified that Dr. Goldman was to conduct a forensic psychological examination and was visiting for legal rather than treatment purposes. Following this clarification, Defendants reaffirmed their demand for a court order admitting Dr. Goldman without explanation.[30]

135.   Defendants' refusal to admit Dr. Goldman was also arbitrary and capricious in that they failed to follow their own prescribed procedures for restricting legal visits.[31]

[29] *See* 28 C.F.R. §543.13-543.16 (providing that professionals working in conjunction with an inmate's attorney are to be accorded "the same status as attorneys with respect to visiting and correspondence").  The regulations use the term "assistants" broadly to encompass adjunct legal professionals working with an attorney.  Such adjunct professionals commonly include forensic experts.  *See generally*, *e.g.*, *Richter v. Hickman*, 578 F.3d 944 (9th Cir. 2009).

[30] *See Arrington v. Daniels*, 516 F.3d 1106, 1114 (9th Cir. 2008) (failure to provide a rationale for a final decision is arbitrary and capricious agency action).

[31] *See* Federal Bureau of Prisons, Program Statement 1315.07: Legal Activities, Inmate (Nov. 5, 1999) (requiring consultation with Regional Counsel prior to imposing any restriction on visits by attorneys and professionals working in conjunction with attorneys);

On information and belief, Defendants failed to consult with the BOP Western Regional Counsel prior to imposing restrictions on Dr. Goldman's legal visit.

136.    Defendants also violated the APA by approving Plaintiff's rendition to Solano County, California, officials under the IADA.  This approval was an agency action in that it was a final disposition of Solano County's request for custody and of Mr. Muller's request that such custody be denied.  It is also a withholding of relief in that Defendants refused to recognize Plaintiff's claimed right to an extradition hearing and to a transfer process that adheres to the terms of the IADA.[32]

137.    Defendants' action denied Mr. Muller's claimed right to an extradition hearing and proper transfer procedures under the IADA.  As a consequence, he is to be transferred to Solano County for prosecution and has had no meaningful opportunity to contest that transfer.[33]

138.    Defendants' decision is final and not merely tentative or interlocutory, in that they have affirmed it to Mr. Muller and made a final offer of custody to Solano County.[34]

---

*Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[w]here the rights of individuals are affected, it is incumbent on agencies to follow their own procedures").

[32] *See* 5 U.S.C. § 551.

[33] *See Bennet*, 520 U.S. at 178.

[34] *See* Exhibit C (Superior Court of California docket records in Plaintiff's state case, reflecting receipt of a formal offer by Defendants for Solano County to take custody of Plaintiff).

No administrative remedy exists for Defendants' final action, in that BOP policy states that "[t]he Bureau does not decide the validity of the detainer or violation of any IAD provision" and instructs that if an inmate claims any of his rights have been violated, he must "contact the state authorities or his or her attorney."[35]  In addition, no adequate remedy is available and Mr. Muller would face irreparable harm if required to seek administrative remedies because his transfer would likely be effected before that process played out.[36]

139.    As set forth in other claims above and below, Defendants' approval of his transfer violated his rights on the Fifth Amendment of the Constitution.

140.    The IADA constitutes federal statutory law.[37] Defendants' approval of Plaintiff's transfer was arbitrary and capricious because it was contrary to the procedures and standards set forth in the IADA.

141.    Defendants' refusal to allow Mr. Muller an extradition hearing was arbitrary and capricious in that it violates federal law and agency policy and procedures.

---

[35] Federal Bureau of Prisons, Program Statement 5800.15: Correctional Systems Manual at § 612 (9/23/2016).

[36] *See, e.g.*, *Ferguson v. Ashcroft*, 248 F.Supp. 2d 547, 563 (M.D. La. 2003) (exhaustion not required before action to prevent transfer, because the available remedy could not redress the situation and the transfer would be effected and the matter moot before the remedy process completed).

[37] *See generally Cuyler v. Adams*, 449 U.S. 433 (1981).

142.    Defendant Baltazar is aware of circumstances surrounding the request for Mr. Muller's transfer and the risks attendant to it.  He has approved the transfer or is now aware it was approved and has ratified the decision.

143.    The requested relief is ***not*** for damages and is not otherwise barred by statute.[38]   Absent other equivalent relief obtained as a result of this action, no other adequate remedy is available.

144.    For the reasons previously stated, Plaintiff submits that these violations are likely to recur.

///

///

///

///

///

///

_____

[38] Review under the APA of BOP actions taken under authority of 18 U.S.C. § 3621-3526 is barred.  These provisions include authority to effect certain types of prisoner transfers. However, Defendants' transfer of Mr. Muller transfer is under the authority of the IADA, encoded at 18 U.S.C. App. 2.  BOP policy specifically excepts IADA transfers from the ambit of its authority and discretion under the above sections.  *See*, *e.g.*, Federal Bureau of Prisons, Program Statement 5800.15: Correctional Systems Manual, Ch. 6 (9/23/2016). Accordingly, review under the APA is not barred.

**FOURTH CAUSE OF ACTION**

(As to Defendants United States, Baltazar and Molinar)

DEPRIVATION WITHOUT DUE PROCESS OF RIGHT TO

EXTRADITION HEARING AND TO CONTEST TRANSFER UNDER THE IADA

(Violations of the Due Process Clause of the Fifth Amendment)

145.   Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

146.   Under the IADA and relevant BOP policy, Plaintiff has the right to an extradition hearing and to a meaningful opportunity to contest his IADA transfer.[39]

147.   The above laws set forth substantive predicates to govern official decisions and contain explicit, mandatory language requiring particular outcomes.[40]   For example,

---

[39] Plaintiff does not claim that he has a right "to be at any particular prison," *Grayson v. Rison*, 945 F.2d 1064, 1067 (9th Cir. 1991), nor that the due process clause "in and of itself" protects him from transfer.   *See Meachum v. Fano*, 427 U.S. 215, 225 (1976).   Rather, Plaintiff contends that his transfer is to be effected pursuant to a very particular process— one that mandates certain procedural protections and substantive preconditions before it may proceed, as set forth further below.   This claim does not concern an intrasystem transfer or other discretionary transfer, and so procedural due process cases addressing such transfers are inapposite.

[40] *See Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (holding that statutory rights can give rise to a liberty interest); *United States v. Juvenile Male*, 670 F.3d 999, 1013 (9th Cir. 2012) ("We have recognized that constitutionally protected liberty interests can be created where a law sets forth substantive predicates to govern official decision making and contains explicit, mandatory language that mandates a particular outcome."); *see also Valdez v.*

Article IV(a) of the IADA requires that the appropriate court of the requesting jurisdiction "shall" have "duly approved, recorded and transmitted" a proper request before that request can be recognized.  Further, it requires that there "shall" be a period of 30 days after a request is perfected before it is honored, during which time a prisoner may contest transfer. Article VI(b) mandates that no person who is found "to be mentally ill" can be transferred under the terms of the IADA.

148.    Mr. Muller is entitled by law to an extradition hearing.[41]  In addition, BOP policy provides for various mandatory steps and protections in the IADA process and requires that inmates "will be" turned over to local authorities for an extradition hearing prior to transfer, subject to certain exceptions.[42]

149.    By offering up custody of Plaintiff and preparing to render him directly to Solano County, California, authorities, Defendants unlawfully deprived Plaintiff of his right to an extradition hearing and to contest his transfer under the terms of the IADA.

_____

*Rosenbaum*, 302 F.3d 1039, 1044 n.3 (9th Cir. 2002) (holding that the foregoing "liberty interest" analysis is still valid in the wake of *Sandin v. Conner*, 515 U.S. 472 (1995).

[41] *See* Az. Rev. Stat. § 13-3850 (encoding section 10 of the Uniform Extradition Act); U.S. Const. art. IV, cl. 2 (Extradition Clause); 18 U.S.C. § 3192 (Extradition Act); *Cuyler v. Adams*, 449 U.S. 433, 449 (1981) ("[t]he remedial purpose of the [IADA] supports an interpretation that gives prisoners the right to a judicial hearing in which they can bring a limited challenge to the receiving state's custody request").

[42] *See* Federal Bureau of Prisons, Policy Statement 5800.15: Correctional Systems Manual at Ch. 6 and Ch. 9 (9/23/2016).

Given serious irregularities in the extradition documents—including misidentification of the Plaintiff—and other issues relating to his prosecution in Solano County, Plaintiff submits that he has meritorious grounds on which to challenge his extradition.

150.    Such deprivation occurred with no attendant constitutionally sufficient process, in that Mr. Muller was allowed no process at all to contest deprivation of these rights.[43]  Despite diligently pursuing his rights and requesting to be notified as soon as Solano County had perfected its request, Defendants approved that request without notifying Plaintiff, and while interfering with Plaintiff's access to a forensic expert he required in order to have a meaningful opportunity to contest the transfer.[44]

151.    Plaintiff further submits that he is entitled by law to earn good conduct time toward satisfaction of his federal sentence, and that it does not appear he will be allowed to earn such credit while he is out of BOP custody.[45]  Plaintiff has been afforded no process

---

[43] *See Carver v. Lehman*, 558 F.3d 859, 872 (9th Cir. 2009) (holding that the procedural due process analysis comprises two inquiries: "whether there exists a liberty or property interest which has been interfered with" and "whether the procedures attendant upon that deprivation were constitutionally sufficient").

[44] *See Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (observing that a fundamental requirement of due process is the opportunity to be heard, "an opportunity which must be granted at a meaningful time and in a meaningful manner").

[45] *See* Federal Bureau of Prisons, Program Statement 5880.28: Sentence Computation Manual (7/19/1999) (providing that good conduct time "is not awarded on the basis of the length of the sentence imposed" but rather based on the number of days actually served in BOP custody).

to contest this probable loss of good conduct time.  Depending on how long he remains in Solano County custody, Plaintiff is likely to be deprived of his liberty for as much as six months without a meaningful opportunity to contest such deprivation.

152.   Plaintiff realleges that Defendant Baltazar is aware of all relevant circumstances surrounding the approval of Mr. Muller's transfer, the threat it poses to his life and safety, and the disregard of substantive criteria and procedural rights required by law and policy to be applied attendant to IADA transfers.   In information and belief, Defendant Baltazar has failed to act to remedy the above denials of due process.

153.   For the reasons previously set forth, Plaintiff submits that the above violations are likely to recur whether or not he is temporarily transferred out of BOP custody.

///

///

///

///

///

# RELIEF REQUESTED[46]

WHEREFORE Plaintiff requests that the Court grant the following relief:

**A.    Issue a declaratory judgment stating that:**

1.      Defendants unjustifiably obstructed the availability of professional legal services to Plaintiff by refusing to allow a legal visit by a forensic psychologist acting in conjunction with Plaintiff's civil and criminal attorneys, in violation of the First Amendment of the U.S. Constitution.

2.      Plaintiff has fundamental liberty interests (1) in access at his own expense to legal services needed to protect his life and safety, free from unjustifiable official interference; and (2) in freedom from intergovernmental custody transfers that unjustifiably pose a serious threat to his life or safety.  Defendants, by their actions and inactions, infringed on these liberty interests in violation of the Fifth Amendment of the U.S. Constitution.

///

_____

[46]A U.S. District Judge has broad latitude in fashioning equitable relief when necessary to remedy an established wrong.  *Weinberger v. Romero-Barcelo*, 465 U.S. 305 (1982).  This broad latitude applies in circumstances where a federal agency has, through its violations of law, forced the courts to become involved in its affairs.  *See Alaska Center for the Environment v. Browner*, 20 F.3d 981, 987 (9th Cir. 1994) (given that "Congress...lack[s] clairvoyance to foresee the precise nature of agency dereliction of duties... it is up to the courts in their traditional, equitable, and interstitial role to fashion the remedy").

3.      Defendants have violated Mr. Muller's constitutional and statutory rights (1) by refusing to allow a legal visit by Plaintiff's forensic expert; and (2) by approving Plaintiff's transfer directly to out-of-state authorities—neither action taken in conformance with prescribed Bureau of Prisons procedures—all in violation of the Administrative Procedures Act.

4.      By failing to afford Mr. Muller a hearing to contest (1) his transfer under the Interstate Agreement on Detainers Act; and (2) his extradition from Arizona to California, Defendants violated Plaintiff's right to due process under the Fifth Amendment of the U.S. Constitution.

**B.      Issue an injunction ordering Defendants United States, Baltazar, and Mr. Baltazar's successors to:**

1.      Allow unaccompanied legal visits during standard business hours by Dr. George Goldman, with the first appointment to be available as soon as feasible and not later than four days from the date of any order entered by the Court in this matter.

2.      Refrain from transferring Mr. Muller from U.S. Penitentiary Tucson until a Bureau of Prisons psychologist and an independent psychologist to be arranged by Mr. Muller have agreed that the proposed transfer poses no serious threat to Mr. Muller's life or safety.

**C.      Grant such other relief to which it may appear Plaintiff is entitled**

Dated: August 23, 2018

STACY SCHEFF
Attorney for Plaintiff
Matthew D. Muller

I, Matthew Muller, swear under penalty of perjury that the foregoing information is true

and correct.

# EXHIBIT A



# USP Tucson
# Inspection Report



*Source: bop.gov*

## District of Columbia
## Corrections Information Council

April 4, 2017



# District of Columbia Corrections Information Council (CIC)

Charles Thornton, Board Chair
Phylisa Carter, Board Member
Katharine A. Huffman, Board Member

*About the District of Columbia Corrections Information Council*

The District of Columbia Corrections Information Council (CIC) is an independent oversight body mandated by the United States Congress and the Council of the District of Columbia to inspect, monitor, and report on the conditions of confinement in correctional facilities where inmates from the District of Columbia are incarcerated.  This includes facilities operated by the Federal Bureau of Prisons (FBOP), the District of Columbia Department of Corrections (DOC), and private contractors.

The CIC reports its observations and recommendations to the District of Columbia Representative in the United States Congress, the Mayor of the District of Columbia, the Council of the District of Columbia, the District of Columbia Deputy Mayor for Public Safety and Justice, the Director of the FBOP, the Director of the DOC, and the community.

Although the CIC does not handle individual complaints or provide legal representation or advice, individuals are still encouraged to contact the CIC. Reports, concerns, and general information from incarcerated DC residents and the public are very important to the CIC, and they greatly inform our inspection schedule, recommendations, and reports. However, unless expressly permitted by the individuals or required by law, names and identifying information of inmates, corrections staff not in leadership, and members of the general public will be kept anonymous and confidential.

**DC Corrections Information Council**
2901 14th Street, NW
Ground Floor
Washington, DC 20009
Phone: (202) 478-9211
Email: dc.cic@dc.gov

| Mail Communication | 20 | 8 | 12 | 3 | 0 |
| Medical (Excl. Forced Treatment) | 39 | 13 | 26 | 18 | 0 |

Approximately 45% of DC inmates interviewed have used the administrative remedy process at USP Tucson (Figure 5). While the mass majority reported having access to cop outs and sick call slips, nearly half of all respondents reported not having access to administrative remedy forms. Among all DC inmates surveyed, two reported that informal complaints are treated fairly, two that grievances are treated fairly, and two that grievance appeals are treated fairly (Figure 6). A large number of DC inmates reported not knowing about how fairly complaints, grievances, and appeals are addressed.

Figure 5

**Have you ever used the grievance process at this facility?**



Figure 6

**Fairness of Administrative Remedy Process**



The number one answer to why DC inmates have chosen not to use the grievance process was staff retaliation (Figure 7). The next most common reasons include that the grievance process does not work and that inmates were not satisfied with the outcome of previously filed grievances. Several DC inmates reported that they had no problems or reason to use the grievance process. Others indicated that forms are not available, inmates do not want to be snitches, and inmates do not know how to use the grievance process.

Figure 7

**If you have chosen not to use the grievance process, why?**

| | |
|---|---|
| Staff retaliation | 16 |
| The grievance process does not work | 15 |
| Not satisfied with outcome of previously filed grievance | 10 |
| No problems/ No reason to use | 7 |
| Forms not available | 5 |
| Do not want to be a snitch | 3 |
| Do not know how to use | 2 |

With regards to staff retaliation, the CIC received reports of staff assaults, cell shakedowns, planted contraband, and lock ups due to inmates filing grievances against staff. One DC inmate stated that "staff sticks together" and another that speaking up will result in getting an incident report. Other DC inmates commented more broadly about the ineffectiveness of the grievance

process, specifically that grievances are ignored or purposely delayed. For instance, a DC inmate explained that although he has access to administrative remedy forms, staff do not look at them or claim to have lost them. Other comments from DC inmates included that the grievance process is a "waste of time" and that there is "no due process." Another DC inmate noted that the grievance process has worked in other places but not at USP Tucson.

### Recommendations

5. ***Stress the importance of zero tolerance of staff retaliation or intimidation of inmates who wish to file an administrative remedy, with meaningful personnel consequences for staff who violate the FBOP's objectives.***

   - The FBOP should stress the importance of zero tolerance of staff retaliation or intimidation of inmates who wish to file an administrative remedy, with meaningful personnel consequences for staff who violate the FBOP's objectives. Such measures will increase transparency and improve efforts to deter staff retaliation and promote the availability for inmates to use the Administrative Remedy process.


# IX.   Special Housing Unit (SHU)

The SHU, often referred to as segregated housing, is designed to securely separate inmates from the general inmate population. In the FBOP, inmates placed in SHU are housed in two-person cells. The two categories of Special Housing are administrative detention[17] and disciplinary segregation.[18] According to FBOP policy, an inmate may be placed in administrative detention for the following reasons:

   a) Pending classification or reclassification of custody level;
   b) Holdover status while awaiting redesignation to another facility;
   c) Investigation of alleged violation of agency regulation or criminal law;
   d) Awaiting transfer to another facility;
   e) Administrative detention for the inmate's own protection ; or
   f) Post-disciplinary detention.

The SHU at USP Tucson is designed to house up to 238 inmates. All inmates housed in FCI Tucson requiring placement in SHU are sent to the SHU at USP Tucson. One range in the SHU is for inmates designated at FCI Tucson, Pretrial inmates and inmates designated to the satellite Prison Camp.[19] At the time of the inspection, staff reported 145 inmates were in the SHU in administrative detention, 51 of whom were pending investigation. Two inmates were pending investigation over 30 days, none of whom were DC inmates. Staff also reported 120 inmates were in the SHU in disciplinary segregation; 36 inmates were pending transfer, one of whom was

---

[17] FED. BUREAU OF PRISONS, U.S. DEP'T OF JUSTICE, PROGRAM STATEMENT NO. 5270.10, SPECIAL HOUSING UNITS (Nov. 23, 2016).
[18] Disciplinary segregation is imposed as a sanction for violations of FBOP rules and regulations.
[19] FBOP Response to CIC USP Tucson Draft Inspection Report, dated 3/29/2017.

staff. Specific examples of unprofessionalism include one account that staff members "have a bad habit" of looking up information on why an inmate is incarcerated and then sharing the information with other inmates. One DC inmate stated that staff perceives inmates as either "gay" or "locked up for dealing with kids" while another noted that staff do not respect inmates' rights because "they feel everyone here is a drop out, snitch, or child molester." One DC inmate reported that staff will not move him even though they know he was assaulted.

### Recommendations

7. *Implement a cultural diversity sensitivity training program.*
   - Working with the National Institute of Corrections, USP Tucson can identify training needs and implement a cultural diversity sensitivity training program for staff members to increase awareness of cultures different from their own. Providing staff with such training would further the FBOP's mission "to protect society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure...."[24]

## XI.   Institutional Safety

More than half of all DC inmates surveyed reported being harassed, threatened, or abused by staff. Five reported by harassed, threatened, or abused by other inmates (Figure 12).



Figure 12
**Inmates Harassed, Threatened, or Abused**

Regarding staff harassment, the top three types were insulting remarks, discrimination due to DC residency status, and discrimination based on offense or crime (Figure 13). DC inmates who selected "Other" referenced "aggressive communication" and staff instigating reactions from inmates (e.g., an officer daring inmate to hit him). Seven DC inmates indicated that they have reported harassments, threats, or abuse by staff, and none were satisfied by how the reports were

---

[24] FED. BUREAU OF PRISONS, U.S. DEP'T OF JUSTICE, HTTPS://WWW.BOP.GOV/ABOUT/AGENCY/AGENCY_PILLARS.JSP.

receive local news and receive updated information on developments happening in Washington, DC.

# XIV.   Communication & Visitation

DC inmates experienced varying levels of difficulty regarding visitation and communication (Figure 20). A large majority of DC inmates experienced no trouble regarding sending or receiving legal mail or accessing the telephone.

Figure 20
**Problems with Visitation and Communication**



## A.  Visitation

USP Tucson offers in-person visitation on Friday, Saturday, Sunday and holidays. There is a children's room in the visiting room to accommodate families. The facility uses ION Scanners to check visitors for drugs before entering the facility. The facility is in the process of offering online video visitation and expects to begin offering video visitation in 2017.

Regarding procedures for notifying potential visitors of the facility's lock down status on visiting day's families must go onto the FBOP website, locate the facility where their loved one is incarcerated and call the main number to the facility. An automated system will notify callers as to the status of visitation.

The most common type of visitation problem was the distance for visitors (Figure 21). DC inmates were nearly unanimous (all but one) in expressing their desire to move closer to home if given the opportunity. DC inmates noted that they are too far from home, and that the distance from DC to Arizona makes it difficult, if not nearly impossible, for family to visit. Others expressed their desire for a prison in DC.

EXHIBIT B

TRULINCS  72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

-----------------------------------------------------------------------------------------------

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 06/29/2018 01:19:16 PM

To: Warden Baltizar
Inmate Work Assignment: A-2 Unit Orderly

Dear Warden Baltizar,

I am writing to request that my extradition to Solano County be delayed for health reasons until at least October 1, 2018. I would also like you to please reverse the decision of your staff blocking my expert witness from visiting to examine me.

As you may know, Solano County, California, has requested temporary custody of me under the Interstate Agreement on Detainers (IAD). On about June 21, I exercised my right under IAD Article IV(a) to have at least 30 days in which to oppose transfer.

I am actually eager to meet the Solano charges. But I was just released from the SHU here, where some rather extreme things happened and left me in a poor state of mental health. That ordeal would have affected anybody. The fact that I'm a care level 3 inmate suffering from bipolar illness made it much worse. I need to recover before I can reasonably face new charges and a new institution.

So I am requesting at least three months to regain my health. This is only about 60 days past the earliest date on which Solano County could otherwise take custody. I have hired a local forensic psychiatrist, Dr. Goldman, to examine me and document the medical necessity of this brief delay. He will also submit a time-sensitive expert report in my 28 U.S.C. sec. 2255 motion, in which I face a past-due filing deadline.

For some reason, your staff is blocking my expert witness from conducting his examination. Just to clarify: Dr. Goldman is not visiting to provide medical treatment. He is visiting for legal purposes, as the agent of my local attorney Stacey Scheff and my Sacramento-based attorney Richard Dudek. Ms. Scheff is being forced to obtain a court order directing the prison to allow the examination. It really is well-settled law that access under these circumstances is a matter of right, not of the prison's discretion. The likely result of your staff's opposition is that the Bureau will be liable to me for the cost of obtaining the court order and for damages resulting from the delay in access. Please consider allowing the exam without a court order.

Please also note that it may be against the interests and wishes of the Sacramento U.S. Attorney's Office to transfer me to Solano at this time. They are responsible for opposing my section 2255 motion. Issues affecting that motion may be litigated in Solano County in a way that binds the U.S. Attorney as well. That office may wish to have the first opportunity to litigate those issues. I am not sure whether they apply to IAD transfers, but regulations do provide that "[i]f the inmate... has federal civil proceedings pending, staff must clear the transfer through the U.S. attorney" (2255 motions are considered civil proceedings). 28 C.F.R. sec 527.31(e). They also state that extradition decisions must ensure that "the safety or other interests of the inmate... are not seriously jeopardized, and that federal interests... will not be interefered with, or harmed." 28 C.F.R. sec. 527.31(b). DOJ regulations specify that "[a]uthorization may not be given where substantial concer exists over any of these considerations." Id.

Thank you, sir, for considering that matter. I feel that litigation is always a last resort, but I will do what is needed to protect my health and interests. Hopefully the matter can be resolved amicably without unnecessary expenditure of goverment resources.

Respectfully,
Matthew Muller

LINCS  72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 07/02/2018 11:39:22 AM

To: AW Jusina / Legal Department
Inmate Work Assignment: A-2 Unit Orderly

Dear Associate Warden Jusina,

Thank you for taking the time to speak with me at lunch today. I'm writing to follow up on my attorney's request that a psychiatric expert be allowed to visit me on Tuesday, June 26, 2018, to conduct a forensic examination. The expert's report is needed to support my pending section 2255 motion. I also need to document the medical necessity of a short delay in my extradition to Solano County, California.

As we discussed, the legal department denied my attorney Stacy Scheff's request. Perhaps there was some confusion. Dr. Coleman's visit is not for purposes of medical treatment. He is acting as an expert witness and is the agent of my attorney. As you can confirm with your legal staff, it is very well-established law that attorneys and their bona fide agents have a right of access to their incarcerated clients. Ms. Scheff was chagrined at the denial and wanted to file immediately for an injunction in federal court. I asked her to please wait one week--until Thursday, July 5--so that I could clear up any confusion and resolve the matter informally. If she is forced to file, she will request costs, fees and damages from the Bureau, since this should be a very standard and uncontroversial legal visit.

I would greatly appreciate it if you could touch bases with the legal department. Perhaps there was some misunderstanding about the nature of the request. Time is of the essence, in that I must document my section 2255 pleadings as quickly as possible. We need to conduct the examination by the end of next week at the latest. Ms. Scheff can be reached at (520) 471-0756 and at stacy.scheff@gmail.com .

In general, I am trying "keep my head down" and do my time, as you might recall from our talk in your office several months ago. I do need to protect my health and legal interests. I have already bent to the interests of the institution in quite a few matters. There is just no reasonable alternative means of getting this forensic examination done. I hope you will allow it. Thank you for your time and consideration.

Respectfully,

Matthew Muller

TRULINCS 72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

---------------------------------------------------------------------------------

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 07/06/2018 12:58:59 PM

To: AW Jusino / Legal Department
Inmate Work Assignment: A-2 Unit Orderly

Dear Ms. Jusino,

Thank you for taking the time Tuesday to speak with me about my attorney's request that her expert witness Dr. Goldman be allowed to visit me to conduct a psychiatric exam. From what you explained to me, the prison will only allow the exam to take place if I obtain a court order requiring it to.

I just wanted to check in one last time in hopes this matter can be resolved amicably, without a court order. It will be both costly and time-consuming for us to obtain such an order. And it will impose even more delay beyond the two weeks that have passed since Dr. Goldman was first refused entry.

Perhaps if you share with me the reason the prison will not allow Dr. Goldman to visit, I could provide some reassurance. Is there some security concern? Otherwise, denying Dr. Goldman access would appear to run contrary to BOP regulations, to BOP Program Statements, and to applicable Supreme Court precedent. See 28 C.F.R. 543.16 ("[t]he Bureau of Prisons... accords [attorneys'] assistants the same status as attorneys with respect to visiting and correspondence"); BOP Program Statement 1315.07 (same); Procunier v. Martinez, 416 U.S. 396, 419-422 (1974) ("[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid.").

I am also concerned, because I have heard from both staff, and from other inmates who overheard staff, that efforts were being made to transfer me to another BOP facility, but that instead the intention now is to "fast track" an extradition request by Solano County so that I will be shipped away. The purpose of the psychologist visit does relate to my Solano case and the extradition matter. So we will be seeking a temporary restraining order barring the BOP from transferring me until the expert witness has had time to visit and produce a report.

Again, I would much rather work this out amicably. Please let me know if there are some concerns my attorney or I can address to facilitate the visit. Thank you for your time.

Best,

Matthew Muller

Via Institutional Mail

July 2, 2018

Warden Baltizar
U.S. Penitentiary Tucson
9300 S. Wilmot Road
Tucson, AZ 85756

Subject:   MULLER, Matthew / Reg. No. 72875-097
           Attorney and Expert Witness Visit

Dear Warden Baltizar,

Good day, sir.  I am writing to respectfully request that you allow my attorney to visit the prison with a psychiatric expert witness to examine me.  The exam is needed to meet an immediate deadline in my pending 28 U.S.C. §2255 motion.  I also need it to document the medical necessity of a short delay in my extradition to Solano County, California.

As you might know, my attorney Stacey Scheff sought to visit the facility on Tuesday, June 26, with our expert witness Dr. Goldman. Your staff declined to allow the appointment.  Just to clarify, Dr. Goldman's visit is not for purposes of medical treatment.  He is an expert witness in my §2255 case and needs to conduct a forensic examination to assess my mental health from 2015 to 2017, when I was being held in solitary confinement pending trial.  His report is already overdue and my §2255 motion will be substantially undermined without it.  Time is of the essence.

I do not know on what grounds your staff denied Dr. Goldman's visit.  The right of attorneys (and their agents, including expert witnesses) to access incarcerated clients is very well-established. See, e.g., Ching v. Lewis, 895 F.2d 608, 610 (9th Cir. 1990) (striking down Arizona Department of Corrections policy allowing only non-contact visits by attorneys and their agents).  And examination by a defense psychiatric expert is very common.

My attorney has prepared a submission to obtain a court order directing the prison to allow the visit.  But I asked her not to file it yet, to see if I can resolve the matter informally.  If she is forced to obtain a court order, it is likely the Bureau will be ordered to pay me the expense of seeking the injunction. I do not wish to unnecessarily take up staff time or resources with litigation.  Please allow my expert to visit and examine me. Thank you, sir, for considering it.

Respectfully,

Matthew Muller

Attorney: Stacey Scheff - (520) 471-8333

TRULINCS 72875097 - MULLER, MATTHEW D - Unit: TCP-A-B

--------------------------------------------------------------------------------

FROM: 72875097
TO: USP AWs
SUBJECT: ***Request to Staff*** MULLER, MATTHEW, Reg# 72875097, TCP-A-B
DATE: 07/09/2018 11:40:33 AM

To: AW Jusino / Pending IAD from Solano County
Inmate Work Assignment: A-2 Unit Orderly

Dear Ms. Jusino,

I am writing in regards to a pending request by Solano County, California, to take custody of me under the Interstate Agreement on Detainers. I was told that at some point in the process I would have 30 days in which my attorney or I could file an opposition to Solano County's request. Could you please let me know what the deadline is for that submission? As I mentioned before, that submission is going to include an expert psychiatric report. But the prison has blocked the expert witness from interviewing me.

Since the delay is being imposed by the prison, please consider extending the deadline for the opposition accordingly. Otherwise, I will need to obtain additional court orders. So far that delay has amounted to 17 days (the examination was originally scheduled for June 23, 2018).

You let me know that the prison would require a court order before allowing the examination to proceed. My attorney was told the same. I tried my best to resolve the matter informally, without litigation. I am only asking for very narrow relief--the court order plus fees and costs that were required to obtain it. If the prison tries to transfer me without giving me a reasonable opportunity to submit an opposition (including the expert report), my attorney stated that she has prepared a more extensive filing that substantially escalates the matter.

Please understand that I could have just started with this approach. There is much that I can do that I have chosen not to. The issue of the expert exam has forced me to disclose facts adverse to the prison that I had not planned to disclose and to take other steps to protect myself.

I had a right to assist inmates with their legal work and limited myself to postconviction matters and helping with certain release issues such as obtaining disability benefits. I was not doing anything that would stir up trouble at the prison. So I admit I am puzzled as to why certain staff went out of their way to stifle my work and punish me. I hope that prison staff will now proceed in the Bureau's best interest--as if a judge were looking over their shoulders assessing whether actions taken are neutral and reasonable or retaliatory and/or unreasonable. If you want me to walk small and disappear back into the inmate population like I'd like to, then please help me by engaging with my attorney, talking out any concerns you have and generally adopting a more conciliatory approach.

Thank you very much, ma'am, for considering it.

Respectfully,

Matt Muller

# EXHIBIT C

## Report Selection Criteria

**Case ID:** VCR231350
**Docket Start Date:**
**Docket Ending Date:**

## Case Description

**Case ID:** VCR231350 - People vs. MATTHEW DAVID MULLER - DMS
**Filing Date:** Friday , January 26th, 2018
**Type:** VF - Vallejo Felony
**Status:**

## Related Cases

*No related cases were found.*

## Case Event Schedule

*No case events were found.*

## Case Parties

| Seq # | Assoc | Party End Date | Type | Name |
|---|---|---|---|---|
| 2 | | | JUDGE | **BOWERS, ROBERT** |
| **Address:** *unavailable* | | | **Aliases:** | BOWERS, ROB S <br> BOWERS, ROB S |
| 3 | | | DEFENDANT | MULLER, MATTHEW DAVID |
| **Address:** *unavailable* | | | **Aliases:** | *none* |

## Docket Entries

| Filing Date | Description | Name | Monetary |
|---|---|---|---|
| 26-JAN-2018 03:26 PM | COMPLAINT FILED BY DA | | |
| Entry: | *none.* | | |
| 07-FEB-2018 03:26 PM | DA NUMBER | | |
| Entry: | V172309 | | |
| 07-FEB-2018 03:26 PM | AGENCY | | |
| Entry: | VJPD | | |
| 07-FEB-2018 03:26 PM | POLICE REPORT NUMBER | | |
| Entry: | 15-3817 | | |
| 07-FEB-2018 03:26 PM | RAP PROVIDED BY DA | | |
| Entry: | *none.* | | |
| 07-FEB-2018 03:26 PM | COURT INFO SHEET FROM DA | | |
| Entry: | *none.* | | |
| 21-FEB-2018 02:25 PM | SUBMITTED | | |
| Entry: | TO JUDGE BOWERS FOR SIGNATURE ON ARREST WARRANT ...RKEA | | |
| 12-MAR-2018 02:12 PM | SUBMITTED | | |
| Entry: | ORDER SIGNED BY JUDGE BOWERS ON 3/12/18. FILE RETURNED TO FF CRIMINAL (RL) TO PROCESS...HL | | |
| 28-MAR-2018 01:56 PM | AMENDED COMPLAINT (NO FEE) | | |
| Entry: | WITH AMENDED DECLARATION IN SUPPORT OF ARREST WARRANT ...RKEA | | |
| 28-MAR-2018 02:03 PM | COURT INFO SHEET FROM DA | | |
| Entry: | AMENDED ...RKEA | | |
| 02-APR-2018 01:50 PM | BENCH WARRANT RECALLED | | |
| Entry: | RECALLED BY DA , AMENDED COMPLAINT, NEW COURT INFORMATION, WARRANT AND DECL IN SUPPOR OF WARRANT FILED 3/28/18 ...RKEA RECALLED O. ORTIZ, SO ...RKEA | | |
| 03-APR-2018 02:58 PM | WARRANT RETURNED TO FILE | | |
| Entry: | 03-12-18 RWIL | | |
| 11-MAY-2018 09:45 AM | REQUEST | | |
| Entry: | INTERSTATE AGREEMENT ON DETAINERS REQUEST FOR TEMPORARY CUSTODY. SIGNED BY JUDGE BOWERS ON 5/11/18. ORIGINALS PROVIDED TO DA STAFF (SH) TO PROCESS...HL | | |
| 14-AUG-2018 12:53 PM | CORRESPONDENCE-NOT CONFID. | | |
| Entry: | RECEIVED 7/26/18 MEMORANDUM FROM U.S. DOJ FEDERAL BUREAU OF PRISONS, FEDERAL CORRECTIONAL COMPLEX, TUCSON AZ RE: APPROVAL OF INTERSTATE AGREEMENT ON DETAINERS ACT (IADA); SCANNED AND PLACED IN VJO RUN ATTN: D15 CLERK (NO FUTURE COURT DATE)- AYOU | | |

Copyright(c) Xerox Government Systems, LLC 2014. Xerox and the Xerox logo are registered trademarks.
This material contains trade secrets and other confidential information and is subject to a confidentiality agreement.
The unauthorized use, reproduction, distribution, display, or disclosure of this material or the information contained herein is prohibited.
All rights reserved. User Accesses/Agrees to Disclaimer. Not for official use.